RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2020 APR 23 ₽ ⊕ 12

DANIEL ADAM BEATY
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA
Plaintiff,

v.

JEFFERSON S. DUNN, GRANT
CULLIVER, TERRANCE G.
MCDONNELL, GREG LOVELACE,
RUTH NAGLICH, KARLA JONES,
KENNETH DRAKE, PAMELA HARRIS,
ELIZABETH LASETER, MARKEON
PERSON, ROBERT LINDSEY, DANTE
BALDWIN, TAMEKA GREY, JOSHUA
PITTMAN, JONATHAN PITTMAN,
LANCIE CANNON, JOSHUA MERRITT,
RICKEY DENNIS, DEON STEELE,
UNKNOWN ASSISTANT WARDENS,
UNKNOWN COMMANDERS,
UNKNOWN OFFICERS, AND THE
STATE OF ALABAMA,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  **2:20-cv-279-ECM-SRW**

JURY TRIAL DEMANDED

## COMPLAINT

## INTRODUCTION

1.      On April 24, 2018, while incarcerated at the Alabama Department of Corrections

("ADOC") Ventress Correctional Institution ("Ventress") in Clayton, Barbour County, Alabama,

Plaintiff Daniel Beaty was maliciously assaulted by Defendant Sergeant Markeon Person, a

correctional officer, who, after handcuffing Mr. Beaty's arms behind his back, struck him from

behind, breaking his jaw in two places, sending a large portion of his jawbone between his teeth,

and spraying blood all over the wall.  Two other guards, Defendants Grey and Baldwin, witnessed

the assault, but did nothing to intervene. Mr. Beaty, bleeding profusely with a bone protruding from his gums, implored Person and other Ventress employees (including Defendants Cannon and Merritt) to take him to the prison infirmary. They refused, and left Mr. Beaty, with blood pouring from his mouth, in the B-1 Dorm, known as the "Hot Bay," which was notorious for violence and housed some of the most dangerous inmates at Ventress. Defendant Person threatened Mr. Beaty to stay quiet, "not to tell on him," and took other steps to conceal the assault.

2.     After four hours, a nurse who was visiting the Hot Bay for other reasons saw that Mr. Beaty was severely injured and escorted him to the prison infirmary. While he was in the infirmary, Mr. Beaty was assaulted a second time by another correctional officer, Defendant Sergeant Robert Lindsey, who pulled Mr. Beaty's mouth open, causing him excruciating pain. Defendant Lieutenant Elizabeth Laseter witnessed this second assault, and, just as Defendant Person had, Defendants Lindsey and Laseter threatened Mr. Beaty not to tell anyone what happened.

3.     After an hour and a half at the infirmary, Mr. Beaty was transported by prison van to Troy Regional Medical Center. Doctors there, judging his injuries to be too serious for treatment at that hospital, determined that he should be transferred to Baptist Medical Center South in Montgomery. At Baptist South, Mr. Beaty underwent surgery to repair his injuries and wire his jaw shut. After several days, he was transported to the infirmary at Kilby Correctional Facility ("Kilby") in Montgomery, Alabama. He spent 2 months in recovery there, limited to a liquid diet, losing 25 pounds.

4.     Throughout and after the assault, Defendant Person and other officers (including Defendant Lieutenant Laseter), attempted to cover up Defendant Person's involvement in the assault. Before leaving Mr. Beaty, Defendant Person forced Mr. Beaty to change his prison

2

uniform, which had become saturated in blood. After Mr. Beaty was hospitalized, Defendant Person attempted to coerce other inmates to take responsibility. And when Mr. Beaty returned to Ventress, Defendant Person attempted to intimidate him, demanding to know why Mr. Beaty had told medical personnel and others that Person was the perpetrator instead of saying falsely that it was someone else. Over a year later, Defendant Person was discharged as a direct result of his assault on Mr. Beaty. Upon information and belief, none of the other Defendants -- not Defendant Lindsey who committed a separate assault, nor any of the other Defendants who witnessed and failed to prevent the assaults or denied or delayed Mr. Beaty's medical care -- were disciplined.

5. Sergeant Person's assault on Mr. Beaty, and the events that preceded and followed it, were not an isolated incident. Numerous other incarcerated persons in the charge of the Alabama Department of Corrections ("ADOC") at Ventress and other ADOC facilities have been assaulted by correctional staff, including, in some cases, while they were handcuffed, restrained, or otherwise defenseless. As found by the United States Department of Justice (the "Justice Department"), based on its investigation spanning 2016 through 2019, the conditions in Alabama's male prisons violate the Eighth Amendment's protection from cruel and unusual punishment due to ADOC's failure to "protect prisoners from serious harm and substantial risk of serious harm." The Justice Department also concluded that ADOC's constitutional violations are "severe, systemic" and "pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment."

6. Despite knowledge of this pattern of violence, the leadership of Ventress and the ADOC has condoned and encouraged and/or were willfully indifferent to the widespread and persistent violence committed by correctional officers, frequently retaining and promoting individuals who supervised the prisons plagued by violence.

3

7.      Mr. Beaty brings this lawsuit to recover damages and other relief for the injuries he suffered, both physical and emotional, and the violation of his constitutional rights. Defendants, in addition to the individual prison guards, include the ADOC and its senior officials, who have, according to findings by the Justice Department, consistently and systematically failed to protect prisoners from serious violence and harm at Ventress and other facilities.

8.      According to ADOC's Mission Statement, ADOC's mission is to provide inmates a "safe, secure, and humane environment." Instead, through a pattern of abuse by correctional officers, it has knowingly subjected inmates to cruel and unusual punishment.

## PARTIES

9.      Plaintiff Daniel Adam Beaty is a 39-year-old resident of Alabama who entered ADOC custody on April 25, 2017 and was assaulted on April 24, 2018. Mr. Beaty is eligible for parole beginning some time after April 2030.

10.     Defendant Jefferson S. Dunn is over 19 years of age and is a resident of the State of Alabama. Defendant Dunn was appointed the Commissioner of the ADOC in April 2015, held that position at the time of the events described in Plaintiff's Complaint, and continues to hold the position of Commissioner of the ADOC today. As Commissioner, Defendant Dunn is the ADOC's highest ranking official, and he is responsible for the ADOC's direction, supervision, and control. Defendant Dunn is responsible for exercising the authority, functions and duties of the Commissioner of the ADOC, including the appointment of personnel and employees within the ADOC required for the performance of the ADOC's duties to the prisoners it incarcerates. Those duties include operating a prison system that protects the constitutional and human rights of persons within the custody of the ADOC, including the rights of Mr. Beaty while he is an ADOC prisoner.

4

11. Defendant Grant Culliver is over 19 years of age and is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Culliver was employed by the ADOC as Associate Commissioner for Operations. As Associate Commissioner, Defendant Culliver was responsible for ensuring the effective and safe daily operations of all prison facilities, including overseeing institutional security, staffing, Institutional Coordinators, Correctional Emergency Response Teams, the Classification Review Board, the Training Division, and the Transfer Division. Defendant Culliver retired from the ADOC effective December 1, 2018.

12. Defendant Terrance G. McDonell is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant McDonnell was employed by the ADOC as Associate Commissioner for Plans and Programs. As Associate Commissioner, Defendant McDonnell was responsible for the Central Records Division, Research and Planning Division, Supervised Reentry Program, Religious Programs, Educational and Vocational Programs, and Victim-Constituent Services. Upon information and belief, he is responsible for classification of prisoners and played a role in the establishment of the "Hot Bay" system.

13. Defendant Greg Lovelace is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Lovelace was employed by the ADOC as Deputy Commissioner of Maintenance. As Deputy Commissioner, Defendant Lovelace is responsible for the maintenance and construction of correctional facilities, and as such is responsible for the presence or absence of video surveillance cameras in the facilities.

14. Defendant Ruth Naglich is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Naglich was

5

employed by the ADOC as Associate Commissioner of Health Services. As Associate Commissioner of Health Services, Defendant Naglich is responsible for the administration of medical and mental health services, including for inmates housed at Ventress.

15. Collectively, individual Defendants Dunn, McDonnell, Lovelace, Culliver and Naglich are referred to as "Defendant Administrative Supervisors."

16. Defendant Karla Jones is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Jones was employed by the ADOC as Warden of Ventress. She held that position until or around May 2018. As Warden of Ventress, Defendant Jones was responsible for the day-to-day operations of the prison, the safety of all prisoners, and the training and supervision of all subordinate employees.

17. Defendant Unknown Assistant Wardens are each over 19 years of age and, upon information and belief, are residents of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Unknown Assistant Wardens were employed by the ADOC as Assistant Wardens at Ventress. Assistant Wardens at Ventress were responsible for staff planning, discipline, and security.

18. Defendant Kenneth Drake is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Drake was employed by the ADOC as a Captain at Ventress. As a Captain, Drake was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.

19. Defendant Pamela Harris is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Harris was employed by the ADOC as a Captain at Ventress. As Captain, Harris was responsible for the

6

safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.

20.   Defendant Elizabeth Laseter is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Laseter was employed by the ADOC as a Lieutenant at Ventress. As Lieutenant, Defendant Laseter was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees. Defendant Laseter was on duty on April 24, 2018 and present in the infirmary to witness Defendant Lindsey's subsequent assault on Mr. Beaty. Defendant Laseter did nothing to intervene or stop this assault; she also delayed Mr. Beaty's medical care, which was urgently needed, and threatened Mr. Beaty not to tell anyone else what happened.

21.   Defendants Unknown Commanders are each over 19 years of age and, upon information and belief, are residents of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Unknown Commanders, including individuals who served as Captains and Lieutenants, were employed by ADOC and were assigned and on duty on April 24, 2018. The responsibilities of Commanders include supervising institutional activities during shifts, as well as the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees, including the subordinates who supervised locations such as the E-Dorm and Hot Bay units and the infirmary. The Defendant Unknown Commanders supervised the correctional officers in E-Dorm, the Hot Bay, the infirmary, and other locations at times relevant to the assaults on Mr. Beaty and the failure to provide prompt medical care.

7

22.    Collectively, individual Defendants Jones, Defendant Unknown Assistant Wardens, Defendant Drake, Defendant Harris, Defendant Laseter, and Defendant Unknown Commanders are referred to as "Defendant Prison Supervisors."

23.    Defendant Markeon Person is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Person was employed by the ADOC as a Sergeant at Ventress. On April 24, 2018, Defendant Person assaulted Mr. Beaty in the "Hot Bay" Dormitory (B-1 Dorm) while Plaintiff was restrained in handcuffs. Defendant Person was dismissed from employment by the ADOC for violation of multiple standards under ADOC Administrative Regulation 208, Employee Standards of Conduct and Discipline, in whole or in substantial part based on his assault of Mr. Beaty. His dismissal was upheld by the Alabama Personnel Board on August 21, 2019.

24.    Defendant Robert Lindsey is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Lindsey was employed by the ADOC as a Sergeant at Ventress. After Mr. Beaty was taken to the Ventress infirmary on April 24, 2018 following the assault while handcuffed by Defendant Person, Defendant Lindsey assaulted and further damaged and exacerbated Mr. Beaty's severe facial injuries. Defendant Lindsey also delayed Mr. Beaty's medical care, which was urgently needed

25.    Defendant Dante Baldwin is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Baldwin was employed by the ADOC as an officer at Ventress. Defendant Baldwin was on duty in E-Dorm on April 24, 2018 and witnessed Defendant Person's assault on Mr. Beaty. Defendant Baldwin did nothing to intervene or stop the assault and ignored Mr. Beaty's urgent need for medical attention.

8

26.    Defendant Tameka Grey  is over 19 years of age and, upon information and belief,
is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Grey was
employed by the ADOC as an officer at Ventress. Defendant Grey was on duty in E-Dorm on
April 24, 2018 and witnessed Defendant Person's assault on Mr. Beaty.  Defendant Grey did
nothing to intervene or stop the assault and ignored Mr. Beaty's pleas and urgent need for medical
attention.

27.    Defendant Jonathan Adell Pittman is over 19 years of age and, upon information
and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant
Pittman was employed by the ADOC as an officer at Ventress.  Defendant Pittman was on duty
on April 24, 2018 and present in the infirmary to witness Defendant Lindsey's subsequent assault
on Mr. Beaty. Defendant Pittman was on duty on April 24, 2018 and present in the infirmary to
witness Defendant Lindsey's subsequent assault on Mr. Beaty.  Defendant Pittman did nothing to
intervene or stop the assault, and delayed Mr. Beaty's medical care, which was urgently needed.

28.    Defendant Joshua Aaron Pittman is over 19 years of age and, upon information and
belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Pittman
was employed by the ADOC as an officer at Ventress.  Defendant Pittman was on duty on April
24, 2018 and present in the infirmary to witness Defendant Lindsey's subsequent assault on Mr.
Beaty.  Defendant Pittman did nothing to intervene or stop the assault, and delayed Mr. Beaty's
medical care, which was urgently needed.

29.    Defendant Lancie Cannon is over 19 years of age and, upon information and belief,
is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Cannon was
employed by the ADOC as an officer at Ventress. Defendant Cannon was on duty in the Hot Bay

9

on April 24, 2018 and witnessed Mr. Beaty's severe injuries resulting from Defendant Person's assault. Defendant Cannon ignored Mr. Beaty's urgent need for medical attention.

30.     Defendant Joshua Merritt is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Merritt was employed by the ADOC as an officer at Ventress. Defendant Merritt was on duty in the Hot Bay on April 24, 2018 and witnessed Mr. Beaty's severe injuries resulting from Defendant Person's assault. Defendant Merritt ignored Mr. Beaty's urgent need for medical attention.

31.     Defendant Rickey Dennis is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Dennis was employed by the ADOC as an officer at Ventress. Defendant Dennis was on duty in the Hot Bay on April 24, 2018 and witnessed Mr. Beaty's severe injuries resulting from Defendant Person's assault. Defendant Dennis ignored Mr. Beaty's urgent need for medical attention.

32.     Defendant Deon Steele is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Steele was employed by the ADOC as an officer at Ventress. Defendant Steele was on duty in the Hot Bay on April 24, 2018 and witnessed Mr. Beaty's severe injuries resulting from Defendant Person's assault. Defendant Steel ignored Mr. Beaty's urgent need for medical attention.

33.     Defendants Unknown Officers are each over the age of 19 and, upon information and belief, are residents of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Unknown Officers were employed by the ADOC as officers at Ventress. Defendant Unknown Officers include the officers on duty in the E-Dorm, Hot Bay and the infirmary on April 24, 2018 who failed to protect Mr. Beaty from the extortion attempt, witnessed Mr. Beaty's severe injuries resulting from the assaults and/or ignored Mr. Beaty's pleas and urgent need for medical attention.

10

34.     Defendant David Gallew is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Gallew worked for the ADOC Investigations and Intelligence Division ("I&I") and was assigned to investigate Mr. Beaty's assaults. Due to Defendant Gallew's inadequate investigation, numerous Defendants were not appropriately investigated or disciplined.

35.     Defendant Scott Sides is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Sides was the Assistant Director of ADOC I&I Division and was responsible for the supervision of all I&I investigations, including the investigation into the events surrounding Mr. Beaty's assaults.

36.     Defendant Arnoldo Mercado is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Mercado was the Director of ADOC I&I Division and was responsible for the supervision of all I&I investigations, including the investigation into the events surrounding Mr. Beaty's assaults.

37.     Defendant Unknown I&I Officers are each over the age of 19, and upon information and belief, are residents of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Unknown Officers were employed by the ADOC in the I&I. Defendant Unknown I&I Officers are additional officers who conducted or supervised the investigation into the events of April 24, 2018 related to Mr. Beaty's assaults.

38.     Collectively, all of the individual Defendants in this Complaint are referred to as the "Individual Defendants."

39.     Defendant State of Alabama is a state of the United States and is sued only in its capacity as an indemnitor.

11

40.     Unless otherwise noted, Plaintiff sues each of the Individual Defendants in his or her individual capacity.  Each of the Individual Defendants acted under color of law and within the scope of his or her employment by the ADOC when engaging in the conduct described in this Complaint.

## JURISDICTION AND VENUE

41.     This Court has original jurisdiction over the Federal law claims herein pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Several claims herein arise under the Constitution, laws, or treaties of the United States.

42.     This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a).

43.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims presented in this case occurred in the Middle District of Alabama.

## FACTUAL ALLEGATIONS

## I.      THE ASSAULT ON MR. BEATY AND ITS AFTERMATH

44.     On April 25, 2017, having been convicted and sentenced to incarceration, Mr. Beaty entered the custody of the ADOC.

45.     Mr. Beaty was transferred to Ventress in late 2017.  He was housed in Dormitory E-1 ("E-Dorm").

46.     On Tuesday, April 24, 2018 shortly after 5 pm, in E-Dorm, Mr. Beaty was cornered by three inmates with reputations for being violent. The inmates were seeking to extort a large sum of money from him and threatened to kill him.

12

47.    As highlighted in the Justice Department's Notice Regarding Letter, "extortion of prisoners and family members of prisoners is common in Alabama's prisons" and is "unchecked." The Justice Department cited specific examples of extortion throughout the ADOC system, including at Ventress, and noted that ADOC's Investigations and Intelligence Division ("I&I") had confirmed that "extortion of family members and prisoners is a significant problem in Alabaman's prisons." The Justice Department also noted that the response of ADOC employees in most of the cited examples to reports of extortion was either to do nothing or to punish the complainant by placing them in restricted housing.

48.    Mr. Beaty had been the victim of extortion efforts before and had been attacked by other inmates, but he was frightened of these prisoners, who threatened to kill him.

49.    When Mr. Beaty resisted the extortion attempt, the inmates threatened him with knives and attacked him with sticks, causing lacerations to his face (a cut by his eye and his lip) as well as an injury to his head. Mr. Beaty tried to resist the assault and, after a struggle, broke free and fled from his attackers out of the E-Dorm and into the lobby.

50.    At the time of this assault, Mr. Beaty was aware that prisoners at Ventress who reported incidents to correctional officers risked retaliation from other inmates. Nevertheless, Mr. Beaty was so afraid of the prisoners who attempted to extort him that he immediately sought help from a correctional officer, Defendant Person. Defendant Person was the on-duty officer in the E-Dorm whose job it was to supervise dormitory activity. Through his inaction, Defendant Person had failed to protect Mr. Beaty from the extortion attempt, exposing him to the prisoners' assault.

51.    Defendant Person asked Mr. Beaty what happened. After Mr. Beaty told Defendant Person that other inmates had attempted to extort him, threatened to kill him, and he needed medical attention, Defendant Person expressed his disbelief in Mr. Beaty, making comments to

13

other prisoners present that Mr. Beaty was a "crazy white boy [who] is saying too much," was "wigging" (i.e., on drugs) and did not know what he was talking about. At least one of the other prisoners told Defendant Person that Persons should let them handle the situation and to leave Mr. Beaty in the E-Dorm.

52.     Defendant Person started to lead Mr. Beaty away from the E-Dorm, making additional comments expressing his displeasure—that Mr. Beaty was "crazy" or "lying" or didn't know what he was talking about. Instead of heading towards the infirmary, Defendant Person directed Mr. Beaty to go in the opposite direction. Upon information and belief, Defendant Person was not taking Mr. Beaty to the infirmary for medical care, but was preparing to discipline Mr. Beaty for reporting the incident.

53.     While they were walking, Defendant Person continued to make comments expressing his antagonism towards Mr. Beaty. These comments continued until Defendant Person and Mr. Beaty saw Lieutenant Calhoun, a Lieutenant at Ventress who was on-duty in on April 24, 2018.

54.     Once Defendant Person saw Lieutenant Calhoun, he stopped making disparaging comments to Mr. Beaty and instructed Mr. Beaty to be quiet, and not say anything to Calhoun. Notwithstanding this, Mr. Beaty told Lieutenant Calhoun other prisoners had attacked him trying to extort money and he needed medical attention. Lieutenant Calhoun then escorted Defendant Person and Mr. Beaty across the facility to the infirmary to be evaluated and treated. Once they reached the infirmary, Lieutenant Calhoun continued on to the administrative office leaving Mr. Beaty under Defendant Person's supervision. ADOC records confirm that Mr. Beaty was seen by the on-duty nurse, who observed that he had minor injuries, which did not require further treatment. His evaluation was completed in under 10 minutes.

14

55.    Defendant Person then escorted Mr. Beaty out of the infirmary in the direction of B-1 Dorm, which is known as the "Hot Bay."

56.    The "Hot Bay" is a term given to ADOC housing designated for inmates considered violent resulting in higher management needs.

57.    Throughout the ADOC system, and specifically at Ventress, Hot Bays are considered notoriously violent and dangerous dormitories. The Ventress Hot Bay is chronically understaffed and under-supervised, particularly given the level of danger. In addition to using the Hot Bay to house violent inmates, officers at Ventress also routinely threaten to or put inmates in the Hot Bay to punish them for complaining about prison conditions or violence at the facilities.

58.    Mr. Beaty knew that the Hot Bay was used to house inmates identified as violent or people who have received serious disciplinary citations or other punishments for attacking other prisoners. Mr. Beaty also know the Hot Bay had a reputation for having little supervision from correctional officers, and he feared that if he was placed in the Hot Bay the guards would not protect him and his life would be in danger.

59.    Mr. Beaty had no disciplinary issues that warranted his placement in the Hot Bay. Aware of the Hot Bay's violent and dangerous reputation and out of fear for his safety given his recent attack, Mr. Beaty pleaded with Defendant Person not to be placed in the Hot Bay.

60.    Defendant Person ignored Mr. Beaty's plea and continued to escort Mr. Beaty to the Hot Bay.

61.    Once it became clear that Defendant Person intended to take Mr. Beaty to the Hot Bay, Mr. Beaty tried to get away from Defendant Person. Defendant Person pulled out his baton and attempted to hook Mr. Beaty's feet to trip him. Mr. Beaty jumped over the baton and ran from

Defendant Person to a nearby building that housed the administrative office and banged on the door yelling for help.

62.     Realizing that no one was going to help him, Mr. Beaty stopped trying to run away. As Defendant Person approached, Mr. Beaty observed him put on gloves, which on information and belief were riot gloves, and pull out handcuffs.  After apprehending Mr. Beaty, Defendant Person handcuffed Mr. Beaty's hands behind his back, grabbed him by the collar, and led him to the Hot Bay.

63.     At approximately 5:40 p.m., Defendant Person brought Mr. Beaty to the lobby of the Hot Bay Dorm, or B-Dorm, with his hands handcuffed behind his back.  There were several other prisoners just outside the lobby at this time.

64.     Upon information and belief, Defendants Grey and Baldwin were in the lobby or the lobby observation booth and were able to observe Defendant Person and Mr. Beaty.

65.     Defendant Person instructed Defendant Baldwin to close the lobby door behind him, obstructing the view of people outside the Hot Bay Dorm.  Defendant Person then instructed to move a screen in front of the B-1 side of the lobby, obstructing the view of people in the Hot Bay Dorm.  Defendant Baldwin followed these orders, blocking the ability of anyone outside the lobby to see Mr. Beaty.

66.     Defendant Person instructed Defendant Grey to lock the front door to the B-Dorm and to the observation booth, which Defendant Grey did.

67.     Defendant Person, still gloved, pulled Mr. Beaty by his collar and led him into a side hallway or closet.  Upon information and belief, Defendants Baldwin and Grey could still observe Defendant Person and Mr. Beaty

16

68.     Once they were out of the immediate sight of the other people outside the lobby and while Mr. Beaty's hands were still handcuffed behind his back, Defendant Person tightened his grip on Mr. Beaty's collar and asked Mr. Beaty, "why did you run away from me?" Before Mr. Beaty could respond, Defendant Person brutally struck Mr. Beaty from behind, hitting him in the side of his jaw with his riot glove.  Defendant Person's blow was so strong that blood immediately sprayed from Mr. Beaty's mouth all over the wall and his clothes.

69.     Mr. Beaty could not see the attack coming.  His hands were restrained behind his back in handcuffs, and he could not defend himself.  The assault was not necessary for Defendant Person to accomplish any reasonable purpose related to his legitimate duties.  Rather, Defendant Person struck Mr. Beaty maliciously and for the purpose of causing harm.

70.     Defendant Person's attack dislocated Mr. Beaty's jaw, fracturing it in two places, causing a large bone fragment to protrude from Mr. Beaty's gums.  The attack caused Mr. Beaty to bleed profusely from his mouth, spraying blood all over the wall.  As Mr. Beaty fell to his knees, still in handcuffs, blood continued to pour from his mouth all over the floor.

71.     Upon information and belief, Defendants Baldwin and Grey witnessed the incident but did nothing to intervene or to render medical aid to Mr. Beaty.  Immediately after the assault, Defendant Baldwin fled, leaving the front door to the lobby open.

72.     Mr. Beaty required immediate and serious medical care and was in excruciating pain.  Mr. Beaty begged Defendant Person to take him back to the infirmary because he needed a doctor.  Defendant Person refused.  Instead, Defendant Persons pulled Mr. Beaty up and brought him back into the lobby, where he continued to bleed profusely.

73.     Several other prisoners, including at least one of the prisoners involved in the earlier extortion attempt, came into the lobby after Defendant Baldwin fled.  Several of these prisoners

17

attempted to separate Mr. Beaty from Defendant Person, and one of them said to Person "we told you to let us handle him and look what you've done." Upon seeing that Mr. Beaty was injured, several of the prisoners asked that Defendant Person take Mr. Beaty to the infirmary. Defendant Person refused and ordered the other prisoners out of the lobby.

74.    Immediately following the assault, it was obvious that Mr. Beaty had suffered a serious injury—he was bleeding profusely, had a jaw broken in multiple places, and had a bone fragment protruding from his gums—and urgently needed medical care. Rather than seeking medical attention or attending to Mr. Beaty's obvious medical needs, Defendant Person instead cleared the lobby of witnesses and attempted to cover up his own misconduct.

75.    Defendant Person ordered the lobby cleaned—mostly of Mr. Beaty's blood, which had started to pool on the lobby floor—and sent another prisoner to get a clean prison uniform for Mr. Beaty.

76.    Defendant Person directed Mr. Beaty to go a small room off the lobby. Upon entering the small room, conscious of his own guilt, Defendant Person told Mr. Beaty that he would "take him to the doctor but not now." Defendant Persons then threatened Mr. Beaty to keep quiet about the assault.

77.    Defendant Person then took of Mr. Beaty's handcuffs and ordered him to change out of his bloodied uniform and to split blood from his broken jaw into a cup. Mr. Beaty had to change his prison uniform twice as each became covered in his own blood. Mr. Beaty also filled multiple cups with his blood from his mouth.

78.    Rather than take Mr. Beaty to the infirmary, at approximately 5:45 pm, Defendant Person had Beaty brought into the interior of the Hot Bay Dorm, and sat him on a bench, still bleeding profusely. Defendant Person then left, abandoning Mr. Beaty.

18

79.     At the time Mr. Beaty was brought into the Hot Bay, there were at least two officers Defendant Steele and Defendant Dennis and other Defendant Unknown Officers who could see him on the bench, bleeding profusely. Although Mr. Beaty could barely speak due to the misalignment of his jaw, he begged these officers to take him to the infirmary. These officers ignored him.

80.     At 6:00 p.m., there was a shift change and Defendant Steele, Defendant Dennis, and the other Unknown Officers who could see Mr. Beaty bleeding profusely on the bench left, abandoning him without providing medical care. Defendants Steele, Dennis, and the other Unknown Officers never intervened or provided Mr. Beaty with the medical assistance he so obviously needed.

81.     At the time of the shift change, several other correctional officers came on duty in the Hot Bay, including Defendant Cannon, Defendant Merritt, and other Defendant Unknown Officers. Defendants Cannon and Merritt were stationed inside the interior of the Hot Bay approximately ten feet from Mr. Beaty, and witnessed Mr. Beaty continuing to bleed profusely. Over the next several hours, although it was excruciatingly painful for Mr. Beaty to talk, he begged Defendants Cannon and Merritt repeatedly to get him medical help. They ignored him.

82.     Instead, as the hours passed, Defendants Cannon, Merritt, and other Unknown Officers watched Mr. Beaty continue to bleed profusely and writhe in excruciating pain. Mr. Beaty continued to beg these officers and other ADOC staff (including the individuals administering medicine through the dorm window) to get him medical attention. As they watched Mr. Beaty fill, empty and refill a styrofoam cup with his own blood over the next several hours, as Mr. Beaty faded in and out of consciousness from the acute blood loss and pain, these Defendants continued to ignore Mr. Beaty's pleas for medical attention and the obvious physical signs of Mr. Beaty's

19

severe injuries. Other inmates told Defendants Cannon and Merritt that Mr. Beaty needed medical attention, but were ignored. As the hours passed, it became increasingly important that Mr. Beaty receive medical attention, yet the repeated requests were ignored.

83.     Defendants Cannon, Merritt and the other Unknown Officers never intervened or provided Mr. Beaty with the medical assistance he so obviously needed.

84.     Defendant Person's actions, including clearing and cleaning the lobby and attempting to get Mr. Beaty into a clean prison uniform, demonstrate that Defendant Person was conscious of his guilt in assaulting Mr. Beaty. Similarly, Defendant Baldwin demonstrated his guilt by fleeing the scene, and Defendant Grey demonstrated her guilt by allowing Person to destroy evidence of the assault. The failure of Defendant Person, Baldwin, Grey, Cannon, and Merritt, and other Defendant Unknown Officers to seek or secure immediate medical attention for Mr. Beaty demonstrates their callous disregard for Mr. Beaty's health and safety and callous disregard for Mr. Beaty's rights.

85.     As the minutes and then hours ticked by, Mr. Beaty was in excruciating pain, as well as psychological agony as he waited in uncertainty to see whether anyone would help him. Without help, he was not sure whether he would die, like other beaten ADOC inmates had before him.

86.     It was not until approximately 10:00 pm – over four hours after Mr. Beaty was assaulted – that a nurse came into the Hot Bay to dispense medication. The nurse was the same nurse who examined Mr. Beaty earlier that day in the infirmary. Seeing that Mr. Beaty was visibly and severely injured, she asked Mr. Beaty what had happened and noted, "you weren't like this a few hours ago." Mr. Beaty asked her to "please help" because he "needed a doctor." The nurse then took Mr. Beaty to the infirmary to get medical care. On the way to the infirmary, Mr. Beaty

20

recounted to the nurse that he had been assaulted by Defendant Person and then abandoned in the Hot Bay.

87.    When Mr. Beaty was brought to the infirmary, it appeared to be deserted. The nurse began to take photos of his injuries, prepare a chart, and called for an ambulance to take Mr. Beaty to the closest hospital. Mr. Beaty requested that she note in the chart that he had been assaulted by Defendant Person.

88.    After only a few minutes, Defendants Lieutenant Laseter and Sergeant Lindsey entered and asked Mr. Beaty what had happened. Mr. Beaty told them that he had been assaulted by Defendant Person and then abandoned in the Hot Bay. Minutes later, Defendants Officers Jonathan and Joshua Pittman also entered the room and asked what happened, and Mr. Beaty repeated that he had been assaulted by Defendant Person. All four correctional officers were aware that Defendant Person's unlawful assault on Mr. Beaty was the cause of his injuries.

89.    Following Mr. Beaty telling Defendants Laster and Lindsey that he had been assaulted by Defendant Person, one of them directed the nurse to leave because they "had it from here." The nurse left, and one of the Defendant officers closed the door behind her. Mr. Beaty could hear on the radio carried by one of the officers that the ambulance was coming and was only a few minutes away. Although Mr. Beaty was under the impression the nurse would return, when he inquired where she was, one of the officers said that she had gone home for the evening. Mr. Beaty thought this was very unusual considering the severity of Mr. Beaty's injuries and the fact that the nurse had been the one to insist he seek medical attention.

90.    After Mr. Beaty recounted his story to Defendants Jonathan and Joshua Pittman, Defendant Lindsey instructed Mr. Beaty not repeat to anyone else what had happened.

21

91.     In the infirmary, rather than ensure that Mr. Beaty receive proper medical care, Defendant Lindsey took matters into his own hands. Upon information and belief, Defendant Lindsey has no medical training to diagnose or treat injury. Nonetheless, he stated that he was going to determine the cause of Mr. Beaty's bleeding and then put on medical gloves. Defendant Lindsey then told Mr. Beaty that he was "sorry this is going to hurt but I need to see where the blood is coming from," and then proceeded to unnecessarily pry Mr. Beaty's mouth open, causing his skin to tear, a piece of his bone to stick out through his gums, his bones to grind and more blood to flood out of his mouth. This exacerbated Mr. Beaty's already-broken jaw, leaving Mr. Beaty in even greater agony. Defendant Lindsey's actions made Mr. Beaty's injuries worse and needlessly caused Mr. Beaty pain and suffering. It should have been obvious to anyone, including Defendant Lindsey, that his efforts would not help and would cause Mr. Beaty unnecessary pain.

92.     Defendant Laseter observed Defendant Lindsey torture Mr. Beaty, and looked inside Mr. Beaty's mouth while Defendant Lindsey pried it open. While this assault was occurring, Defendant Laseter made a gagging sound like she was going to throw up and ran out of the room.

93.     After Defendant Laseter left the room, Mr. Beaty heard one of the correctional officers cancel the ambulance that was on its way. This delayed Mr. Beaty from receiving adequate medical attention. In addition to delaying his medical care, upon information and belief, the Defendants cancelled the ambulance to minimize the assaults and the seriousness of Mr. Beaty's injuries, and to allow Mr. Beaty to be handcuffed for the journey.

94.     Defendants Lindsey, Laseter, Pittman, and Pittman did not do anything to stop Mr. Beaty's bleeding. They did not provide him with any pain relief. And they did not provide him any treatment to address his medical condition.

22

95.     Defendants Lindsey, Laseter, Pittman, and Pittman did not immediately take Mr. Beaty to the hospital. Rather, they waited approximately one additional hour before loading him into a prison van to drive to the hospital. Before Mr. Beaty left, he was handcuffed for the trip to the hospital. Defendant Lindsay again warned Mr. Beaty not to say anything, and Defendant Laseter warned Mr. Beaty not to tell anyone else about the assaults or what happened afterwards.

96.     Defendant Lindsey's assault and the failure of Defendant Laseter and Defendants Pittman and Pittman to stop the assault, as well as the cancellation of the ambulance, demonstrates their callous disregard for Mr. Beaty's health and safety and callous disregard for Mr. Beaty's rights. Defendants Lindsey and Laseter's warnings to Beaty not to tell anyone about the assaults demonstrate their consciousness of guilt.

97.     Mr. Beaty was transported by prison van (rather than ambulance) to Troy Regional Medical Center, located in Troy, Alabama by Defendant Pittman and a Defendant Unknown Officer. Although Troy is only approximately 35 miles away and is normally a 40-45 minute drive, it took over an hour to get to the hospital from Ventress because the driver was driving below the speed limit. Being handcuffed, Mr. Beaty was unable to brace himself and was tossed around the prison van, causing more suffering. Mr. Beaty fought to stay awake, terrified that if he lost consciousness, he would die.

98.     Shortly after arriving at Troy, Mr. Beaty learned that his injuries were too serious for treatment at that hospital and was transferred to Baptist Medical Center South in Montgomery ("Baptist South"), Alabama for surgery.

99.     Doctors at Baptist South operated on Mr. Beaty on Wednesday, April 25. Given the seriousness of his injuries and the procedures performed during surgery, Mr. Beaty was sedated after surgery.

23

100.    Mr. Beaty recalls awaking two days later on Friday, April 27, with his jaw wired shut and in severe pain.

101.    Shortly thereafter, he was discharged from the hospital and taken to the infirmary at Kilby in Montgomery, Alabama. Over the next weeks and months, Mr. Beaty was limited to a liquid diet as a result of his jaw being wired shut. As a result, Mr. Beaty lost a substantial amount of weight—around 25 pounds—and was consequently prescribed nutritional supplements.

102.    Mr. Beaty continues to suffer as a consequence of his injury and subsequent procedures. He regularly gets headaches, and feels a steady pain on the left side of his face. Defendant Person's blow caused some of Mr. Beaty's teeth to break, which still cause him pain today. In addition, from his lips to the right side of his face, Mr. Beaty continues to experience numbness and, as a result, has had to re-learn to chew his food using different portions of his mouth. He still cannot enjoy a normal diet.

103.    After approximately two months at Kilby, Mr. Beaty was returned to Ventress.

104.    Upon returning, Mr. Beaty learned that, during his absence, Defendant Person had sought out inmates in an attempt to coerce one or more of them to lie and take the blame for Mr. Beaty's broken jaw. When Defendant Person could not find an inmate willing to falsely take the blame for Defendant Person's assault on Mr. Beaty, Defendant Person resorted to threats.

105.    Defendant Person's threats were not limited to other inmates. After Mr. Beaty returned to Ventress, Defendant Person sought out Mr. Beaty repeatedly, and employed different methods to try to induce Mr. Beaty to conceal Defendant Person's responsibility for the assault. On one occasion, Defendant Person had Mr. Beaty pulled out of the chow line and into the office where Defendant Baldwin was present. Defendant Person then threatened Mr. Beaty, "I don't know why you dropped my name. You could have said any name, but you said mine."

24

106. At the time he made this statement, Defendant Person was aware that he had assaulted Mr. Beaty and he had broken Mr. Beaty's jaw. Afraid and unsure how to respond, Mr. Beaty ignored Defendant Person's inquiry.

107. Mr. Beaty was transferred from Ventress to Kilby in early January 2019, and then eventually to Bibb Correctional Facility in Brent, Alabama ("Bibb").

## II. THE ASSAULT OF MR. BEATY WAS A MANIFESTATION OF DEFENDANTS' POLICIES AND CUSTOMS

108. The Eighth Amendment of the United States Constitution requires that prisoners be furnished with basic human needs including reasonable safety. On April 2, 2019, the Justice Department) issued its notice letter ("Notice Letter") to the State of Alabama that it had concluded, based on its investigation spanning 2016 through 2019, that the conditions in Alabama's male prisons violate the Eighth Amendment's protection from cruel and unusual punishment due to ADOC's failure to "protect prisoners from serious harm and substantial risk of serious harm." The Justice Department also concluded that ADOC's constitutional violations are "severe, systemic" and "pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment."

### 1. Alabama Prisons Are Chronically Overcrowded and Egregiously Understaffed

109. One of the Justice Department's key findings was that across ADOC's prisons, violations of the Eighth Amendment were "exacerbated by serious deficiencies in staffing and supervision and overcrowding[.]"

110. For decades, Alabama has been home to the nation's most overcrowded and chronically understaffed prisons, resulting in a pattern of excessive violence at the hands of both prisoners and staff.

25

111.    Alabama's imprisonment rate is 946 per 100,000 residents—the fifth highest in the nation. The federal Bureau of Justice Statistics—a federal agency within the Justice Department— found that in 2017, prisons within the ADOC system were operating at 167.8 percent of design capacity with 21,750 prisoners in custody. The percentage has continued to increase over the last two years and in January 2020, ADOC prisons were at 170.4 percent of design capacity.

112.    While the population of ADOC's prisons swells, the level of staff continues to dwindle despite acknowledgment by Defendant Dunn and his staff of the need to "address the significant challenges caused by long-term issues in an overpopulated prison system that has been under-resourced for decades."[1]

113.    The egregious level of understaffing and inadequate supervision in ADOC facilities directly contribute to increased violence and risk of substantial harm to prisoners. As a spokesperson for the ADOC has admitted: "There is a direct correlation between the level of prison violence and the shortage of correctional staff in an overpopulated prison system with limited resources for rehabilitating offenders."[2]

114.    ADOC prisons, including Ventress where Mr. Beaty was housed at the time of his assault, have been systemically overcrowded and understaffed for years creating a dangerous environment for prisoners both from assaults by other prisoners and by correctional officers.

> a.  Ventress is a level-4 medium-security prison designed to hold 650 inmates at a time.[3] However, Ventress is consistently overcrowded and houses up to 1,335 inmates at any given time—more than double the facility's capacity.

---

[1] Alabama Dep't of Corrections, *Annual Report for the Fiscal Year 2018* (May 20, 2019), http://www.doc.alabama.gov/docs/AnnualRpts/2018AnnualReport.pdf
[2] Jennifer Horton, *ADOC: Staffing shortages, contraband fueling prison violence*, WSFA News (Dec. 18, 2018), https://www.wsfa.com/2018/12/19/adoc-staffing-shortages-contraband-fueling-prison-violence/
[3] Alabama Dep't of Corrections, *Monthly Statistical Report for January 2020*, http://www.doc.state.al.us/docs/MonthlyRpts/DMR%2001%20January%202020PUB.pdf

b. In April 2018, the month of Mr. Beaty's assault, the number of prisoners at Ventress was 1,293, again, essentially double its capacity. This means that at the time of Mr. Beaty's assault, the Ventress incarcerated population was 198.9% of its design capacity.

c. In stark contrast, at the time of Mr. Beaty's assault, Ventress had only filled approximately 35% of the authorized number of correctional officers.[4] At the end of the second quarter of 2019, there were even fewer correctional officers— 28.8% of the authorized positions—leaving a deficit of over 150 officers.

d. Another way of understanding the staffing deficit at Ventress is that the prison is supposed to have a 2.6-to-1 ratio of correctional officers to prisoners; Ventress' actual ratio is closer to 14-to-1.

e. Because there are not enough officers to adequately staff the prison, incarcerated persons at Ventress are frequently under-supervised or completely unsupervised for nearly the entire day.

f. As illustrated by what happened to Mr. Beaty and numerous other prisoners at Ventress, this significant shortage of officers at Ventress has led to a fundamental lack of supervision and basic security at the facility.

g. Ventress remains severely overcrowded. As of January 2020, Ventress housed 1,218 prisoners, which was 187.4% of its design capacity.

---

[4] Notice Letter at 10; Quarterly Staffing Reports filed in *Braggs et al. v. Dunn et al.*, M.D. Ala. 2:14-cv-601 (ECF Nos. 2325-2, 2325-3).

115.   ADOC's overcrowding and understaffing has been widespread and persistent across its facilities.   Other examples of overcrowding and understaffing across ADOC prisons include, but are not limited to:

    a.   At the time of Mr. Beaty's assault, Kilby, a maximum-security prison with a design capacity for 440 prisoners, reported a population of 1,321, which is an occupancy rate of 300.2%.   Kilby remains overcrowded today: in January 2020, it held 1,449 prisoners—an occupancy rate of 329.3%.

    b.   At the time of Mr. Beaty's assault, Elmore Correctional Facility in Elmore, Alabama ("Elmore"), a medium security prison with a design capacity for 600 prisoners, housed 1,167 prisoners, which is 194.5% of its design capacity.   Elmore continues to suffer from chronic overcrowding: in January 2020, it held 1,180 prisoners, which is 198% of its design capacity. Upon information and belief, Elmore staffs two correctional officers to supervise its dormitories, each housing just under 400 prisoners.

    c.   In April 2018, at St. Clair Correctional Facility in Springville, Alabama ("St. Clair"), a maximum security prison which was also operating above design capacity at the time of Mr. Beaty's assault, a single officer was assigned to supervise and monitor each of the housing blocks, which have housed as many as 96 prisoners. This officer was stationed in a windowed "cube" which provided a limited view of both sides of the block.   The officer was not permitted to leave their post during the shift, and roving patrols by additional officers occurred infrequently. During yard call and gym call, anywhere between 200 and 400 prisoners were supervised by one officer with the assistance of two to four roving officers.

28

116.    The Justice Department found that across ADOC's facilities, prisoner dormitories, housing up to 180 men, often go unsupervised for hours at a time.[5]

117.    The Justice Department noted that correctional officers are frequently called upon to work "voluntary mandatory overtime" shifts to address understaffing leading, in some cases, to a 90-to-95-hour work week.[6] Upon information and belief, correctional officers who do not comply leave prisons with more of a staffing deficit, but they are routinely allowed to do so without discipline. Correctional officers who do work overtime are often exhausted and ineffective in their roles thereby exposing themselves, prisoners and colleagues to life-threatening conditions.

118.    ADOC officials have admitted it may not be possible to hire and train the necessary 2,000 correctional officers with "proper education, the proper sense of duty and the proper mindset" over the next four years to meet staffing needs.[7]

119.    Due to overcrowding and understaffing at Ventress (and at other ADOC facilities), the officers who do work at these facilities are unable to perform basic security functions, such as protecting prisoners from violence, preventing extortion by other prisoners, conducting contraband searches, assuring inmates are in the right locations, and assigning officers to maintain a security presence in housing areas.  All of these conditions existed at Ventress at the time of Mr. Beaty's assaults.

120.    Many incidents at Ventress and other ADOC facilities are facilitated or worsened by the sparse guard presence.  The inability of the skeleton crew of officers to maintain basic security and supervision has led to high rates of violence within Ventress and other ADOC

---

[5] U.S. Dep't of Justice, Investigation of Alabama State Prisons for Men (April 2, 2019),
https://www.justice.gov/crt/case-document/file/1149971/download
[6] Notice Letter at pg. 10.
[7] Notice Letter at pg. 50.

facilities and lack of basic inmate safety. This was the condition of Ventress at the time of Mr. Beaty's assault.

121. Beatings and assaults of inmates by inmates are commonplace at Ventress and other ADOC facilities. Many of these incidents are connected to specific failures of correctional officers and administration, such as a failure to control the movements of the inmate population within the prison, retaliation against victims who report inmate-on-inmate assaults or extortion, and failure to take any corrective action in response to clear threats. As alleged above, Defendant Person, the Defendant Unknown Commanders, and the Defendant Unknown Officers on duty in E-Dorm failed to protect Mr. Beaty from the extortion attempt.

122. At Ventress, prison staff, including supervisors, fuel and encourage the culture of violence through their indifference and failure to enforce policies. Upon information and belief, officers at Ventress placed wagers on the outcome of fights between inmates. And Ventress staff routinely fail to enforce dorm assignments and policies governing the times and locations that men are permitted to move about the facility. For example, officers in security control cubes frequently let prisoners into a unit without verifying that the prisoners are allowed in the unit. The continuing failure of officers to enforce policies controlling the movement of prisoners within Ventress further undermines the security of incarcerated persons and increases the risk and frequency of physical and sexual assaults. These conditions existed at Ventress at the time of Mr. Beaty's extortion attempt and assaults.

123. At Ventress and other ADOC facilities, extortion by other prisoners is commonly reported, and the response is inadequate. As the Justice Department found "extortion by fellow prisoners is commonly reported by prisoners." The Justice Department detailed seven specific examples from ADOC facilities, including Ventress, and noted that when prisoners reported

30

extortion attempts to correctional officers, in a majority of these cases, the response was to say "nothing could be done" or to punish the complainant by placing them in restricted housing. As discussed above, after Mr. Beaty reported the extortion attempt to Defendant Person, Defendant Person took Mr. Beaty to the Hot Bay to punish him.

124.    When inmates are injured in violent incidents, officers' responses are consistently delayed and inadequate given the severity of inmates' injuries. In the aftermath of these incidents, officers often make little effort to investigate or protect injured inmates from future attacks and instead retaliate against inmates who persist in reporting incidents. As discussed elsewhere in this Complaint, numerous Defendant officers denied or delayed Mr. Beaty's medical care after his assault by Defendants Person and Lindsay, and the investigation conducted by the Unknown I&I Defendants was wholly inadequate.

125.    These extraordinarily dangerous conditions have led to the deaths of numerous inmates at Ventress, including, but not limited to, Alonzo Montez Sykes, Joshua David Willingham, William Stanley Warren, and Daniel Bens.

### 2. Defendants' Knowledge that Alabama Prisons Are Chronically Overcrowded and Egregiously Understaffed

126.    Defendants State of Alabama, ADOC, Dunn, Culliver, Jones, and the other Defendant Administrative Supervisors were aware of the understaffing issues within ADOC prisons generally and Ventress specifically. They also know the excessive amount of violence that occurs within the ADOC prisons resulting from understaffing. Defendant Dunn himself has admitted that at ADOC prisons, "the fundamental, systemic problem is a combination of lack of staff and overcrowding."

127.    On October 6, 2016, the Justice Department put Defendants on notice that it opened a Civil Rights of Institutionalized Person Act ("CRIPA") investigation into Alabama's male prisons, including Ventress. [8]

128.    On April 2, 2019, the Justice Department issued the Notice Letter detailing the findings of its CRIPA investigation. The Justice Department clearly identified the "combination of ADOC's overcrowding and understaffing" as key factors leading to inadequate supervision, unsafe housing and violence.

129.    Per the Justice Department's findings, correctional officer staffing levels across ADOC are "at crisis level."

a.  Based on information available during the CRIPA investigation, as of June 2018, just after Mr. Beaty's assault, Alabama's prisons were employing 1,072 of the 3,326 correctional officers ADOC was authorized to hire.

b.  Of the 13 facilities investigated by the Justice Department, only three had correctional officer staffing levels over 40% of their authorized officers. The remaining 10 facilities all had fewer than 40% of the authorized correctional officers, with three facilities having fewer than 20%.

130.    ADOC's Mission Statement states, in part, that ADOC's mission is to provide prisoners with a "safe, secure, and humane environment." Yet, violence has escalated year over year inside Alabama prison walls. According to the ADOC's monthly reports, between January 2015 and December 2017, there were twenty (20) prisoner homicides. Over the course of fiscal years 2018 and 2019, an additional nine (9) prisoners fell victim to the same fate—six of which occurred in the first five months of 2019. This demonstrates an alarming trend which ADOC has

---

[8] Department of Justice Press Release (Oct. 6, 2016).

failed to adequately address with increased staffing, leaving Alabama's prisoners to live in prisons that boast the nation's highest prison homicide rate.

131. ADOC management has continuously failed to address staffing concerns despite commitments made publicly and in legally binding lawsuit settlements. The continued acknowledgement of "critical shortages in correctional officer staffing" and the persistent failure to cure improve the issue—even in the face of the Justice Department's investigation results—has only exacerbated the level of violence.

132. The United States District Court for the Middle District of Alabama (the "Middle District") has noted that, "Understaffing has been a persistent, systemic problem that leaves many ADOC facilities incredibly dangerous and out of control....[A] severe shortage of officers leads to dangerous and violent conditions, especially in high-security facilities with overcrowded dormitories." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1198 (M.D. Ala. 2017).

133. The Middle District also found that "[t]he combination of overcrowding and understaffing leads to an increased level of violence, both because of the difficulty of diffusing tension and violence in an overcrowded open-dormitory setting, and because of the lack of supervision by correctional officers." *Braggs*, 257 F. Supp. 3d at 1200.

134. Although Defendants Dunn and Culliver and the other Supervisory Defendants were well aware of the history of widespread violence throughout the ADOC's male prisons and the connection between violence and the ADOC's chronic problems with overcrowding and understaffing, Defendants failed to take meaningful steps prior to Mr. Beaty's assault to significantly alter systemic staffing disparities creating an environment where violence was widespread and persistent.

33

135.    In ADOC's 2018 Annual Report—published on May 20, 2019, 13 months after Mr. Beaty's assault, Defendant Dunn claimed that ADOC had finally implemented an "aggressive plan to optimize the chronic understaffing of correctional officers through a comprehensive recruiting and marketing initiative."[9]  But as of the filing of this Complaint, ADOC had made minimal progress to address the chronic understaffing.  As of September 2019, the number of correctional officers had increased to 1,339[10] — well short of 3,326 correctional officers it was authorized to hire, and far less than the critical mass needed to ensure the safety of prisoners.[11]

136.    In his January 2020 budget presentation to the Alabama Legislature, Defendant Dunn noted "there is a direct correlation between overcrowding and understaffing."  He further noted the "best thing" ADOC could do is to "accelerate the on-boarding of new correctional officers." While Dunn has claimed that ADOC is taking steps to do so, Dunn admitted that "challenges still remain" and the rate or violence in ADOC's prisons remains "unacceptably high."[12]

137.    After years of failing to address the overcrowding and staffing issues, Alabama's prisons are deeply entrenched in a culture of violence and these new efforts have failed to change the tide as the level of prisoner-on-prisoner assault, the level of staff-on-prisoner assault, and the death toll continue to climb.

### 3. Defendants Have Relied on and Condoned Use of Excessive Force by Correctional Officers to Cover for Overcrowding and Understaffing

---

[9] Alabama Department of Corrections, Annual Report for the Fiscal Year 2018 (October 1, 2017 to September 30, 2018), pg. 5.

[10] (i) *ADOC Graduates 405 Officers; 2,000 Still Needed,* Times Daily, December 5, 2019 (ii) "'*You get what you pay for' Federal judge concerned about ADOC staffing numbers, lesser trained positions*", Alabama Daily News, December 11, 2019 (iii) *Recruiting and Retaining Correctional Officers, A Report for the Alabama Department of Corrections,* Warren Everett, LLC.

[11] Investigation of Alabama's State Prisons for Men, Department of Justice, April 2, 2019, pg. 9.

[12] Prison Officials Request $42 Million Increase to Hire Staff, Improve Healthcare, WBHM.org, University of Alabama, January 21, 2020.

138.    The chronic overcrowding, serious understaffing and inadequate supervision in ADOC facilities deprives prisoners of their right to be protected from the constant threat of violence. ADOC's prisons are plagued by violence—often at the hands of correctional officers and with the full knowledge of senior leadership. Yet, leadership has continuously failed to take reasonable measures to change procedures and improve the safety and security of prisoners.

139.    Prison staff at Ventress and other ADOC facilities routinely resort to the use of excessive force and directly participate in the violence at the prison.    Officer violence and misconduct significantly contribute to the danger and high risk faced by inmates.    ADOC employees have described conditions within one of ADOC's most violent prisons as a "security nightmare."[13]

140.    Egregious understaffing and poor training contribute to an increased use of excessive force by correctional officers, further creating an environment where the risk of physical harm is high. ADOC leadership continues to condone systemic violence by allowing a relatively dwindling number of correctional officers to manage a growing prison population with whatever disciplinary methods they deem effective.

141.    In numerous instances, correctional officers have imposed discipline among the incarcerated population through excessive force, including use of force against restrained prisoners.    This practice or custom is widespread and persistent, and is conducted with the knowledge of senior leadership of ADOC.

---

[13] Sarah Snyder, Dangerous conditions for state prisons and guards, ABC 3340 News (March 16, 2012), https://abc3340.com/archive/dangerous-conditions-for-state-prisonsl Second Amended Complaint, pg. 8, 23 (Warden Davenport in reference to St. Clair), Duke v. Dunn, 4:14-dv-01952, pending United States District Court, Northern District of Alabama.

142.    Incidents of severe violence perpetrated by correctional officers at ADOC facilities—Ventress and elsewhere—have been well documented.  These incidents have been persistent and widespread, involving officers of all ranks and further promulgate the custom of correctional officer violence against prisoners at ADOC facilities.

143.    In some cases, these incidents of excessive force by correctional officers resulted in the death of prisoners in ADOC custody.  Prisoners incarcerated at Ventress and at other ADOC prisons assaulted by officers have suffered serious injuries and died.  Upon information and belief, prior to Mr. Beaty's assault, these incidents include, but are not limited to, the following assaults, all of which resulted in serious injury to the incarcerated person:

a.  On the evening of August 4, 2010, 24-year-old Rocrast Mack Jr. was beaten unconscious by a group of Ventress officers with their batons and fists while Mr. Mack was lying on the ground of his dorm.  The officers then took Mr. Mack, unresponsive and in handcuffs, to the shift office and continued to beat him, at one point slamming his head into a wall.  Mr. Mack sustained fractures to his ribs, arms, legs, and skull and had to be taken to multiple hospitals.  He was ultimately declared brain dead as a result of blunt force trauma.  The coroner ruled that his death was a homicide.

b.  On November 16, 2012, at Elmore, Mario Taylor was punched by Officer Carter, and then handcuffed.  Other officers joined in and began beating Mr. Taylor, even attempting to ram his head into the wall while he was standing.  During the assault, Mr. Taylor's handcuffs were removed and he was ordered to strip and get on the ground. After complying, he was immediately re-cuffed, and the assault continued.

c.  In 2012, at St. Clair, former Warden Davenport, while conducting a routine cell transfer, reportedly punched a prisoner in the head while the prisoner was handcuffed.

36

The incident was never investigated, despite widespread publication of the assault. Former Warden Davenport was not demoted or removed from his command.

d.  On March 28, 2013, at Elmore, Dion Neal was ordered to the shift office where he was beaten by Lieutenant Calloway, Sergeant King, Officer Wilson and Officer Woods. The officers subsequently handcuffed Mr. Neal, transported him to a guard shack near Elmore's rear gate, and, joined by other officers, severely beat him.  Warden Daniels ordered Mr. Neal shackled and placed in the holding cell.  While in the holding cell, Mr. Neal was again assaulted by officers while Warden Daniels observed and failed to intervene.  As a result of these assaults, Mr. Neal was suffered three facial fractures and severe eye damage.

e.  On April 4, 2013, Tyrone Triplett was assaulted by Officer Holyfield at Bibb.  Officer Holyfield came up to Mr. Triplett from behind and used his baton to strike Mr. Triplett in the head.  Officer Holyfield's blow was so strong that it split Mr. Triplett's head open and knocked him unconscious.  At the time of this assault, there were other officers in the immediate vicinity, all of whom failed to intervene.

f.  On September 8, 2013, Rufus Ricks was taken to the shift office at Bibb after getting into a verbal altercation with Sergeant Sealy.  While in the shift office, Mr. Ricks' hands were cuffed behind his back.  Sergeant Sealy then hit Mr. Ricks from behind, and Sergeant Webster knocked him to the ground and sprayed Mr. Ricks with mace. Mr. Ricks was then beaten with a baton on his legs and hands, fracturing part of his hand.  Other officers (including a Lieutenant) were present in the shift office during the assault and failed to intervene to protect Mr. Ricks.

37

g. On October 30, 2013, at Bullock Correctional Facility in Union Springs, Alabama ("Bullock"), Marcus Allen was assaulted by a group of officers. Mr. Allen was taken by the officers to the shift office, where the officers proceeded to spray Mr. Allen in the face with mace, beat him with batons, and strike him with handcuffs wrapped around the officers' fists. As a result of the assault, Mr. Allen lost consciousness and suffered lacerations to the back of his head.

h. On January 3, 2014, at Donaldson Correctional Facility in Bessemer, Alabama ("Donaldson"), Daryl Hardy was returning to his dorm when Sergeant Jenkins forced him to strip naked and ordered him to enter the dorm naked as a form of humiliation. Rather than comply, Mr. Hardy requested to be taken to the shift office. Sergeant Jenkins responded by spraying Mr. Hardy with pepper spray in his face and bare genitals. Sergeant Jenkins then threw Mr. Hardy to the ground and he was beaten by multiple guards.

i. In January 2014, after conducting a federal investigation, the Justice Department concluded that ADOC violated the Eighth Amendment by failing to protect female prisoners at the Julia Tutwiler Prison for Women ("Tutwiler") due to the long "[h]istory of unabated staff-on-prisoner sexual abuse and harassment." Defendant Jones was Deputy Warden during the period of the Justice Department's investigation. The Justice Department's findings described numerous incidents where ADOC staff raped, sodomized, fondled, and exposed themselves to prisoners. For decades, Tutwiler staff engaged in a pattern and practice of sexually harassing and sexually abusing the female prisoners.

38

j.  On April 25, 2014, David Tumbs was assaulted by officers after he was transferred from the mental health residential care unit to the general population at Bullock.  Mr. Tumbs suffers from paranoid schizophrenia and, after telling Officer King that he was hearing voices and required medical attention, Officer King and others responded by spraying Mr. Tumbs in the face with mace, handcuffing him, forcing him to the ground and striking him in the face.

k.  On May 21, 2014, at Elmore, Jeffery McCormick was placed in handcuffs, belly chained, and shackled around the ankles with industrial tape.  While Mr. McCormick was in these restraints, Sergeant Sasser severely beat him in a holding cell, where he was left for 17 hours.

l.  On July 25, 2014, Venture Harrison was taken out of his cell at St. Clair by several officers.  The officers handcuffed Mr. Harrison, sprayed him with mace, and then repeatedly hit him in the back of the head with handcuffs wrapped around their knuckles.  Former Warden Davenport reportedly witnessed this severe beating and did nothing to intervene.

m.  On October 22, 2014, Antwain Henderson was assaulted by several officers in the shift office at Draper Correctional Facility in Elmore, Alabama ("Draper").  Sergeant Boyd placed Mr. Henderson in a chokehold until Mr. Henderson lost consciousness.  When he regained consciousness, several officers were punching and kicking him in the ribs and back.  While the officers were assaulting Mr. Henderson, the Warden was standing nearby and failed to intervene or stop the assault.

n.  In 2014, at Elmore, Nedrick Boyd was handcuffed and on his knees when Sergeant Cole struck him several times in the face.  Lieutenant Cooper and another officer

39

watched as Sergeant Cole repeatedly beat Mr. Boyd, to the point where he fell to the ground. Neither intervened to stop Sergeant Cole from assaulting Mr. Boyd.

o. In May 2015, Brandon Ladd was assaulted by Officer Fife and Officer Burns at St. Clair. As Mr. Ladd lay on his stomach in both handcuffs and shackles, Officer Burns kicked Mr. Ladd while Officer Fife wrapped handcuffs around his fist and proceeded to repeatedly hit Mr. Ladd in the head.

p. In early 2016, Randall McCants was assaulted by Officer McMillan. Officer McMillan handcuffed Mr. McCants, slammed Mr. McCants to the floor, and repeatedly struck Mr. McCants' arm using his baton. Lieutenant Whitley and Officer Randolph were present during the assault and did nothing to stop Officer McMillan.

q. In February 2016, Joseph Dowdy was assaulted by multiple officers at Bullock. Officers removed Mr. Dowdy from his dorm and, in the process, dropped and kicked him. This beating continued while Mr. Dowdy was in the infirmary.

r. In March 2016, at Bullock, Officer Faulk slapped James Thomas Johnson in the face. When Mr. Johnson then attempted to go to the cube to the speak with a more senior officer, Officer Faulk punched Mr. Johnson three times in the head.

s. In April 2016, Loyde McNeil Scott was assaulted in the cafeteria at Bullock by Sergeant Randolph, who punched Mr. Scott in the eye. Sergeant Randolph and other officers then removed Mr. Scott from the cafeteria and took him to a secluded area down the hall. The officers proceeded to beat Mr. Scott, striking him in the eye with handcuffs wrapped around their fists and kicking him in the face.

t. In January 2017, Jamie Lee Walker was attacked by guards and a Warden at Ventress. As a result, Mr. Walker sustained cuts and bruises, was forced to wear a helmet to

camouflage the injuries on his head, and was kept hidden when others came to tour the prison.

u.  On or about January 24, 2017, Eugene Moore was jumped by a Warden and four to five other officers at Ventress. As a result of the attack, Mr. Moore had to be rushed to the emergency room.

v.  In February 2017, Sergeant White and Sergeant Franklin entered Jonathan Forrest's cell at Bibb and proceeded to handcuff Mr. Forrest, strip him of his clothing, and then punch and kick him.

w.  In November 2017, after being involved in an altercation with another prisoner, Billy Smith was assaulted by Officer Singleton at Elmore. Officer Singleton struck Mr. Smith in the head and face and kicked his feet out from underneath him. After assaulting Mr. Smith, Officer Singleton failed to obtain timely medical attention. As a result, Mr. Smith died a few weeks later of a traumatic brain injury. The coroner ruled this death a homicide.

x.  On or about May 7, 2017, at Ventress, Defendant Person sprayed Dedrick Dean with mace and left him with no treatment for 24 hours, and allowed another inmate to access Mr. Dean's cell and choke him.

144.    Many of these incidents occurred while Defendant Jones was Warden at Ventress.

145.    After Mr. Beaty's assault, correctional officers continued to assault prisoners in Alabama's prisons, including Ventress. Upon information and belief, some examples of these assaults include, but are not limited to, the following assaults:

41

a. On or about June 11, 2018 at Ventress, Mardarrius Johnson was grabbed by his neck and choked by Sergeant Terry while Officer Edwards slammed Mr. Johnson against the wall.

b. In July 2018, an officer sexually assaulted Mr. Antonio Cunningham at Ventress. When Mr. Cunningham reported the assault, he was sent to the "Hot Bay." Another officer attempted to take Mr. Cunningham to a closet to perform sexual acts. When Mr. Cunningham refused, the officer sprayed Mr. Cunningham's genitals and buttocks with mace.

c. On August 4, 2018, at Donaldson, three officers beat Jerald Hyde with their batons in the back of his legs and over his head. The officers then handcuffed Mr. Hyde and transported him to the shift office, where a supervisor sprayed Mr. Hyde in the face with mace. The officers subsequently threw Mr. Hyde in the infirmary shower and, after turning the water off, instructed Mr. Hyde to keep his head down with his backside in the air, and pushed a baton against Mr. Hyde's rectum. After transporting him back to his cell, the officers tightened his handcuffs, fastened him to a metal hook on the wall, and left him for four to five hours. Mr. Hyde was later put in the Hot Bay after he returned from the infirmary.

d. On or about September 2, 2018 at Ventress, after Melissa Morgan, a transgender prisoner, was pushed to the ground by an officer. This officer then dragged Ms. Morgan outside, shoved her into a pole, kicked her in the ribs, and stomped on her head.

e. On or about September 24, 2018 at Ventress, after Matthew Jones was stabbed, he was placed in a segregation cell and left handcuffed for several hours. When Mr. Jones was released from the handcuffs, he dropped a tray of food because his hands were shaky

from being handcuffed for such a long period of time. The officer who brought the food slapped Mr. Jones so hard that Mr. Jones lost hearing in one ear for an extended period of time.

f.  On October 11, 2018, following an incident at Staton, a Correctional Emergency Response Team ("CERT") entered the D-Dorm and proceed to assault several prisoners. Officer Boone ordered Zachary Cain to get off his rack, and then hit him twice in the head; a number of other officers joined in and knocked Mr. Cain to the ground before beating him several times.

g.  During the same October 11, 2018 incident at Staton, Carmice Reon Hill was dragged out of his bed onto the floor and subsequently attacked by several officers who struck Mr. Hill with their batons, causing head injury his head and breaking several ribs. Despite Mr. Hill's visible injuries, he was not transferred to a hospital.

h.  Later on October 11, 2018, again at Staton, Adam Hagood was beaten by CERT officers in the C-2 Dorm. The officers used batons to hit Mr. Hagood several times in the back of his legs. The officers shoved Mr. Hagood to the ground and stomped on him. Mr. Hagood did not receive medical treatment until several days later.

i.  In October 2018, a prisoner at Kilby who was reportedly around 60 years of age was severely beaten into brain death by several officers, including Officer Meadows and Officer Williamson. He died approximately three weeks after the assault.

j.  In November 2018 at Ventress, John Ray was assaulted by a group of officers in the medical ward. Mr. Ray then had a seizure. Over the protests of other inmates in the ward, officers dragged Mr. Ray by his feet into a smaller treatment room. Mr. Ray was

43

kept in the room for several hours shackled and belly-chained to the bed. Officers continued to assault Mr. Ray for several hours.

k.  On January 2, 2019, Michael Hall was handcuffed by correctional officers at Kilby and dragged on the ground from the J-Dorm to the shift office. As a result of being dragged, Mr. Hall had abrasions all over his body. Some were so severe that the cuts exposed bone. On the way to the shift office, Mr. Hall was struck in the face and, as a result, his head became extremely swollen; he suffered a seizure the next morning. In addition, Mr. Hall was handcuffed so tightly that he had groove marks in both wrists. Mr. Hall was not taken to the infirmary until the next day.

l.  On January 21, 2019, Sergeant Dent and another correctional officers at St. Clair beat Jerald Hyde with batons in the restricted housing unit. The prisoner allegedly suffered from mental illness.

m.  On February 16, 2019, at Elmore, a handcuffed prisoner (C.H.) was knocked to the floor by Sergeant Oliver, who then proceeded to strike the prisoner with his fists and feet. Sergeant Oliver repeatedly bashed the prisoner with his baton. Sergeant Oliver then assaulted a second handcuffed prisoner (C.R.) in the same manner. Sergeant Oliver's supervisor, Lieutenant Burks, and two other officers (Mosley and Williams) were also present during the assaults and failed to intervene or order Sergeant Oliver to stop the beating.

n.  On March 25, 2019 at Ventress, Officer Patterson allowed inmates to approach Javaris Barnes's cell, remove the plate glass window, and verbally harass and threaten him. Because Mr. Barnes felt unsafe in his cell, he reported to Officer Patterson that he was suicidal and needed to seek mental health services, but Officer Patterson refused to take

44

him.  Mr. Barnes then set a fire in his cell, and Officer Patterson responded, "I hope you can clean that up yourself," before leaving Mr. Barnes in the burning cell.  Mr. Barnes required significant medical care as a result of the smoke inhalation.

o.  On May 9, 2019 at Ventress, Officer Patterson assaulted Rashad Donner outside the dining hall, grabbing him by the throat, slamming him to the ground, striking him in the face with a baton, and stomping and kicking him.  A number of other officers, including Officers Rogers and Dennis, joined in.  Mr. Donner was beaten unconscious and had to be sent to a hospital for treatment.

p.  On or about May 9, 2019 at Ventress, James Flair was assaulted by a Sergeant.  After his cell flooded, the sergeant entered the cell and held Mr. Flair's face in the two to three inches of water that had accumulated.

q.  On or about July 20, 2019 at Ventress, James Long was assaulted by Officer Blair while walking to the dining hall.  Officer Blair, who was stationed outside the dining hall, called Mr. Long over, and slapped Mr. Long repeatedly in the face.

r.  In July 2019 at Ventress, Jason Decker was assaulted by the Ventress Institutional PREA Compliance Manager (IPCM) and Officer Patton while he was confined to a single-man cell in the E-Dorm.  Mr. Decker had previously reported being sexually assaulted in the E-Dorm.  When he asked the officers to take him to the infirmary because he had continuing pain from his injuries, the IPCM—an officer specifically charged with protecting inmates from sexual assault—beat him with a baton while Officer Patton sprayed Mr. Decker with mace.  Mr. Decker had to be hospitalized after the assault.

s.  On October 4, 2019, Steven Davis was severely beaten by correctional officers at
    Donaldson. He was later taken to UAB hospital, where he died the next day.

t.  On or about December 5, 2019 at Ventress, according to a press release issued by
    ADOC, Michael Smith died in the hospital following an "alleged use of force" by
    officers on November 30, 2019. Two correctional officers were placed on mandatory
    leave following the incident, and the circumstances of Mr. Smith's death are still being
    investigated.

u.  In 2019 at Ventress, Officer Dennis assaulted a prisoner in handcuffs while in the
    process of transporting the man from Ventress to Holman Correctional Facility in
    Atmore, Alabama ("Holman"). Officer Dennis was fired after video emerged of him
    handcuffing the man to a fence and beating him.

v.  In 2019 at Ventress, Eddie Crout was assaulted by Sergeant Knight in the infirmary.
    Knight grabbed Mr. Crout by the neck and choked him, saying that he would drag him
    out of the infirmary if he did not leave on his own.

w.  Sometime in 2018 or 2019 at Ventress, Brandon Lee Jackson was assaulted by four
    officers, including Officers Barber, Lafogg, and Smith. These officers put a handcuff
    on Mr. Jackson's arm and used the other end of the cuff to twist Mr. Jackson's arm
    behind his back. The officers then then kicked and stomped Mr. Jackson multiple
    times.

x.  On or about January 29, 2020 at Ventress, Anthony Poe was assaulted by a group of
    officers including Lieutenant Whitt after Mr. Poe got up to use the bathroom in the B-
    1 Dorm. Mr. Poe was knocked unconscious by Lieutenant Whitt, woke up, and was
    then beaten unconscious a second time by a group of officers.

y.  On or about March 27, 2020 at Ventress, a prisoner was assaulted by several officers with batons.

z.  On or about March 30, 2002 at Ventress, the ADOC CERT team conducted a raid on Ventress. During the raid, a number of prisoners were assaulted and injured.

146.  Despite widespread knowledge of violent officer behavior, ADOC officials have done little to address this behavior or to hold wardens and other supervisory officers accountable for their actions and the actions of their direct reports. As a result, the prevalent use of excessive force in interactions with prisoners has increased and appears to be an accepted—or even preferred—method of discipline and control within ADOC facilities.

147.  The systemic failure to hold perpetrators of violence at all personnel levels accountable for the abuse of prisoners has led to the continued proliferation of violence under the watch of ADOC leadership. Correctional officers rarely face discipline for prisoner abuse and in many instances, reports of violence are investigated in a perfunctory manner, if at all.

### 4.  Defendant Karla Jones and Other Warden-Level Supervisors Were Not Only Retained, But Rewarded and Promoted After Presiding Over, Ignoring and/or Condoning Violence and Abuse

148.  The most consistent response to widespread violence by correctional officers against prisoners seems to be the retention of and continued promotion of the very supervisory personnel that have consistently failed to establish and enforce effective procedures to protect inmates from officer violence. As a result, excessive force thrives among staff and a message is sent that such action is condoned and indeed, preferred.

149.  For example, Defendant Karla Jones has a long history of presiding over institutions marred by widespread correctional officer violence against prisoners:

a.  At the time Jones was the Deputy Warden responsible for security and staff at Tutwiler, the Justice Department conducted and completed its investigation of Tutwiler. Its

47

findings letter and Notice of Expanded Investigation (the "Tutwiler Report") was submitted to Alabama Governor Robert Bentley with a copy to the then-Commissioner of the ADOC, Kim Thomas. The Justice Department found Tutwiler staff subjected its female prisoners to a pattern of sexual abuse in violation of the Eighth Amendment. Defendant Jones was directly responsible for overseeing security and staff who engaged in this misconduct. A contemporaneous evaluation conducted by the National Institute of Corrections noted that Tutwiler operated under "fear driven leadership" and operated under a culture of "intimidation and undue harshness." The Tutwiler Report highlighted ineffective reporting, lack of investigations and the absence of a grievance policy among several systemic failures fueling the abuse against prisoners. The Justice Department also confirmed allegations of rape, assault and sexual abuse by correctional officers. Defendant Jones took no action to address sexual abuse and misconduct at Tutwiler.

b. Rather than being penalized by ADOC leadership for her failure to address the growing horrors at Tutwiler, Defendant Jones was rewarded with a promotion to the Warden position at Easterling, which experienced in an increase in violence following her transfer.[14] The Equal Justice Initiative specifically put the Defendants on notice of Defendant Jones' misconduct at Easterling in March and April 2014, noting that since her arrival, there had been "a continuing wave of complaints from Easterling about arbitrary new policies and procedures that have increased violence and tension at that facility."

---

[14] Equal Justice Initiative Report: Tutwiler Prison for Women, November 2014, EJI.com

48

    c. Following this notice, no attempts were made by ADOC to alter Defendant Jones' fear-based leadership style, which set the tone for treatment of prisoners by her subordinates. Rather, Jones' leadership style also led to numerous complaints and even the loss of personnel in an already understaffed prison.

    d. Defendant Jones was subsequently named Warden at Ventress, which was similarly plagued with widespread violence by correctional officers against prisoners. Defendant Jones was in that position at the time of Mr. Beaty's assaults.

    e. This record followed Defendant Jones to St. Clair, where Jones served as warden from 2018 to 2019. During her tenure, there were pervasive issues with correctional officer violence against prisoners.

    150.    Defendant Jones is not an exception. A number of other wardens have similar records, where they have presided over facilities plagued by violence, and have been retained and promoted. For example:

    a. Warden Frank Albright similarly failed to address systemic abuse at Tutwiler. The Equal Justice Initiative filed a complaint based on the Tutwiler Report calling for Albright's removal. Rather than terminating his employment, Commissioner Thomas noted she would not "remove a very passionate warden...who's dedicated a lot of their life to the department and the state, merely on the whim of one request." Commissioner Thomas did ultimately transfer Albright to Kilby, and moved Kilby's warden, Bobby Barret, to Tutwiler. This method of staff reallocation to address concerns rather than holding leadership accountable through disciplinary action leads to the continuation of poor practices and further danger to prisoner safety. Ultimately, Albright retired with

49

full benefits despite being at the helm of Tutwiler during periods of some of the worst prisoner abuse ADOC has ever seen.

b.  Warden Davenport of St. Clair was promoted into his position after punching a handcuffed prisoner in the face as a form of discipline. When asked about an investigation of this horrific act, Defendant Culliver testified on record that he did not see a need to investigate Davenport's actions because he self-reported the incident. Davenport was given a two-day suspension, and no effort was made to determine if his behavior demonstrated a regular pattern of behavior. Davenport's promotion to Warden of St. Clair sent a clear message to prisoners that violent behavior on the part of leadership and correctional staff is permissible and the people put in place to protect them at the highest levels have no interest in doing so. Davenport was subsequently reassigned and became the Warden at Easterling Correctional Facility in Clio, Alabama ("Easterling") and later, Holman.  While Davenport was at Holman, conditions in the prison culminated in a riot, televised on social media, which ended with an officer being killed and Warden Davenport himself being stabbed. He retired soon thereafter with full benefits and no record of discipline for the degradation of prisoner rights at his facility.

c.  Defendant Culliver was demoted from Associate Commissioner to Regional Coordinator based on allegations of sexual misconduct. Just six months later, he was promoted back into his position as Associate Commissioner by Defendant Dunn.

151.   In other words, ADOC has incentivized violence by continuing to retain and promote senior staff who engage in and condone violence in their prisons, including Defendant Jones.

### 5. ADOC Has Developed "Hot Bays" as a Means of Instilling Fear in Prisoners

152.   In addition to the culture of violence promulgated by the chronic overcrowding, understaffing, use of excessive force and condonation of officer violence, ADOC facilities further fail to protect prisons from risk of serious harm through the creation of "Hot Bays" across the ADOC system.

153.   The "Hot Bay" is a term given to housing designated to inmates considered violent resulting in higher management needs.  As described in the Justice Department findings, the Hot Bay—an internal nickname for the "Behavior Modification" dormitory or "Restricted Housing Unit"—involves housing men with higher management needs together in a single, open bay unit. Despite the higher needs of this population, and the open layout, ADOC fails to provide adequate correctional officer presence necessary to manage these units.  Prisoners are commingled and generally unsupervised.  In most facilities, the Hot Bay serves as an unsupervised dumping ground for troublesome or violent inmates.

154.   This is the opposite of how administrative segregation is supposed to work. Inmates that are violent should be supervised to a greater degree and with more staff, and should have less unsupervised freedom of movement, than the general prison population.

155.   The Hot Bay is a mechanism used by ADOC to further instill fear among prisoners and exacerbate the culture of violence at its facilities.  Upon information and belief, the Hot Bay is routinely used to house prisoners who have been disciplined, as well as to discipline prisoners because they have reported violence by other prisoners or complained about prison conditions.

156.   Hot Bays are considered notoriously violent and dangerous dormitories.  As part of its investigation into ADOC facilities, the Justice Department inspected the Hot Bay at Bibb and

51

found that it was "critically dangerous." During another facility visit, when a Justice Department representative entered the Hot Bay, a captain remarked, "enter at your own risk."

157.    Prisoners in the Hot Bays are housed in double bunkbeds multiple rows deep, creating "blind spots" where correctional officers cannot observe prisoner-on-prisoner violence.

158.    ADOC's Hot Bays suffer from even more severe understaffing and lack of supervision than other portions of the prison facility. As the Justice Department noted, "unlike disciplinary units in other correctional systems, which require increased correctional staffing and supervision, prisoners and staff reported that there is little supervision in ADOC's Hot Bays, greatly contributing to the high level of violence in these units."

159.    Defendants have been put on notice of the violent culture in ADOC Hot Bays and the need for enhanced supervision of these housing units. They have failed to take remedial measures to enhance the safety of these dorms and add additional staffing to ensure that the prisoners in Hot Bays are adequately supervised.

160.    Hot Bays are used as a disciplinary tool by ADOC to both instill fear in prisoners and subject them to heighted violence in order to dissuade them from committing further infractions. Men are often placed in the Hot Bay even while their disciplinary infractions are pending investigation. They report being kept in the Hot Bay indefinitely, with no timeline for their release back to the general population. Through the use of Hot Bays, ADOC cultivates an environment where prisoners are at serious risk of physical harm as a disciplinary tactic—in clear violation of the Eighth Amendment.

161.    Like at other ADOC prisons, Ventress uses a Hot Bay system wherein prisoners considered particularly dangerous are collected in a single, woefully insecure dormitory. At Ventress, the B-1 housing unit is the "Hot Bay." Rather than alleviating the dangerous conditions

at Ventress, the Hot Bay only heightens the risk of violence.  There is little staff presence in the Ventress "Hot Bay."  In addition to using the Hot Bay to house violent inmates, officers at Ventress threaten to or put inmates in the Hot Bay to punish them for complaining about the prison conditions or violence at the facility.

162.    The layout of the B-1 Hot Bay dorm at Ventress heightens the risk of danger for inmates there because it limits the ability of any correctional officer who is present to maintain security.  Within the Hot Bay, inmates live on double bunks around the perimeter of the dorm. Sheets hang from the bunks and create blind spots.  The lack of a regularly functioning wall phone in the Hot Bay deprives inmates of any means to reach out for help when staff is not present.

163.    Because Ventress is overcrowded with inmates far beyond its capacity, when the limited number of holding cells are full, men who are pending investigation or serving disciplinary time are placed in the "Hot Bay."  They are often left there indefinitely with no timeline for their release back to the general population dorms.

164.    The environment within the Hot Bay leads to higher levels of prisoner-on-prisoner violence.  Ventress officers use placement in the Hot Bay as a means to retaliate against prisoners who complain about misconduct.  For example, upon information and belief, in May 2017, after a prisoner was stabbed by inmates in the Hot Bay who blamed him for stealing contraband that belonged to an officer, the officer blocked the prisoner from going to the infirmary for medical attention. After the prisoner obtained medical attention, the officer directed other officers to return the prisoner to the "Hot Bay."  When the prisoner was retuned, he was assaulted by other prisoners again and had to be transported to a hospital

**C.    The Insufficiency of Defendants' Response to Mr. Beaty's Assault**

165.    Defendants are responsible for the care, custody, and control of prisoners in their facilities, and, through their acts and omissions, Defendants have subjected prisoners at Ventress and at other ADOC facilities to an environment of violence and danger that poses an ongoing threat to the physical safety, mental health, and lives of prisoners at Ventress, as demonstrated by the numerous events narrated above, the assault on Mr. Beaty, and many other incidents.

166.    Defendant Administrative Supervisors and Defendant Prison Supervisors knew about the understaffing and overcrowded conditions at Ventress and at other ADOC facilities, unchecked extortion at Ventress and other ADOC facilities, and the frequent incidents of correctional officer violence that resulted, through internal reports, including incident reports, duty officer reports, and medical reports, as well as through external sources including the April 2, 2019 Justice Department report.

167.    Upon information and belief, and as evidenced by the unabated and widespread violence and neglect within Ventress and throughout the ADOC system, the Defendant Administrative and Prison Supervisors have not made meaningful efforts to address the dangerous conditions at Ventress that allow violence, including violence perpetrated by ADOC staff, to proliferate.

168.    The Defendant Administrative and Prison Supervisors adopted no changes at Ventress in response to either the internal or external reports of violence at Ventress due to understaffing and overcrowding and instead allowed the violence to continue unabated.

169.    Defendant Administrative and Prison Supervisors also failed to promulgate, implement, and enforce adequate policies, procedures, or practices essential to adequately supervise correctional staff and monitor the common areas and to ensure the safety of inmates.

54

170.    Defendant Administrative and Prison Supervisors were put on notice of the inadequate security provided to inmates at Ventress and throughout the ADOC system, through their own observations, their supervisory roles at the prison and ADOC, internal ADOC reports, communications with staff and inmates, inmate lawsuits naming them as defendants, and the Justice Department Report.

171.    Despite their knowledge that overcrowding, understaffing, and inadequate policies resulted in unchecked extortion and prevalent violence, including violence by correctional staff, at Ventress and throughout the ADOC system, Defendant Administrative and Prison Supervisors acted with deliberate indifference to the substantial risk of harm to Mr. Beaty and other such inmates by failing to address Ventress's dangerous conditions.

172.    Defendant Administrative and Prison Supervisors also knew that the efforts of the I&I Division to investigate violence against prisoners, including violence by correctional staff, at Ventress and throughout the ADOC system were wholly inadequate. If a correctional agency does not adequately investigate allegations, it will be unable to determine the factors that enable incidents to occur and the corrective actions necessary to address the problem. As the Justice Department found in the Notice Letter ADOC's "investigations are incomplete and inadequate," and noted that ADOC "dismisses many incidents as unsubstantiated without a thorough investigation."

173.    This inaction by Defendant Administrative and Prison Supervisors to take adequate steps to improve the conditions at Ventress signaled to correctional officers and inmates that anything except the most egregiously violent behavior would be tolerated, and that correctional officers could engage in such behaviors without any fear of consequences.

174.    For example, with regard to Mr. Beaty's assault on April 24, 2018, it took over a year—until May 1, 2019—for the ADOC to dismiss Defendant Person, in whole or in part for his assault on Mr. Beaty.

175.    And the investigation conducted by the Unknown I&I Officer Defendants was patently inadequate.  The I&I Officer Defendants did not adequately investigate the numerous officers who refused to help him get medical assistance or second assault in the infirmary. Following the inadequate investigation, the ADOC did not terminate or take any action against any other correctional employee who (i) assisted Defendant Person in trying to cover up his assault, (ii) who denied Mr. Beaty much-needed medical treatment, (iii) Defendant Lindsey who committed a second assault on Mr. Beaty in the infirmary, or (iv) the officers who assisted Defendant Lindsay in trying to cover up his assault.

176.    There was no discipline for Defendant Jones. Rather, she transferred to become the Warden at St. Clair, a larger and higher security prison.  While Defendant Jones was at St. Clair, there were pervasive issues with correctional officer violence against prisoners.

### PLAINTIFF'S DAMAGES

177.    As a result of Defendants' wrongful actions, Plaintiff has suffered severe physical and emotional trauma.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

178.    There are no administrative remedies within the Alabama Department of Corrections for Plaintiff to exhaust.

### CLAIMS

### Count I – 42 U.S.C. SECTION 1983
### Eighth and Fourteenth Amendment Excessive Force
### Against Defendants Person and Lindsey

179.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here

56

180.    As described more fully herein, Defendant Person used force against Mr. Beaty, causing him severe injury. At the time Defendant Person used force against Mr. Beaty, Mr. Beaty was restrained with his hands physically restrained in handcuffs behind his back. That use of force was unreasonable in light of the facts and circumstances present at the time that the force was used.

181.    As described more fully herein, Defendant Lindsey used force against Mr. Beaty, causing him severe injury. At the time Defendant Lindsey used force against Mr. Beaty, Mr. Beaty was in the infirmary seeking medical attention. That use of force was unreasonable in light of the facts and circumstances at the time that the force was used.

182.    In using force against Mr. Beaty, these Defendants intentionally used extreme and/or excessive cruelty toward Mr. Beaty for the purpose of causing him harm, and not in a good faith effort to maintain or restore security or discipline.

183.    Additionally, these Defendants knew that using force presented a risk of harm to Mr. Beaty, but they recklessly disregarded that risk and Mr. Beaty's safety by failing to take reasonable measures to minimize that risk of harm.

184.    The use of force used by these Defendants was unreasonable in light of all of the circumstances present during the encounter.

185.    As a result of this unjustified and unconstitutional conduct of these Defendants, Mr. Beaty experienced pain, suffering, emotional distress and severe injury.

186.    Defendants Person and Lindsey each negligently, wantonly, willfully, or otherwise wrongfully assaulted Mr. Beaty.

187.    The assaults by Defendants Person and Lindsey were so brutal that they caused severe injuries to Mr. Beaty.

### Count II - 42 U.S.C § 1983
### Eighth and Fourteenth Amendment Failure to Intervene

**Against Defendant Administrative Supervisors, Defendant Prison Supervisors, and
Individual Defendants Laseter, Pittman, Pittman, Grey, and Baldwin**

165.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

166.    As described more fully above, each of the Defendants had a reasonable
opportunity to prevent the violation of Mr. Beaty's constitutional rights as set forth above had they
been so inclined, but failed to do so.

167.    Defendants knew of a substantial risk to Mr. Beaty's safety, but consciously
disregarded that risk by failing to take reasonable steps to prevent the harm from occurring.

168.    The misconduct described in this Count was objectively unreasonable and was
undertaken intentionally with malice, willfulness, and/or deliberate indifference to Mr. Beaty's
rights.

169.    As a result of Defendants' failure to intervene, Mr. Beaty experienced pain,
suffering, emotional distress and severe injury.

170.    Prior to the assault of Mr. Beaty by Defendant Person, Defendants Baldwin and
Grey had a reasonable opportunity to prevent the assault on Mr. Beaty and violation of Mr. Beaty's
constitutional rights.

171.    Prior to the assault of Mr. Beaty by Defendant Lindsey, Defendants Laseter,
Pittman, and Pittman had a reasonable opportunity to prevent the assault on Mr. Beaty and
violation of Mr. Beaty's constitutional rights.

172.    Mr. Beaty's injuries were also proximately caused by the policies, practices, and
customs of the Defendant Administrative Supervisors and the Defendant Prison Supervisors.

173.    Prior to the two April 24, 2018 assaults, the Defendant Administrative Supervisors
and the Defendant Prison Supervisors knew that correctional officers routinely were using
excessive force against prisoners at Ventress and other ADOC facilities.  This routine use of

excessive force was widespread and pervasive. Despite this knowledge of unconstitutional use of force, the Defendant Administrative Supervisors and the Defendant Prison Supervisors failed to adequately supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to prevent officers like Defendants Person and Lindsey from using excessive force against prisoners like Mr. Beaty.

174.    At all times relevant to their involvement in this case, the Defendant Administrative Supervisors and the Defendant Prison Supervisors were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the use of force, the training of correctional staff on the use of force, and the supervision and discipline of correctional staff at Ventress and throughout the ADOC system.

175.    By failing to take any minimally adequate action to address the pervasive use of excessive force that Ventress, the Defendant Administrative Supervisors and the Defendant Prison Supervisors were deliberately indifferent to the problem thereby effectively ratifying it.

176.    Mr. Beaty's injuries were caused by employees of ADOC, including Defendants Person and Lindsey, who acted pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system described above, that were ratified by the Defendant Administrative Supervisors and the Defendant Prison Supervisors.

177.    Defendants' misconduct directly and proximately caused Mr. Beaty to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, emotional distress and severe injury.

### Count III - 42 U.S.C § 1983
**Eighth and Fourteenth Amendment Deliberate Indifference to Serious Medical Needs Against Defendant Administrative Supervisors, Defendant Administrative Supervisors, and Individual Defendants Person, Grey, Baldwin, Steele, Dennis, Cannon, Merritt, Laseter, Lindsey, Pittman, Pittman, and Unknown Officers.**

165.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

166.    As described more fully above, after his assaults, Mr. Beaty had an objectively serious medical need.

167.    As described more fully above, Defendants had notice of Mr. Beaty's medical needs and the seriousness of his medical needs, and they knew the risk of harm to Mr. Beaty's health if he did not receive adequate and immediate medical care.  Despite that knowledge, Defendants refused and unreasonably delayed medical treatment care.

168.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Beaty's rights. Alternatively, Defendants were deliberately indifferent to Mr. Beaty's objectively serious medical needs.

169.    Defendants Person, Grey, Baldwin, Steele, Dennis, Merritt, Cannon and Unknown Officers, knew that Mr. Beaty had been assaulted and had severe medical needs.  As a proximate result of their malice, deliberate or reckless indifference to his serious medical needs, Mr. Beaty's treatment was refused and delayed for hours after his assault exacerbating his injuries and suffering.

170.    Defendants Laseter, Lindsey, Pittman, and Pittman, knowing that Mr. Beaty had been assaulted and had severe medical needs, intentionally, with malice, and/or with reckless indifference, exacerbated Mr. Beaty's injury and caused Mr. Beaty's medical care to be further delayed.  As a proximate result of their malice, deliberate, or reckless indifference to his serious medical needs, Mr. Beaty's injury and suffering were exacerbated.

171.    Mr. Beaty's injuries were also proximately caused by the policies, practices, and customs of the Defendant Administrative Supervisors and the Defendant Prison Supervisors.

172.    Prior to the April 24, 2018 assaults, the Defendant Administrative Supervisors and the Defendant Prison Supervisors were aware of or deliberately indifferent that correctional officers routinely were refusing to provide or delaying the medical care for prisoners assaulted by correctional officers at Ventress and other ADOC facilities. The failure to provide timely medical care for prisoners assaulted by correctional officers was widespread and pervasive. Despite this knowledge of unconstitutional deprivation of medical care, the Defendant Administrative Supervisors and the Defendant Prison Supervisors failed to adequately supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to prevent officers like Defendants Person, Lindsey, Baldwin, Grey, Steele, Dennis, Merritt, Cannon, Laseter, Pittman, or Pittman from failing to provide timely medical care to prisoners like Mr. Beaty.

173.    At all times relevant to their involvement in this case, the Defendant Administrative Supervisors and the Defendant Prison Supervisors were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners, the training of correctional staff on the provision of medical care, and the supervision and discipline of correctional staff at Ventress and throughout the ADOC system.

174.    By failing to take any minimally adequate action to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress and other ADOC facilities, the Defendant Administrative Supervisors and the Defendant Prison Supervisors were deliberately indifferent to the problem thereby effectively ratifying it.

175.    Mr. Beaty's injuries were exacerbated by the conduct of employees of ADOC, who acted pursuant to the de facto policies, practices, and customs at Ventress and throughout the

ADOC system, described above, that were ratified by the Defendant Administrative Supervisors and the Defendant Prison Supervisors.

176.   Defendants' misconduct directly and proximately caused Mr. Beaty to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, emotional distress and severe injury.

**Count IV - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect**
**Against All Defendant Administrative Supervisors and Defendant Prison Supervisors**

177.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

178.   Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

179.   Defendant Administrative Supervisors and Defendant Prison Supervisors, acting individually and in conspiracy with other Defendants, failed to protect Mr. Beaty.

180.   Defendant Administrative Supervisors and Defendant Prison Supervisors knew of and consciously disregarded the substantial risk that Mr. Beaty would be injured while in custody at Ventress, failing to protect him from harm.

181.   Additionally, Defendant Administrative Supervisors and Defendant Prison Supervisors knew of and consciously disregarded the substantial risk that Defendant Person and Defendant Lindsey would harm prisoners like Mr. Beaty while in custody at Ventress, and Defendant Administrative Supervisors and Defendant Prison Supervisors failed to take any action in response.

182.   The misconduct described in this Count was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of Mr. Beaty and other

prisoners at Ventress and other ADOC facilities, and this misconduct was objectively unreasonable.

183.    The misconduct of Defendant Administrative Supervisors and Defendant Prison Supervisors directly and proximately caused Mr. Beaty to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, emotional distress and severe injury.

**Count V - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment State-Created Danger**
**Against All Individual Defendants**

184.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

185.    Pursuant to the Eighth and Fourteenth Amendment of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State, including from a State-created danger.

186.    Defendants limited Plaintiff's ability to care for himself in prison.

187.    Defendants affirmatively placed Plaintiff in a position of danger he would not have otherwise faced.

188.    In violation of Plaintiff's Eighth and Fourteenth Amendment rights, Defendants knew of and consciously disregarded the substantial risk that Plaintiff would be injured while in custody at Ventress, including from a State-created danger.

189.    Defendants, acting individually and in conspiracy with other Defendants, then failed to take reasonable steps to address the known and unreasonable risk of serious harm to Plaintiff resulting from the State's creation.

190. The misconduct described in this Count was undertaken with deliberate indifference, malice, willfulness, and reckless indifference to the rights of others, and was objectively unreasonable.

191. Defendants' misconduct directly and proximately caused Mr. Beaty to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, emotional distress and severe injury.

### Count VI - 42 U.S.C § 1983
### Civil Conspiracy
### Against All Defendants

192. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

193. As described more fully in the preceding paragraphs, the Defendants and other co-conspirators not yet known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

194. The Defendants and other co-conspirators not yet known to Mr. Beaty (including the unknown defendants) reached an agreement among themselves to deprive Plaintiff of his right to be free from unreasonable harm and fail to intervene to prevent harm from occurring to Plaintiff, in violation of Plaintiff's constitutional rights, in the manner described above.

195. In furtherance of this conspiracy, and as set forth in the complaint above, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity. Among other things, each of the Defendants was involved in the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the use of force and medical treatment at Ventress and throughout the ADOC system.

196. As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered damages.

## Count VI – State Law
## Civil Conspiracy
## Against All Defendants

197.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

198.    As described more fully in the preceding paragraphs, the Defendants and other co-conspirators not yet known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

199.    In furtherance of a conspiracy to deprive Plaintiff of his right to be free from unreasonable harm and retaliation while in State custody, the Defendants and other unknown coconspirators committed overt acts and were otherwise willful participants in joint activity. Among other things, each of the Defendants was involved in the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the use of force and medical treatment at Ventress and throughout the ADOC system.

200.    The misconduct described above was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

201.    As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered damages.

## Count VII - State Law Negligent/Wanton Retention
## Against Defendants State of Alabama, ADOC, Defendant
## Administrative Supervisors, and Defendant Prison Supervisors

202.    Defendants had a duty to act reasonably in retaining correctional officers, including Defendants Person and Lindsey.

203.    Defendants had a duty to protect prisoners from cruel and unusual punishment by correctional officers, including Defendants Person and Lindsey.

204.    Upon information and belief, during their employment with Ventress, Defendants Person and Lindsey, on other occasions, unlawfully assaulted inmates in violation of the

Constitutions and laws of the United States and the State of Alabama and in violation of ADOC Regulations.

205.    Defendants knew or should have known that Defendants Person and Lindsey were not fit to serve as correctional officers, would unlawfully assault inmates, and were otherwise dangerous persons to be guarding inmates.

206.    Defendants negligently or wantonly retained Defendants Person and Lindsey as corrections officers.

207.    The negligent or wanton conduct of Defendants was a contributing cause of Plaintiff's injuries.

208.    The decision to allow Defendants Person and Lindsey to continue to work as correctional officers and oversee inmates was not an exercise of judgment of ADOC, but rather was in violation of the rights and safety of inmates, including Plaintiff.

209.    The conduct of Defendants was in violation of the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State.

210.    The conduct of Defendants was willful, malicious, fraudulent, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

### Count VIII – State Law
### Intentional Infliction of Emotional Distress
### Against Defendants Person, Lindsey, Baldwin, Grey, Laseter, Pittman, and Pittman

211.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

212.    The acts of Defendants as set forth above were both extreme and outrageous.

213.    Defendants intended to cause, or acted in reckless regard of the probability that they would cause, severe emotional distress to Plaintiff.

214.   The misconduct described above was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

215.   As a direct and proximate result of the misconduct described above, Plaintiff's rights were violated and he suffered damages.

### Count IX – State Law Claim
### Indemnification
### Against Defendant State of Alabama

216.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

217.   Defendants were all state employees, acting at all relevant times within the scope of their employment, in committing the misconduct described herein.

218.   Alabama law including Alabama Code § 36-1-6.1 requires the State to pay any judgment against each of the Individual Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. declare that the acts and omissions of the Defendants violated the Eighth and Fourteenth Amendments of the United States Constitution;

b.  order Defendants to comply with the Constitution and enter an injunction prohibiting Defendants from engaging in further violations of the Eighth Amendment;

c. enter an injunction prohibiting Defendants from retaliating against Plaintiff;

d. enter a judgment in his favor and against all Defendants;

e. award Plaintiff compensatory damages against Defendants, jointly and severally, in an amount to be determined;

f. award Plaintiff punitive damages against Defendants, jointly and severally,

g. award reasonable attorneys' fees and costs; and

h. order such additional relief as the Court may deem just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b)

on all issues so triable.

Benjamin W. Maxymuk (ASB-9590-M67M)
COPELAND FRANCO SCREWS & GILL, P.A.
444 South Perry Street
Montgomery, AL 36104
Tel: (334) 384-1180
maxymuk@copelandfranco.com

John A. Freedman (D.C. Bar No. 453075) (pro hac vice
forthcoming)
Maureen R. Jeffreys (D.C. Bar No. 476621) (pro hac vice
forthcoming)
Stuart W. Turner (VA Bar No. 47489) (pro hac vice
forthcoming)
Florence Bryan (D.C. Bar No. 1672343) (pro hac vice
forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
John.Freedman@arnoldporter.com
Maureen.Jeffreys@arnoldporter.com
Stuart.Turner@arnoldporter.com
Florence.Brayn@arnoldporter.com

Jeffrey A. Fuisz (N.Y. Bar No. 2472868) (pro hac vice
forthcoming)
Jason T. Raylesberg (N.Y. Bar No. 5588165) (pro hac vice
forthcoming)
Neesha Chhina (N.Y. Bar No. 5726021) (pro hac vice
forthcoming)
Linghan Wang (N.Y. Bar No. 5751250) (pro hac vice
forthcoming)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Jeffrey.Fuisz@arnoldporter.com

68

Jason.Raylesberg@arnoldporter.com
Neesha.Chhina@arnoldporter.com
Linghan.Wang@arnoldporter.com

*Attorneys for Plaintiff Daniel Beaty*

69