**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| DANIEL ADAM BEATY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:20-CV-279-ECM-SRW |
| JEFFERSON S. DUNN, GRANT | ) | |
| CULLIVER, RUTH NAGLICH, KARLA | ) | |
| JONES, KENNETH DRAKE, PAMELA | ) | |
| HARRIS, ELIZABETH LASETER, | ) | |
| MARKEON PERSON, ROBERT | ) | |
| LINDSEY, LADARION BALDWIN, | ) | JURY TRIAL DEMANDED |
| TAMEKA GREY, JOSHUA PITTMAN, | ) | |
| JONATHAN PITTMAN, LANCIE | ) | |
| CANNON, JOSHUA MERRITT, DAVID | ) | |
| DENNIS, DEON STEELE, DAVID | ) | |
| GALLEW, SCOTT SIDES, AND | ) | |
| ARNOLDO MERCADO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## CORRECTED THIRD AMENDED COMPLAINT

### INTRODUCTION

1.      On April 24, 2018, while incarcerated at the Alabama Department of Corrections ("ADOC") Ventress Correctional Institution ("Ventress") in Clayton, Barbour County, Alabama, Plaintiff Daniel Beaty was maliciously assaulted by Defendant Sergeant Markeon Person, a correctional officer, who, after handcuffing Mr. Beaty's arms behind his back, struck him from behind, breaking his jaw in two places, sending a large portion of his jawbone between his teeth, and spraying blood all over the wall.  Two other guards, Defendants Grey and Baldwin, witnessed

Person prepare to and commit the assault, but did nothing to intervene.  Mr. Beaty, bleeding profusely with a bone protruding from his gums, implored Person and other Ventress employees (including Defendants Cannon, Merritt, Dennis, and Steele) to take him to the prison infirmary. They refused and left Mr. Beaty, with blood pouring from his mouth, in the B-1 Dorm, known as the "Hot Bay," which was notorious for violence and housed some of the most dangerous inmates at Ventress.  Defendant Person threatened Mr. Beaty to stay quiet, "not to tell on [me]," and took other steps to conceal the assault.

2.     After four hours during which Mr. Beaty continued to bleed, a nurse who was visiting the Hot Bay for other reasons saw that Mr. Beaty was severely injured and escorted him to the prison infirmary.  Although initially taking photos and calling an ambulance, the nurse treating Mr. Beaty in the infirmary was directed by Defendant Sergeant Robert Lindsey, Lieutenant Elizabeth Laseter, Officer Jonathan Pittman, and Officer Joshua Pittman to abandoned him, leaving Mr. Beaty alone with Defendants Lindsey and Laseter.  One of the officers in the infirmary cancelled the ambulance that would have taken Mr. Beaty to the hospital, further delaying his medical treatment and causing him additional pain and injuries.

3.     While he was in the infirmary, without having received adequate medical treatment or care, Mr. Beaty was assaulted a second time by Defendant Lindsey, who yanked Mr. Beaty's mouth open, causing him excruciating pain.  Defendant Laseter witnessed this second assault, and, just as Defendant Person had, Defendants Lindsey and Laseter threatened Mr. Beaty not to tell anyone what happened.

4.     After an hour and a half at the infirmary, Mr. Beaty was transported by prison van (not an ambulance) to Troy Regional Medical Center.  Being handcuffed, Mr. Beaty was unable to brace himself and was tossed around the prison van, causing more suffering.  Mr. Beaty fought

to stay awake, terrified that if he lost consciousness, he would die.  Once at Troy Medical Center, doctors judged Mr. Beaty's injuries to be too serious for treatment at that hospital and transferred him to Baptist Medical Center South in Montgomery.  At Baptist South, Mr. Beaty underwent surgery to repair his injuries and wire his jaw shut.  After several days, he was transported to the infirmary at Kilby Correctional Facility ("Kilby") in Montgomery, Alabama.  He spent 2 months in recovery there, limited to a liquid diet, and lost 25 pounds.

5.       Throughout and after the assault, Defendant Person and other officers (including Defendant Lieutenant Laseter), attempted to cover up Defendant Person's involvement in it. Defendant Person forced Mr. Beaty to change his prison uniform, which had become saturated in blood.  After Mr. Beaty was hospitalized, Defendant Person attempted to coerce other inmates to take responsibility.  And when Mr. Beaty returned to Ventress, Defendant Person attempted to intimidate him, demanding to know why Mr. Beaty had told medical personnel and others that Person was the perpetrator instead of saying falsely that it was someone else.  During the investigation of the incident, which was led by Defendant David Gallew, investigators repeatedly urged Mr. Beaty to abandon his complaints against the Defendant officers.  It was only because Mr. Beaty refused these exhortations that over a year later, Defendant Person was discharged as a direct result of his assault on Mr. Beaty.  Upon information and belief, none of the other Defendants—not Defendant Lindsey, who committed a separate assault on Mr. Beaty, nor any of the other Defendants who witnessed and failed to prevent the assaults or denied or delayed Mr. Beaty's medical care—were disciplined.

6.       Sergeant Person's assault on Mr. Beaty, and the events that preceded and followed it, was not an isolated incident.  Numerous other incarcerated persons in the charge of the ADOC at Ventress and other ADOC facilities have been assaulted by correctional staff, including, in some

3

cases, while they were handcuffed, restrained, or otherwise defenseless.  And, once assaulted, many of those same individuals were denied timely and proper medical care.

7.      Moreover, the leadership of the Alabama Department of Corrections, including Commissioner Dunn and Associate Commissioner Culliver, as well as the leadership of Ventress, including Warden Jones and Captains Harris and Drake, had notice of the widespread correctional officer assaults at Ventress and at other facilities in the ADOC system that were overcrowded and understaffed.  According to ADOC statistical reports, at the end of 2017 (mere months before the assault on Mr. Beaty), Ventress reported more assaults on inmates than any other facility in the ADOC system; and in the three months leading up to the assault on Mr. Beaty, ADOC reported a spike of assaults on inmates at Ventress, with assaults occurring at twice the already high rate they had in 2017.  Despite knowledge of this pattern of violence, the leadership of Ventress and the ADOC has condoned and encouraged and/or were willfully indifferent to the widespread and persistent violence committed by correctional officers, frequently retaining and promoting individuals who supervised the prisons plagued by violence.  And the ADOC leadership, including Defendants Commissioner Dunn, Associate Commissioner Culliver, and Investigations & Intelligence Division ("I&I") Director Mercado, and Assistant Director Sides,  had notice prior to the assault on Mr. Beaty that these assaults were not adequately investigated and the responsible correctional officers were not appropriately disciplined.

8.      As found by the United States Department of Justice (the "Justice Department") based on its investigation spanning 2016 through 2019, which includes the time when Mr. Beaty was assaulted, the conditions in Alabama's male prisons violate the Eighth Amendment's protection from cruel and unusual punishment due to ADOC's failure to "protect prisoners from serious harm and substantial risk of serious harm."   The Justice Department found that

US 172228547v4

"correctional officers within the Alabama Department of Corrections frequently use excessive force on prisoners housed in Alabama's prisons for men."   The Justice Department review found "frequent uses of excessive force in 12 of the 13 Alabama prisons" reviewed, including Ventress, and that this conduct was "pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment."   The Department of Justice also found that in light of the "pervasiveness of the uses of excessive force and the statewide application of ADOC's use of force policies and procedures," there was cause to believe that "uses of excessive force occurring within Alabama's prisons give rise to systemic unconstitutional conditions" and that there was a "lack of accountability in reviewing and tracking uses of force."

9.     Following his assault, eleven separate Ventress correctional officers (Defendants Laseter, Person, Lindsey, Baldwin, Grey, Pittman, Pittman, Cannon, Merritt, Dennis, and Steele), as well as medical personnel, deliberately failed to attend to Mr. Beaty's serious medical needs. This widespread failure by eleven Ventress correctional officers demonstrates obvious and significant deficiencies in training at Ventress, for which Defendant Jones as Warden, and Drake and Harris as Captains, are responsible.   And this incident does not stand on its own—it is part of a pattern of Ventress correctional officers failing to attend to the serious medical needs of incarcerated persons in their care and a culture of deliberate indifference.   As detailed in this complaint, there were other similar incidents, including incidents where inmates, like Mr. Beaty, were attacked in the Ventress infirmary.

10.     The failure of correctional officers and medical personnel to attend to the serious medical needs of inmates is not isolated to Ventress.   Prior to the failure to attend to Mr. Beaty's serious medical needs, ADOC leadership including Commissioner Dunn and Associate Commissioner Naglich knew or were deliberately indifferent to the failure of correctional officers

US 172228547v4

and ADOC medical staff to attend to inmates' serious medical needs.  [CONSIDER WHAT WE CAN ADD HERE]

11.   Mr. Beaty brings this lawsuit to recover damages and other relief for the injuries he suffered, both physical and emotional, and the violation of his constitutional rights.  Defendants, in addition to the individual prison guards, include the ADOC and its senior officials, who have, according to findings by the Justice Department, consistently and systematically failed to protect prisoners from serious violence and harm at Ventress and other facilities.

12.   According to ADOC's Mission Statement, ADOC's mission is to provide inmates a "safe, secure, and humane environment."  Instead, through a pattern of abuse by correctional officers that was well known by ADOC leadership, it has knowingly subjected inmates to cruel and unusual punishment.

## PARTIES

13.   Plaintiff Daniel Adam Beaty is a 39-year-old resident of Alabama who entered ADOC custody on April 25, 2017 and was assaulted on April 24, 2018.  Mr. Beaty is eligible for parole beginning some time after April 2030.

14.   Defendant Jefferson S. Dunn is over 19 years of age and is a resident of the State of Alabama.  Defendant Dunn was appointed Commissioner of the ADOC in April 2015 and held that position at the time of the events described in Plaintiff's Complaint.  The Commissioner is ADOC's highest ranking official, and is responsible for the direction, supervision, and control of ADOC and its employees, including ensuring that departmental employees are properly trained to perform and  properly carry out their assigned duties. Defendant Dunn is responsible for setting departmental policies and customs at ADOC and its facilities, including Ventress; overseeing institutional policies and customs at facilities, including Ventress; supervising the adoption of changes in departmental and institutional policies and customs or corrective action plans as

6

needed; planning, directing, controlling, and otherwise managing ADOC facilities including Ventress to ensure the safety and security,  as well as the protecting constitutional and human rights of persons within the custody of the ADOC, including the rights of Mr. Beaty while he is an ADOC prisoner.  At Ventress and other ADOC facilities, Commissioner Dunn had notice and/or knowledge of these patterns of correctional officer violence and abuse against prisoners, as well as insufficient investigation and discipline of correctional officers engaging in such violence. Indeed, Commissioner Dunn regularly received and/or had access to incident reports of correctional officers using excessive force against inmates, as well as reports by the Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, internal communications, and/or prisoner lawsuits.

15.    Defendant Grant Culliver is over 19 years of age and is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Culliver was employed by the ADOC as Associate Commissioner for Operations and Institutional Security.  Defendant Culliver first undertook that role in August 2014 and returned to the position in mid-2015 after a demotion in early 2015, and he remained in the position until he was placed on administrate leave in September 2018.  As Associate Commissioner for Operations and Institutional Security, Defendant Culliver was responsible for ensuring the effective and safe daily operations of all prison facilities, including Ventress, including overseeing institutional security, staffing, Institutional Coordinators, Correctional Emergency Response Teams, the Classification Review Board, and the Transfer Division; administering the training program for departmental employees, and the Training Division; managing the Security Audit Team, ensuring that security and audits were properly conducted to assess the adequacy of institutional policies and procedures, and whether staff were following institutional policies and procedures; and overseeing the design and implementation of

7

any necessary correction action plans.   At Ventress and other ADOC facilities, Associate Commissioner Culliver had notice and/or knowledge of these patterns of correctional officer violence and abuse against prisoners, as well as insufficient investigation and discipline of correctional officers engaging in such violence.   Indeed, Associate Commissioner Culliver regularly received and/or had access to incident reports of correctional officers using excessive force against inmates, as well as reports by the Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, internal communications, and/or prisoner lawsuits.  Defendant Culliver retired from the ADOC effective December 1, 2018.

16.    Defendant Ruth Naglich is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Naglich was employed by the ADOC as Associate Commissioner of Health Services.   As Associate Commissioner of Health Services, Defendant Naglich was responsible for establishing, monitoring, and enforcing system-wide health care policies and practices; supervising the provision of adequate medical care for all prisoners within the custody of the department; and administering medical and mental health services, including those for inmates housed at Ventress.

17.    Defendant Karla Jones is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Jones was employed by the ADOC as Warden of Ventress.  She held that position until or around May 2018. As Warden of Ventress, Defendant Jones was responsible for establishing institutional policies and customs at Ventress; adopting and implementing changes in institutional policies and customs as needed; planning, directing, controlling, and otherwise management Ventress to ensure the safety and security of its prisoners; managing the internal security audit team; debriefing external

security audits with the external security audit team; conducting inspections of the facility; creating and implementing improvement plans in response to internal and external security audits and inspections; reviewing and signing off on incident reports; the day-to-day operations of the prison, the safety of all prisoners, and the training and supervision of all subordinate employees, including assistant wardens and captains. Defendant Jones was responsible for ensuring adequate supervision and monitoring of prisoners (including developing and documenting a facility staffing plan to provide for adequate staffing levels), and appropriate discipline and deterrence of staff misconduct. Prior to coming to Ventress, Jones had previously served in senior levels at Tutwiler and Easterling Correctional Facilitis, both of which witnessed patterns of correctional officer violence and abuse against prisoners, as well as insufficient investigation and discipline of correctional officers for engaging in such violence. Following her time at Ventress, Jones served as Warden of St. Clair Correctional Facility, which also experienced a pattern of correctional officer violence and abuse against prisoners, as well as insufficient investigation and discipline of correctional officers engaging in such violence. At Ventress and these other facilities, Warden Jones had notice and/or knowledge of these patterns of correctional officer violence and abuse against prisoners, as well as insufficient investigation and discipline of correctional officers engaging in such violence. Indeed, Warden Jones regularly received and/or had access to incident reports of correctional officers using excessive force against inmates, as well as reports by the Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, direct observations, internal communications, and/or prisoner lawsuits.

18.   Defendant Kenneth Drake is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Drake was

9

employed by the ADOC as a Captain at Ventress.  As a Captain, Drake was responsible for the safety of all inmates at the facility, security activities, and the supervision of all institutional security activities and subordinate employees to ensure that staff were carrying out ADOC and Ventress policies.  Drake had notice and/or knowledge of the pattern of correctional officer violence and abuse against prisoners at Ventress, as well as insufficient investigation and discipline of correctional officers engaging in such violence because he had access to incident reports of correctional officers using excessive force against inmates, as well as duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, direct observations, internal communications, and/or prisoner lawsuits..

19.     Defendant Pamela Harris is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Harris was employed by the ADOC as a Captain at Ventress.  As a Captain, Harris was responsible for the safety of all inmates at the facility, security activities, and the supervision of all institutional security activities and subordinate employees to ensure that staff were carrying out ADOC and Ventress policies.  Harris had notice and/or knowledge of the pattern of correctional officer violence and abuse against prisoners at Ventress, as well as insufficient investigation and discipline of correctional officers engaging in such violence because she had access to incident reports of correctional officers using excessive force against inmates, as well as duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, direct observations, internal communications, and/or prisoner lawsuits.

20.     Defendant Elizabeth Laseter is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Laseter was employed by the ADOC as a Lieutenant at Ventress.  As Lieutenant, Defendant Laseter was

US 172228547v4

responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.  Defendant Laseter was on duty on April 24, 2018 and present in the infirmary to witness Defendant Lindsey's subsequent assault on Mr. Beaty. Defendant Laseter did nothing to intervene or stop this assault; she also delayed Mr. Beaty's medical care, which was urgently needed, thereby exacerbating his injuries, including his pain and suffering, and she threatened Mr. Beaty not to tell anyone else what happened.

21.     Defendant Markeon Person is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Person was employed by the ADOC as a Sergeant at Ventress.  On April 24, 2018, Defendant Person assaulted Mr. Beaty in the "Hot Bay" Dormitory (B-1 Dorm) while he was restrained in handcuffs. Defendant Person was dismissed from employment by the ADOC for violation of multiple standards under ADOC Administrative Regulation 208, Employee Standards of Conduct and Discipline, in whole or in substantial part based on his assault of Mr. Beaty.  His dismissal was upheld by the Alabama Personnel Board on August 21, 2019.

22.     Defendant Robert Lindsey is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Lindsey was employed by the ADOC as a Sergeant at Ventress.  After Mr. Beaty was taken to the Ventress infirmary on April 24, 2018 following the assault while handcuffed by Defendant Person, Defendant Lindsey assaulted and further exacerbated Mr. Beaty's severe facial injuries. Defendant Lindsey also delayed Mr. Beaty's medical care, which was urgently needed.

23.     Defendant Ladarion Baldwin is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Baldwin was employed by the ADOC as an officer at Ventress.  Defendant Baldwin was on duty

US 172228547v4

in E-Dorm on April 24, 2018 and witnessed Defendant Person's assault on Mr. Beaty. Defendant Baldwin did nothing to intervene or stop the assault and deliberately ignored Mr. Beaty's urgent need for medical attention.

24.     Defendant Tameka Grey is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Grey was employed by the ADOC as an officer at Ventress. Defendant Grey was on duty in E-Dorm on April 24, 2018 and witnessed Defendant Person's assault on Mr. Beaty. Defendant Grey did nothing to intervene or stop the assault and deliberately ignored Mr. Beaty's pleas and urgent need for medical attention.

25.     Defendant Jonathan Adell Pittman is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Pittman was employed by the ADOC as an officer at Ventress. Defendant Pittman was on duty on April 24, 2018 and present in the infirmary to witness Defendant Lindsey's subsequent assault on Mr. Beaty. Defendant Pittman was on duty on April 24, 2018 and present in the infirmary to witness Defendant Lindsey's subsequent assault on Mr. Beaty. Defendant Pittman did nothing to intervene or stop the assault, and deliberately delayed Mr. Beaty's medical care, which was urgently needed.

26.     Defendant Joshua Aaron Pittman is over 19 years of age and, upon information and belief, is a resident of the State of Alabama. At the time of Mr. Beaty's assaults, Defendant Pittman was employed by the ADOC as an officer at Ventress. Defendant Pittman was on duty on April 24, 2018 and present in the infirmary to witness Defendant Lindsey's subsequent assault on Mr. Beaty. Defendant Pittman did nothing to intervene or stop the assault, and deliberately delayed Mr. Beaty's medical care, which was urgently needed.

US 172228547v4

27.     Defendant Lancie Cannon is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Cannon was employed by the ADOC as an officer at Ventress.  Defendant Cannon was on duty in the Hot Bay on April 24, 2018 and witnessed Mr. Beaty's severe injuries resulting from Defendant Person's assault.  Defendant Cannon deliberately ignored Mr. Beaty's urgent need for medical attention.

28.     Defendant Joshua  Merritt is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Merritt was employed by the ADOC as an officer at Ventress.  Defendant Merritt was on duty in the Hot Bay on April 24, 2018 and witnessed Mr. Beaty's severe injuries resulting from Defendant Person's assault.  Defendant Merritt deliberately ignored Mr. Beaty's urgent need for medical attention.

29.     Defendant David Dennis is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Dennis was employed by the ADOC as an officer at Ventress.  Defendant Dennis was on duty in the Hot Bay on April 24, 2018 and witnessed Mr. Beaty's severe injuries resulting from Defendant Person's assault.  Defendant Dennis deliberately ignored Mr. Beaty's urgent need for medical attention.

30.     Defendant Deon Steele is over 19 years of age and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Steele was employed by the ADOC as an officer at Ventress.  Defendant Steele was on duty in the Hot Bay on April 24, 2018 and witnessed Mr. Beaty's severe injuries resulting from Defendant Person's assault.  Defendant Steel deliberately ignored Mr. Beaty's urgent need for medical attention.

31.     Defendant David Gallew is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Gallew worked for the ADOC Investigations and Intelligence Division ("I&I") and was assigned to investigate

US 172228547v4

Mr. Beaty's assaults.  Defendant Gallew repeatedly exhorted Mr. Beaty not to pursue his complaint against the Defendant officers who assaulted him and delayed his medical care.  Due to Defendant Gallew's failure to adequately investigate the assaults, numerous Defendants were not appropriately investigated or disciplined, furthering the culture of violence against inmates at Ventress and other ADOC facilities.

32.     Defendant Scott Sides is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Sides was the Assistant Director of ADOC I&I Division and was responsible for the supervision of all I&I investigations, including the investigation into the events surrounding Mr. Beaty's assaults.  As Assistant Director of I&I, Defendant Sides had notice and/or knowledge of the pattern of correctional officer violence and abuse against prisoners, as well as insufficient investigation and discipline of correctional officers engaging in such violence at Ventress and elsewhere in the ADOC system.

33.     Defendant Arnoldo Mercado is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of Mr. Beaty's assaults, Defendant Mercado was the Director of ADOC I&I Division and was responsible for the supervision of all I&I investigations, including the investigation into the events surrounding Mr. Beaty's assaults.  As Director of I&I, Defendant Mercado had notice and/or knowledge of the pattern of correctional officer violence and abuse against prisoners, as well as insufficient investigation and discipline of correctional officers engaging in such violence at Ventress and elsewhere in the ADOC system.

34.     Collectively, all of the individual Defendants in this Complaint are referred to as the "Individual Defendants."

US 172228547v4

35.     Unless otherwise noted, Mr. Beaty sues each of the Individual Defendants in his or her individual capacity.  Each of the Individual Defendants acted under color of law and within the scope of his or her employment by the ADOC when engaging in the conduct described in this Complaint.

## JURISDICTION AND VENUE

36.     This Court has original jurisdiction over the Federal law claims herein pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Several claims herein arise under the Constitution, laws, or treaties of the United States.

37.     This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a).

38.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims presented in this case occurred in the Middle District of Alabama.

## FACTUAL ALLEGATIONS

### I.     THE ASSAULT ON MR. BEATY AND ITS AFTERMATH

39.     On April 25, 2017, having been convicted and sentenced to incarceration, Mr. Beaty entered the custody of the ADOC.

40.     Mr. Beaty was transferred to Ventress in late 2017.  He was housed in Dormitory E-1 ("E-Dorm").

41.     On Tuesday, April 24, 2018 shortly after 5 pm, in E-Dorm, Mr. Beaty was cornered by three inmates with reputations for being violent. The inmates were seeking to extort a large sum of money from him and threatened to kill him.

42.     As highlighted in the Justice Department's report on its investigation, "extortion of prisoners and family members of prisoners is common in Alabama's prisons" and is "unchecked."

The Justice Department cited specific examples of extortion throughout the ADOC system, including at Ventress, and noted that ADOC's Investigations and Intelligence Division ("I&I") had confirmed that "extortion of family members and prisoners is a significant problem in Alabaman's prisons." The Justice Department also noted that ADOC employees responded to reports of extortion by either doing nothing or by punishing the complainant by placing them in restricted housing.

43. Mr. Beaty had been the victim of extortion efforts before and had been attacked by other inmates, but he was frightened of these prisoners, who threatened to kill him.

44. When Mr. Beaty resisted the extortion attempt, the inmates threatened him with knives and attacked him with sticks, causing lacerations to his face (a cut by his eye and his lip) as well as an injury to his head. Mr. Beaty tried to resist the assault and, after a struggle, broke free and fled from his attackers out of the E-Dorm and into the lobby.

45. At the time of this assault, Mr. Beaty was aware that prisoners at Ventress who reported incidents to correctional officers risked retaliation from other inmates. Nevertheless, Mr. Beaty was so afraid of the prisoners who attempted to extort him that he immediately sought help from a correctional officer, Defendant Person. Defendant Person was the on-duty officer in the E-Dorm whose job it was to supervise dormitory activity. Through his inaction, Defendant Person had failed to protect Mr. Beaty from the extortion attempt, exposing him to the prisoners' assault.

46. Defendant Person asked Mr. Beaty what happened. After Mr. Beaty told Defendant Person that other inmates had attempted to extort him, threatened to kill him, and that he needed medical attention, Defendant Person expressed his disbelief in Mr. Beaty, making comments to other prisoners that Mr. Beaty was a "crazy white boy [who] is saying too much," was "wigging" (i.e., on drugs) and did not know what he was talking about. At least one of the other prisoners

16

told Defendant Person that Person should let them handle the situation and to leave Mr. Beaty in the E-Dorm.

47.    Defendant Person started to lead Mr. Beaty away from the E-Dorm, making additional comments expressing his displeasure—that Mr. Beaty was "crazy" or "lying" or didn't know what he was talking about.  Instead of heading towards the infirmary, Defendant Person directed Mr. Beaty to go in the opposite direction.  Upon information and belief, Defendant Person was not taking Mr. Beaty to the infirmary for medical care, but was preparing to discipline Mr. Beaty for reporting the incident.

48.    While they were walking, Defendant Person continued to make comments expressing his antagonism towards Mr. Beaty.  These comments continued until Defendant Person and Mr. Beaty saw Lieutenant Calhoun, a Lieutenant at Ventress who was on-duty on April 24, 2018.

49.    Once Defendant Person saw Lieutenant Calhoun, he stopped making disparaging comments to Mr. Beaty and instructed Mr. Beaty to be quiet and not say anything to Calhoun. Notwithstanding this, Mr. Beaty told Lieutenant Calhoun other prisoners had attacked him trying to extort money and he needed medical attention.  Lieutenant Calhoun then escorted Defendant Person and Mr. Beaty across the facility to the infirmary so that Mr. Beauty could be evaluated and treated. Once they reached the infirmary, Lieutenant Calhoun continued on to the administrative office, leaving Mr. Beaty under Defendant Person's supervision.  ADOC records confirm that Mr. Beaty was seen by the on-duty nurse, who observed that he had minor injuries which did not require further treatment.  His evaluation was completed in under 10 minutes.

50.    Defendant Person then escorted Mr. Beaty out of the infirmary in the direction of B-1 Dorm, which is known as the "Hot Bay."

51.     The "Hot Bay" is a term given to ADOC housing designated for inmates considered violent, resulting in higher management needs.

52.     Throughout the ADOC system, and specifically at Ventress, Hot Bays are considered notoriously violent and dangerous dormitories.  The Ventress Hot Bay is chronically understaffed and under-supervised, particularly given its high level of danger.  In addition to using the Hot Bay to house violent inmates, officers at Ventress routinely threaten to or put inmates in the Hot Bay to punish them for complaining about prison conditions or violence at the facilities.

53.     Mr. Beaty knew that the Hot Bay was used to house inmates identified as violent or people who have received serious disciplinary citations or other punishments for attacking other prisoners.  Mr. Beaty also knew the Hot Bay had a reputation for having little supervision from correctional officers, and he feared that if he was placed in the Hot Bay the guards would not protect him and his life would be in danger.

54.     Mr. Beaty had no disciplinary issues that warranted his placement in the Hot Bay.  Aware of the Hot Bay's violent and dangerous reputation and out of fear for his safety given his recent attack, Mr. Beaty pleaded with Defendant Person not to be placed there.

55.     Defendant Person ignored Mr. Beaty's plea and continued to escort Mr. Beaty to the Hot Bay.

56.     Once it became clear that Defendant Person intended to take Mr. Beaty to the Hot Bay, Mr. Beaty tried to get away from Defendant Person.  Defendant Person pulled out his baton and attempted to hook Mr. Beaty's feet to trip him.  Mr. Beaty jumped over the baton and ran from Defendant Person to a nearby building that housed the administrative office and banged on the door yelling for help.

57.     Realizing that no one was going to help him, Mr. Beaty stopped trying to run away. As Defendant Person approached, Mr. Beaty observed him put on gloves, which upon information and belief were riot gloves, and pull out handcuffs.  After apprehending Mr. Beaty, Defendant Person handcuffed Mr. Beaty's hands behind his back, grabbed him by the collar, and led him to the Hot Bay.

58.     At approximately 5:40 p.m., Defendant Person brought Mr. Beaty to the lobby of the Hot Bay Dorm, or B-Dorm, with his hands handcuffed behind his back.  There were several other prisoners just outside the lobby at this time.

59.     Upon information and belief, Defendants Grey and Baldwin were in the lobby or the lobby observation booth and were able to observe Defendant Person and Mr. Beaty.

60.     Defendant Person instructed Defendant Baldwin to close the lobby door behind him, obstructing the view of people outside the Hot Bay Dorm.  Defendant Person then instructed Defendant Baldwin to move a screen in front of the B-1 side of the lobby, obstructing the view of people in the Hot Bay Dorm.  Defendant Baldwin followed these orders, blocking the ability of anyone outside the lobby to see Mr. Beaty.

61.     Defendant Person instructed Defendant Grey to lock the front door to the B-Dorm and to the observation booth, which Defendant Grey did.

62.     Defendant Person, still gloved, pulled Mr. Beaty by his collar and led him into a side hallway or closet.  Upon information and belief, Defendants Baldwin and Grey could still observe Defendant Person and Mr. Beaty.

63.     Once they were out of the immediate sight of the other people outside the lobby and while Mr. Beaty's hands were still handcuffed behind his back, Defendant Person tightened his grip on Mr. Beaty's collar and asked Mr. Beaty, "why did you run away from me?"  Before

19

Mr. Beaty could respond, Defendant Person brutally struck Mr. Beaty from behind, hitting him in the side of his jaw with his riot glove.  Defendant Person's blow was so strong that blood immediately sprayed from Mr. Beaty's mouth all over the wall and his clothes.

64.     Mr. Beaty could not see the attack coming.  His hands were restrained behind his back in handcuffs, and he could not defend himself.  The assault was not necessary for Defendant Person to accomplish any reasonable purpose related to his legitimate duties.  Rather, Defendant Person struck Mr. Beaty maliciously and for the purpose of causing bodily harm.

65.     Defendant Person's attack dislocated Mr. Beaty's jaw, fracturing it in two places, causing a large bone fragment to protrude from Mr. Beaty's gums.  The attack caused Mr. Beaty to bleed profusely from his mouth, spraying blood all over the wall.  As Mr. Beaty fell to his knees, still in handcuffs, blood continued to pour from his mouth all over the floor.

66.     Upon information and belief, Defendants Baldwin and Grey witnessed the incident, but did nothing to intervene or to render medical aid to Mr. Beaty.  Immediately after the assault, Defendant Baldwin fled, leaving the front door to the lobby open.

67.     Mr. Beaty required immediate and serious medical care and was in excruciating pain.  Mr. Beaty begged Defendant Person to take him back to the infirmary because he needed a doctor.  Defendant Person refused.  Instead, Defendant Person pulled Mr. Beaty up and brought him back into the lobby, where he continued to bleed profusely.

68.     Several other prisoners, including at least one of the prisoners involved in the earlier extortion attempt, came into the lobby after Defendant Baldwin fled.  Several of these prisoners attempted to separate Mr. Beaty from Defendant Person, and one of them said to Person, "we told you to let us handle him and look what you've done."  Upon seeing that Mr. Beaty was injured,

US 172228547v4

several of the prisoners asked that Defendant Person take Mr. Beaty to the infirmary.  Defendant Person refused and ordered the other prisoners out of the lobby.

69.     Immediately following the assault, it was obvious that Mr. Beaty had suffered a serious injury—he was bleeding profusely, had a jaw broken in multiple places, and had a bone fragment protruding from his gums—and urgently needed medical care.  Rather than seeking medical attention or attending to Mr. Beaty's obvious medical needs, Defendant Person instead cleared the lobby of witnesses and attempted to cover up his own misconduct.

70.     Defendant Person ordered the lobby cleaned—mostly of Mr. Beaty's blood, which had started to pool on the lobby floor—and sent another prisoner to get a clean prison uniform for Mr. Beaty.

71.     Defendant Person directed Mr. Beaty to go a small room off the lobby.  Upon entering the small room, conscious of his own guilt, Defendant Person told Mr. Beaty that he would "take him to the doctor but not now."  Defendant Person then threatened Mr. Beaty to keep quiet about the assault.

72.     Defendant Person then took off Mr. Beaty's handcuffs and ordered him to change out of his bloodied uniform and to spit blood from his broken jaw into a cup.  Mr. Beaty had to change his prison uniform twice as each became covered in his own blood.  Mr. Beaty also filled multiple cups with his blood from his mouth.

73.     Rather than taking Mr. Beaty to the infirmary, at approximately 5:45 pm, Defendant Person had Mr. Beaty brought into the interior of the Hot Bay Dorm, and sat him on a bench, still bleeding profusely and clearly in pain.  Defendant Person then left, abandoning Mr. Beaty.

74.     At the time Mr. Beaty was brought into the Hot Bay, there were at least two officers, Defendant Steele and Defendant Dennis, among other unknown officers, who could see him on

21

the bench, bleeding profusely.  Although Mr. Beaty could barely speak due to the misalignment of his jaw, he begged these officers to take him to the infirmary. These officers ignored him.

75.     At 6:00 p.m., there was a shift change and Defendant Steele, Defendant Dennis, and the other unknown officers who could see Mr. Beaty bleeding profusely on the bench left, abandoning him without providing medical care.  Defendants Steele, Dennis, and the other unknown officers never intervened or provided Mr. Beaty with the medical assistance he so obviously needed.

76.     At the time of the shift change, several other correctional officers came on duty in the Hot Bay, including Defendant Cannon, Defendant Merritt, and other unknown officers. Defendants Cannon and Merritt were stationed inside the interior of the Hot Bay approximately ten feet from Mr. Beaty, and witnessed Mr. Beaty continuing to suffer and bleed profusely.  Over the next several hours, although it was excruciatingly painful for Mr. Beaty to talk, he begged Defendants Cannon and Merritt repeatedly to get him medical help.  They ignored him.

77.     Instead, as the hours passed, Defendants Cannon, Merritt, and other unknown officers watched Mr. Beaty continue to bleed profusely and writhe in excruciating pain.  Mr. Beaty continued to beg these officers and other ADOC staff (including the individuals administering medicine through the dorm window) to get him medical attention.  As they watched Mr. Beaty fill, empty and refill a styrofoam cup with his own blood over the next several hours, and as Mr. Beaty faded in and out of consciousness from the acute blood loss and pain, these Defendants continued to ignore Mr. Beaty's pleas for medical attention and the obvious physical signs of Mr. Beaty's severe injuries.  Other inmates told Defendants Cannon and Merritt that Mr. Beaty needed medical attention, but were ignored.  As the hours passed, it became increasingly important that Mr. Beaty receive medical attention, yet the repeated requests were ignored.

78.    Defendants Cannon, Merritt and the other unknown officers deliberately refused to provide Mr. Beaty with the medical assistance he so obviously needed.

79.    Defendant Person's actions, including clearing and cleaning the lobby and attempting to get Mr. Beaty into a clean prison uniform, demonstrate that Defendant Person was conscious of his guilt in assaulting Mr. Beaty and Mr. Beaty's dire need for medical attention. Similarly, Defendant Baldwin demonstrated his guilt by fleeing the scene, and Defendant Grey demonstrated her guilt by allowing Person to destroy evidence of the assault.  The failure of Defendant Person, Baldwin, Grey, Cannon, and Merritt, and other unknown officers to seek or secure immediate medical attention for Mr. Beaty demonstrates their callous disregard for Mr. Beaty's health and safety and callous disregard for Mr. Beaty's rights.

80.    As the minutes and then hours ticked by, Mr. Beaty was in excruciating pain and psychological agony as he waited in uncertainty to see whether anyone would help him. Without help, he was not sure whether he would die, like other beaten ADOC inmates had before him.

81.    It was not until approximately 10:00 p.m.—over four hours after Mr. Beaty was assaulted—that a nurse came into the Hot Bay to dispense medication.  The nurse was the same nurse who examined Mr. Beaty earlier that day in the infirmary.  Seeing that Mr. Beaty was visibly and severely injured, she asked Mr. Beaty what had happened and noted, "you weren't like this a few hours ago."  Mr. Beaty asked her to "please help" because he "needed a doctor."  The nurse then took Mr. Beaty to the infirmary to get medical care.  On the way to the infirmary, Mr. Beaty recounted to the nurse that he had been assaulted by Defendant Person and then abandoned in the Hot Bay.   The nurse, ultimately under Defendant Jones' and Naglich's supervision and responsibility, did not provide adequate medical assistance and did not ensure Mr. Beaty got to the hospital where he obviously needed to go.

23

82.     When Mr. Beaty was brought to the infirmary, it appeared to be deserted.  The nurse began to take photos of his injuries, prepared a chart, and called for an ambulance to take Mr. Beaty to the closest hospital.  Mr. Beaty requested that she note in the chart that he had been assaulted by Defendant Person.

83.     After only a few minutes, Defendants Lieutenant Laseter and Sergeant Lindsey entered and asked Mr. Beaty what had happened.  Mr. Beaty told them that he had been assaulted by Defendant Person and then abandoned in the Hot Bay.  Minutes later, Defendants Officers Jonathan and Joshua Pittman also entered the room and asked what happened.  Mr. Beaty repeated that he had been assaulted by Defendant Person.  All four correctional officers were aware that Defendant Person's unlawful assault on Mr. Beaty was the cause of his injuries.

84.     Following Mr. Beaty telling Defendants Laseter and Lindsey that he had been assaulted by Defendant Person, one of them directed the nurse to leave because they "had it from here."  The nurse left, abandoning Mr. Beaty, while one of the Defendant officers closed the door behind her.  Mr. Beaty could hear on the radio carried by one of the officers that the ambulance was coming and was only a few minutes away.  Although Mr. Beaty was under the impression the nurse would return, when he inquired where she was, one of the officers said that she had gone home for the evening. Mr. Beaty thought this was very unusual considering the severity of Mr. Beaty's injuries and the fact that the nurse had been the one to insist he seek medical attention. This failure to provide medical attention further contributed to Mr. Beaty's pain, injuries, and delayed treatment.

85.     After Mr. Beaty recounted his story to Defendants Jonathan and Joshua Pittman, Defendant Lindsey instructed Mr. Beaty not to repeat to anyone else what had happened.

86.     In the infirmary, now devoid of any medical personnel who could actually provide proper medical care, Defendant Lindsey took matters into his own hands.  Upon information and belief, Defendant Lindsey has no medical training to diagnose or treat injury.  Nonetheless, he stated that he was going to determine the cause of Mr. Beaty's bleeding and then put on medical gloves.  Defendant Lindsey then told Mr. Beaty that he was "sorry this is going to hurt but I need to see where the blood is coming from," and proceeded to unnecessarily pry Mr. Beaty's mouth open, causing his skin to tear, a piece of his bone to stick out through his gums, his bones to grind and more blood to flood out of his mouth.  This exacerbated Mr. Beaty's already broken jaw, leaving Mr. Beaty in even greater agony.  Defendant Lindsey's actions made Mr. Beaty's injuries worse and needlessly caused Mr. Beaty pain and suffering.  It should have been obvious to anyone, including Defendant Lindsey, that his efforts would not help and would cause Mr. Beaty unnecessary pain.

87.     Defendant Laseter observed Defendant Lindsey torture Mr. Beaty, and looked inside Mr. Beaty's mouth while Defendant Lindsey pried it open.  While this assault was occurring, Defendant Laseter made a gagging sound like she was going to throw up and ran out of the room.

88.     After Defendant Laseter left the room, Mr. Beaty heard one of the correctional officers cancel the ambulance that was on its way.  Because there were no medical personnel in the infirmary at this time, there was no one to protect Mr. Beaty from this cancellation.  This delayed Mr. Beaty from receiving adequate medical attention. In addition to delaying his medical care, upon information and belief, the Defendants cancelled the ambulance to minimize the assaults and the seriousness of Mr. Beaty's injuries, and to allow Mr. Beaty to be handcuffed for the journey.

25

89.     Defendants Lindsey, Laseter, Pittman, and Pittman did not do anything to stop Mr. Beaty's bleeding.  They did not provide him with any pain relief.  And they did not provide him any treatment to address his medical condition.

90.     Defendants Lindsey, Laseter, Pittman, and Pittman did not immediately take Mr. Beaty to the hospital.  Rather, they waited approximately one additional hour before loading him into a prison van to drive to the hospital.  Before Mr. Beaty left, he was handcuffed for the trip to the hospital.  Defendant Lindsay again warned Mr. Beaty not to say anything, and Defendant Laseter warned Mr. Beaty not to tell anyone else about the assaults or what happened afterwards.

91.     Defendant Lindsey's assault and the failure of Defendant Laseter and Defendants Pittman and Pittman to stop the assault, as well as the cancellation of the ambulance, demonstrates their callous disregard for Mr. Beaty's health and safety and callous disregard for Mr. Beaty's rights.  Defendants Lindsey and Laseter's warnings to Beaty not to tell anyone about the assaults demonstrate their consciousness of guilt.

92.     Mr. Beaty was transported by prison van (rather than ambulance) to Troy Regional Medical Center, located in Troy, Alabama by Defendant Pittmanand an unknown officer.  Although Troy is only approximately 35 miles away and is normally a 40-45 minute drive, it took over an hour to get to the hospital from Ventress because the driver was driving below the speed limit.  Being handcuffed, Mr. Beaty was unable to brace himself and was tossed around the prison van, causing more suffering.  Mr. Beaty fought to stay awake, terrified that if he lost consciousness, he would die.

93.     Shortly after arriving at Troy, medical personnel determined Mr. Beaty's injuries were too serious for treatment at that hospital and Mr. Beaty was transferred to Baptist Medical Center South in Montgomery ("Baptist South"), Alabama for surgery.

US 172228547v4

94.     Doctors at Baptist South operated on Mr. Beaty on Wednesday, April 25. Given the seriousness of his injuries and the procedures performed during surgery, Mr. Beaty was sedated after surgery.

95.     Mr. Beaty recalls awaking two days later on Friday, April 27, with his jaw wired shut and in severe pain.

96.     Shortly thereafter, he was discharged from the hospital and taken to the infirmary at Kilby in Montgomery, Alabama.  Over the next weeks and months, Mr. Beaty was limited to a liquid diet as a result of his jaw being wired shut.  As a result, Mr. Beaty lost a substantial amount of weight—around 25 pounds—and was consequently prescribed nutritional supplements.  While he was at Kilby, Mr. Beaty contacted I&I to report his assault.

97.     Mr. Beaty continues to suffer as a consequence of his injury and subsequent procedures.  He regularly gets headaches, and feels a steady pain on the left side of his face. Defendant Person's blow caused some of Mr. Beaty's teeth to break, which still cause him pain today.  In addition, from his lips to the right side of his face, Mr. Beaty continues to experience numbness and, as a result, has had to re-learn to chew his food using different portions of his mouth.  He still cannot enjoy a normal diet.

98.     After approximately two months at Kilby, Mr. Beaty was returned to Ventress.

99.     Upon returning, Mr. Beaty learned that, during his absence, Defendant Person had sought out inmates in an attempt to coerce one or more of them to lie and take the blame for Mr. Beaty's broken jaw.  When Defendant Person could not find an inmate willing to falsely take the blame for Defendant Person's assault on Mr. Beaty, Defendant Person resorted to threats.

100.     Defendant Person's threats were not limited to other inmates.  After Mr. Beaty returned to Ventress, Defendant Person sought out Mr. Beaty repeatedly, and employed different

methods to try to induce Mr. Beaty to conceal Defendant Person's responsibility for the assault. On one occasion, Defendant Person had Mr. Beaty pulled out of the chow line and into the office where Defendant Baldwin was present.  Defendant Person then threatened Mr. Beaty, "I don't know why you dropped my name.  You could have said any name, but you said mine."

101.    At the time he made this statement, Defendant Person was aware that he had assaulted Mr. Beaty and he had broken Mr. Beaty's jaw.  Afraid and unsure how to respond, Mr. Beaty ignored Defendant Person's inquiry.

102.    Under ADOC regulations, Defendants Drake and Harris were responsible for the initial review and investigation of Mr. Beaty's assaults.

103.    After Mr. Beaty returned to Ventress, he was interviewed by I&I.  The primary investigator assigned was Defendant Gallew, who was supervised by Defendants Sides and Mercado.  Upon information and belief, Defendant Gallew was the I&I officer regularly assigned to conduct investigations at Ventress and was familiar with other instances where Ventress officers used excessive force and/or failed to provide prompt medical care for the serious medical needs of prisoners.

104.    Mr. Beaty was interviewed several times by Defendant Gallew and at least one other I&I officer.  During one of these interviews, one of the I&I officers apologized that the investigation had been delayed because the case had "fallen through the cracks,"

105.    During at least two of these interviews, Defendant Gallew and the I&I officer attempted to convince Mr. Beaty not to pursue charges.  During his initial interview, Defendant Gallew told Mr. Beaty that his options were to press charges, or he could "let it go," and warned him that if he pressed charges, he would face risk of retaliation.  At a subsequent meeting,

28

Defendant Gallew asked Mr. Beaty whether he "really wanted to press charges."  Mr. Beaty refused these entreaties to "let it go."

106.    After Mr. Beaty refused to "let it go," on information and belief, I&I ultimately concluded that Defendant Person engaged in excessive force and Defendant Person was terminated.  When Defendant Gallew informed Mr. Beaty of I&I's determination as to Defendant Person, Mr. Beaty inquired why none of the other officers who had attacked him or failed to get him medical care were being disciplined; Defendant Gallew responded that Mr. Beaty had "already won," implying that disciplining Defendant Person was sufficient.

107.    Upon information and belief, I&I did not conduct an adequate investigation into (i) Defendant Lindsay's assault on Mr. Beaty, (ii) the failure of Defendants Grey, Baldwin, Laseter, Pittman, or Pittman to intervene to prevent the assaults on Mr. Beaty, or (iii) the failure of Defendants Grey, Baldwin, Steele, Dennis, Cannon, Merritt, Lindsay, Laseter, Pittman, or Pittman in delaying provision of medical care to Mr. Beaty.  Also upon information and belief, upon receiving this report, Defendants Dunn, Culliver, and Jones did not adequately discipline any officer other than Person; none of the other officers was disciplined for their role in allowing Mr. Beaty's assault, exacerbating his injuries, or delaying his medical care.

108.    Mr. Beaty was transferred from Ventress to Kilby in early January 2019.  Upon information and belief, this transfer was at the request of I&I.  Mr. Beaty was eventually transferred to Bibb Correctional Facility in Brent, Alabama ("Bibb").  Following his transfer to Bibb, Mr. Beaty has not had further contact with I&I.

II.    **THE ASSAULT OF MR. BEATY WAS A MANIFESTATION OF ADOC POLICIES AND CUSTOMS AND THE FAILURE OF DEFENDANTS DUNN, CULLIVER, NAGLICH, MERCADO, SIDES, GALLEW, JONES, DRAKE, AND HARRIS, AFTER RECEIVING NOTICE OF WIDESPREAD CONSTITUTIONAL VIOLATIONS, TO ACT**

109.     The Eighth Amendment of the United States Constitution requires that prisoners be furnished with basic human needs including reasonable safety.

110.     As detailed below, Senior ADOC officials (including Defendants Dunn, Culliver, Naglich, Mercado, Sides, and Gallew) and Senior Ventress officials (including Jones, Drake, and Harris) were on notice prior to the assault on Mr. Beaty that prisoners at Ventress faced known and unreasonable risks that their Eighth Amendment rights (including their rights to be free from known and unreasonable risks and that their serious medical needs be attended to) would be violated.  Specifically, before the attack on Mr. Beaty:

a.   Defendants Dunn, Culliver, Naglich, Jones, Drake, and Harris were on notice that Ventress remained severely overcrowded, housing 1,293 prisoners in a facility designed to hold 650 inmates;

b.   Defendants Dunn, Culliver, Naglich, Jones, Drake, and Harris were on notice that Ventress was severely understaffed, and had only filled approximately 35% of the authorized number of correctional officer at the facility;

c.   Defendants Dunn, Culliver, Jones, Drake, Harris, Mercado, and Sides were on notice that Ventress had the highest number of assaults on inmates of any ADOC facility reported in the fiscal year end September 2017;

d.   Defendants Dunn, Culliver, Jones, Drake, Harris, Mercado, and Sides were on notice that in the three months prior to Mr. Beaty's assault (January to March 2018), Ventress was experiencing a spike of assaults on inmates, with the rate of assaults approximately twice that reported in fiscal year 2017;

e.   Defendants Dunn, Culliver, Jones, Drake, Mercado, Sides, and Gallew were on notice that correctional officers at Ventress were addressing conditions of

overcrowding, understaffing, and increased inmate assaults by using excessive force to discipline prisoners, and that the correctional officers at Ventress who were using excessive force to discipline prisoners included Defendant Person, who sprayed a prisoner in the face with mace in May 2017 and then abandoned him without assisting him to get medical treatment;

f.   Defendants Dunn, Culliver, Naglich, and Jones  were on notice that correctional officers at Ventress were failing to attend to the serious medical needs of prisoners;

g.   Defendants Dunn, Culliver, Jones, Harris, Drake, Mercado, Sides, and Gallew were on notice that their response to increased assaults on prisoners at Ventress, including correctional officer use of excessive force, was inadequate, in that incidents were not adequately investigated and officers were not adequately disciplined.  The failure to discipline, or even to investigate, uses of excessive force emboldened officers who abused prisoners.  For example, upon information and belief, Defendant Person was not adequately disciplined or investigated following the May 2017 incident described above;

h.   With knowledge that conditions at Ventress posed an unreasonable risk to prisoners housed there, Defendants Dunn and Culliver assigned a warden (Defendant Jones) who had a history of presiding over institutions marred by widespread correctional officer violence against prisoners, including serving as Deputy Warden at Tutwiler (during the period where the Department of Justice found a pattern of correctional officer abuse of inmates) and Easterling (which was the subject of a complaint from the Equal Justice Initiative about increased violence and complaints at the facility following Jones' arrival).

31

111.    All of these factors indicate that, prior to the assault on Mr. Beaty, Defendants Dunn, Culliver, Naglich, Mercado, Sides, Gallew, Jones, Drake, and Harris were on notice that prisoners at Ventress faced known and unreasonable risks that their Eighth Amendment rights would be violated.

**A. Dunn, Culliver, Naglich, Mercado, Sides, Jones, Harris and Drake Were On Notice of the Underlying Conditions That Exacerbate Unconstitutional Treatment of Prisoners**

**1. Alabama Prisons Are Chronically Overcrowded and Egregiously Understaffed**

112.    In its April 2019 report, the Justice Department found that violations of the Eighth Amendment were "exacerbated by serious deficiencies in staffing and supervision and overcrowding" across ADOC's prisons.

113.    For decades, Alabama has been home to the nation's most overcrowded and chronically understaffed prisons, resulting in a pattern of excessive violence at the hands of both prisoners and staff.

114.    Alabama's imprisonment rate is 946 per 100,000 residents—the fifth highest in the nation.  The federal Bureau of Justice Statistics—a federal agency within the Justice Department—found that in 2017, prisons within the ADOC system were operating at 167.8 percent of design capacity with 21,750 prisoners in custody.  The percentage has continued to increase over the last two years and in January 2020, ADOC prisons were at 170.4 percent of design capacity.

115.    While the population of ADOC's prisons swells, the level of staff continues to dwindle, despite acknowledgment by Defendant Dunn and his staff of the need to "address the

significant challenges caused by long-term issues in an overpopulated prison system that has been under-resourced for decades."[1]

116.     The egregious level of understaffing and inadequate supervision in ADOC facilities directly contributes to increased violence and risk of substantial harm to prisoners. As a spokesperson for the ADOC has admitted: "There is a direct correlation between the level of prison violence and the shortage of correctional staff in an overpopulated prison system with limited resources for rehabilitating offenders."[2]

117.     Expert analysis in *Dunn v. Thomas* (a suit filed in 2014 to which Defendants Dunn and Naglich were named defendants) reported that ADOC's severe understaffing resulted in "a dangerous environment for inmates" and rendered ADOC "incapable of supporting the rising needs for inmate healthcare." ECF 555-2 at 34, 35.

118.     ADOC prisons, including Ventress where Mr. Beaty was housed at the time of his assault, have been systemically overcrowded and understaffed for years, creating a dangerous environment in which prisoners face increased risk both from assaults by other prisoners and by correctional officers.

   a.   Ventress is a level-4 medium-security prison designed to hold 650 inmates at a time.[3]   However, Ventress is consistently overcrowded and houses up to 1,335 inmates at any given time—more than double the facility's capacity.

   b.   In April 2018, the month of Mr. Beaty's assault, the number of prisoners at Ventress was 1,293—again, essentially double its capacity. This means that at the time of

---

[1] Alabama Dep't of Corrections, *Annual Report for the Fiscal Year 2018* (May 20, 2019), http://www.doc.alabama.gov/docs/AnnualRpts/2018AnnualReport.pdf.
[2] Jennifer Horton, *ADOC: Staffing shortages, contraband fueling prison violence*, WSFA News (Dec. 18, 2018), https://www.wsfa.com/2018/12/19/adoc-staffing-shortages-contraband-fueling-prison-violence/
[3] Alabama Dep't of Corrections, *Monthly Statistical Report for January 2020*, http://www.doc.state.al.us/docs/MonthlyRpts/DMR%2001%20January%202020PUB.pdf

US 172228547v4

Mr. Beaty's assault, the Ventress incarcerated population was 198.9% of its design capacity.

c.  In stark contrast, at the time of Mr. Beaty's assault, Ventress had only filled approximately 35% of the authorized number of correctional officers.[4]  At the end of the second quarter of 2019, there were even fewer correctional officers— 28.8% of the authorized positions—leaving a deficit of over 150 officers.

d.  Another way of understanding the staffing deficit at Ventress is that the prison is supposed to have a 2.6-to-1 ratio of correctional officers to prisoners; Ventress' actual ratio is closer to 14-to-1.

e.  Because there are not enough officers to adequately staff the prison, incarcerated persons at Ventress are frequently under-supervised or completely unsupervised for nearly the entire day.

f.  As illustrated by what happened to Mr. Beaty and numerous other prisoners at Ventress (as discussed below), this significant shortage of officers at Ventress has led to a fundamental lack of supervision and basic security at the facility.

g.  Ventress remained severely overcrowded for years following the assault on Mr. Beaty.  As of January 2020, Ventress housed 1,218 prisoners, which was 187.4% of its design capacity.

119.    These conditions at Ventress were or should have been well known to senior Ventress officials, including Defendants Jones, Harris, and Drake.  And they were or should have

---

[4] Notice Letter at 10; Quarterly Staffing Reports filed in *Braggs et al. v. Dunn et al.*, M.D. Ala. 2:14-cv-601 (ECF Nos. 2325-2, 2325-3).

US 172228547v4

been known by senior ADOC officials, including Defendants Dunn, Culliver, Naglich, Mercado, and Sides.

120.    ADOC's overcrowding and understaffing has been widespread and persistent across its facilities.   These conditions were well known to senior ADOC officials, including Defendants Dunn, Culliver, Naglich, Jones, Mercado, and Sides.

121.    The Justice Department found that across ADOC's facilities, prisoner dormitories, housing up to 180 men, often go unsupervised for hours at a time.[5]

122.    The Justice Department noted that correctional officers are frequently called upon to work "voluntary mandatory overtime" shifts to address understaffing leading, in some cases, to a 90-to-95-hour work week.[6] Upon information and belief, correctional officers who do not comply leave prisons with more of a staffing deficit, but they are routinely allowed to do so without discipline. Correctional officers who do work overtime are often exhausted and ineffective in their roles, thereby exposing themselves, prisoners and colleagues to life-threatening conditions.

123.    ADOC officials have admitted it may not be possible to hire and train the necessary 2,000 correctional officers with "proper education, the proper sense of duty and the proper mindset" over the next four years to meet staffing needs.[7]

124.    Due to overcrowding and understaffing at Ventress (and at other ADOC facilities), the officers who do work at these facilities are unable to perform basic security functions, such as protecting prisoners from violence, preventing extortion by other prisoners, conducting contraband searches, assuring inmates are in the right locations, and assigning officers to maintain a security

---

[5] U.S. Dep't of Justice, Investigation of Alabama State Prisons for Men (April 2, 2019), https://www.justice.gov/crt/case-document/file/1149971/download
[6] Notice Letter at pg. 10.
[7] Notice Letter at pg. 50.

US 172228547v4

presence in housing areas.  All of these conditions existed at Ventress at the time of Mr. Beaty's assaults.

125.    Many incidents at Ventress (including the assault on Mr. Beaty) and other ADOC facilities are facilitated or worsened by the sparse guard presence.  The inability of the skeleton crew of officers to maintain basic security and supervision has led to high rates of violence within Ventress and other ADOC facilities and the lack of basic inmate safety.  This was the condition of Ventress at the time of Mr. Beaty's assault.

126.    Beatings and assaults of inmates by inmates are commonplace at Ventress and other ADOC facilities.  Many of these incidents are connected to specific failures of correctional officers and administration, such as a failure to control the movements of the inmate population within the prison, retaliation against victims who report inmate-on-inmate assaults or extortion, and failure to take any corrective action in response to clear threats.  As alleged above, Defendants Person failed to protect Mr. Beaty from the extortion attempt, and Defendants Jones, Harris, and Drake failed generally to protect prisoners in Ventress from extortion attempts.

127.    At Ventress, prison staff, including supervisors, fuel and encourage the culture of violence through their indifference and failure to enforce policies.  Upon information and belief, officers at Ventress placed wagers on the outcome of fights between inmates. And Ventress staff routinely fail to enforce dorm assignments and policies governing the times and locations that men are permitted to move about the facility.  For example, officers in security control cubes frequently let prisoners into a unit without verifying that the prisoners are allowed in the unit.  The continuing failure of officers to enforce policies controlling the movement of prisoners within Ventress further undermines the security of incarcerated persons and increases the risk and frequency of physical

36

and sexual assaults.  These conditions existed at Ventress at the time of Mr. Beaty's extortion attempt and assaults.

128.    At Ventress and other ADOC facilities, extortion by other prisoners is commonly reported, and the response is inadequate.  As the Justice Department found, "extortion by fellow prisoners is commonly reported by prisoners."  The Justice Department detailed seven specific examples from ADOC facilities, including Ventress, and noted that when prisoners reported extortion attempts to correctional officers, in a majority of these cases, the response was to say "nothing could be done" or to punish the complainant by placing them in restricted housing.  As discussed above, after Mr. Beaty reported the extortion attempt to Defendant Person, Defendant Person took Mr. Beaty to the Hot Bay to punish him.

129.    When inmates are injured in violent incidents, officers' responses are consistently delayed and inadequate given the severity of inmates' injuries.  In the aftermath of these incidents, officers often make little effort to investigate or protect injured inmates from future attacks and instead retaliate against inmates who persist in reporting incidents.  As discussed elsewhere in this Complaint, numerous Defendant officers denied or delayed Mr. Beaty's medical care after his assault by Defendants Person and Lindsay, and the investigation conducted by Defendant Gallew, under the supervision of Defendants Mercado and Sides, was wholly inadequate.

130.    These extraordinarily dangerous conditions have led to the deaths of numerous inmates at Ventress, including, but not limited to, Alonzo Montez Sykes, Joshua David Willingham, William Stanley Warren, and Daniel Bens.

## 2. Defendants' Knowledge that Alabama Prisons Are Chronically Overcrowded and Egregiously Understaffed

131.    Defendants Dunn, Culliver, Naglich, Jones, Mercado, and Sides were aware of the understaffing issues within ADOC prisons generally and (with Defendants Harris and Drake)

US 172228547v4

Ventress specifically.  They also know the excessive amount of violence that occurs within the ADOC prisons, and that it is a direct result of understaffing.  Defendant Dunn himself has admitted that at ADOC prisons, "the fundamental, systemic problem is a combination of lack of staff and overcrowding."

132.    On October 6, 2016, the Justice Department put Defendants on notice that it opened a Civil Rights of Institutionalized Person Act ("CRIPA") investigation into Alabama's male prisons, including Ventress.[8]

133.    The Justice Department released two reports on April 2, 2019 and July 23, 2020, detailing the findings of its CRIPA investigation. The Justice Department clearly identified the "combination of ADOC's overcrowding and understaffing" as key factors leading to inadequate supervision, unsafe housing and violence.  The DOJ concluded that the "severe levels of overcrowding and understaffing contribute to the systemic use of excessive force."

134.    According to the DOJ's 2019 and 2020 reports, Alabama's 13 prisons held 6,000 prisoners above their designated capacity.  DOJ concluded that the average occupancy rate at the 13 major correctional institutions was approximately 182%.

135.    At the same time, the Justice Department found that correctional officer staffing levels across ADOC were "at crisis level."

a.  Based on information available during the CRIPA investigation, as of June 2018, just after Mr. Beaty's assault, Alabama's prisons were employing 1,072 of the 3,326 correctional officers ADOC was authorized to hire.

b.  Of the 13 facilities investigated by the Justice Department, only three had correctional officer staffing levels over 40% of their authorized officers.  The remaining 10 facilities

---

[8] Department of Justice Press Release (Oct. 6, 2016).

all had fewer than 40% of the authorized correctional officers, with three facilities having fewer than 20%.

136.    ADOC's Mission Statement states, in part, that ADOC's mission is to provide prisoners with a "safe, secure, and humane environment."  Yet, violence has escalated year over year inside Alabama prison walls. According to the ADOC's monthly reports, which Defendant Dunn and other senior ADOC officials receive, between January 2015 and December 2017 there were twenty (20) prisoner homicides. Over the course of fiscal years 2018 and 2019, an additional nine (9) prisoners fell victim to the same fate—six deaths occurred in the first five months of 2019. ADOC has failed to adequately address this alarming trend by increasing staffing, leaving Alabama's prisoners to live in prisons that boast the nation's highest prison homicide rate.

137.    ADOC management has continuously failed to address staffing concerns despite commitments made publicly and in legally binding lawsuit settlements. The continued acknowledgement of "critical shortages in correctional officer staffing" and the persistent failure to cure the issue—even in the face of the Justice Department's investigation results—has only exacerbated the level of violence.

138.    The United States District Court for the Middle District of Alabama (the "Middle District") has noted that, "Understaffing has been a persistent, systemic problem that leaves many ADOC facilities incredibly dangerous and out of control....[A] severe shortage of officers leads to dangerous and violent conditions, especially in high-security facilities with overcrowded dormitories." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1198 (M.D. Ala. 2017).

139.    The Middle District also found that "[t]he combination of overcrowding and understaffing leads to an increased level of violence, both because of the difficulty of diffusing

US 172228547v4

tension and violence in an overcrowded open-dormitory setting, and because of the lack of supervision by correctional officers." *Braggs*, 257 F. Supp. 3d at 1200.

140.    Although Defendants Dunn, Culliver, Naglich, Jones, Mercado, and Sides were well aware of the history of widespread violence throughout the ADOC's male prisons and the connection between violence and the ADOC's chronic problems with overcrowding and understaffing, Defendants failed to take meaningful steps prior to Mr. Beaty's assault to meaningfully address these systemic staffing disparities, thereby creating an environment where violence and denial of adequate medical care were widespread and persistent.

141.    In ADOC's 2018 Annual Report—published on May 20, 2019, 13 months after Mr. Beaty's assault—Defendant Dunn claimed that ADOC had finally implemented an "aggressive plan to optimize the chronic understaffing of correctional officers through a comprehensive recruiting and marketing initiative."[9]  But as of the filing of this lawsuit in April 2020, ADOC had made minimal progress to address the chronic understaffing.  As of September 2019, the number of correctional officers had increased to 1,339[10]—well short of the 3,326 correctional officers it was authorized to hire, and far less than the critical mass needed to ensure the safety of prisoners.[11]

142.    In his January 2020 budget presentation to the Alabama Legislature, Defendant Dunn noted "there is a direct correlation between overcrowding and understaffing."  He further noted the "best thing" ADOC could do is to "accelerate the on-boarding of new correctional officers."  While Dunn has claimed that ADOC is taking steps to do so, Dunn admitted that

---

[9] Alabama Department of Corrections, Annual Report for the Fiscal Year 2018 (October 1, 2017 to September 30, 2018), pg. 5.
[10] (i) *ADOC Graduates 405 Officers; 2,000 Still Needed,* Times Daily, December 5, 2019 (ii) "*'You get what you pay for' Federal judge concerned about ADOC staffing numbers, lesser trained positions*", Alabama Daily News, December 11, 2019 (iii) *Recruiting and Retaining Correctional Officers, A Report for the Alabama Department of Corrections*, Warren Everett, LLC.
[11] Investigation of Alabama's State Prisons for Men, Department of Justice, April 2, 2019, pg. 9.

"challenges still remain" and the rate or violence in ADOC's prisons remains "unacceptably high."[12]

143.    After years of failing to address the overcrowding and staffing issues, Alabama's prisons are deeply entrenched in a culture of violence and these new efforts have failed to change the tide as the level of prisoner-on-prisoner assault, the level of staff-on-prisoner assault, and the death toll continue to climb.

### B. Dunn, Culliver, Mercado, Sides, Gallew, Jones, Drake, and Harris Were on Notice of the Early 2018 Spike in Assaults on Ventress Inmates

144.    In 2018, Alabama's prisons for men had the highest homicide rate in the nation for a state prison system.

145.    As discussed in more detail below, well before the assault of Mr. Beaty at Ventress, Defendants Dunn, Culliver,  Jones, Drake, Harris, Mercado, Sides, and Gallew were all on notice of widespread constitutional violations at Ventress, and that prison staff at Ventress routinely resorted to the use of excessive force at the prison.   Senior ADOC leaders, including Dunn and Culliver, were aware that correctional officers at Ventress used excessive force against inmates as early as August 4, 2010, when 24-year-old Rocrast Mack Jr. was beaten to death by a group of Ventress officers.

146.    Violence at Ventress increased significantly after 2010.   According to ADOC's own statistical reports, in fiscal year 2010, the number of reported assaults at Ventress was 13. Since that time, the same reports show that the total number of assaults at Ventress increased to 114 in 2016, an average of 10 per month; and 180 in 2017, an average of 15 per month, with four inmate deaths reported.

---

[12] Prison Officials Request $42 Million Increase to Hire Staff, Improve Healthcare, WBHM.org, University of Alabama, January 21, 2020.

US 172228547v4

147.    As a facility, Ventress reported the highest number of assaults on prisoners of any ADOC facility during FY 2017, which ended just months before the assault on Mr. Beaty.

148.    Even after having reported the highest number of assaults on prisoners of any facility in FY 2017, violence against prisoners spiked Ventress in early 2018.  Specifically, ADOC reported 26 assaults at Ventress in January 2018, 29 in February 2018, and 34 in March 2018—rates twice as high as FY 2017.  As of the end of March 2018, Ventress had also reported two prisoner deaths for the year.

149.    ADOC and Ventress leadership, including Dean, Culliver, Mercado, Sides, Jones, Harris, and Drake, received and/or had access to these statistical reports showing the spike in violence at Ventress just before the assault on Mr. Beaty.

150.    The consequences of inaction by ADOC officials, including Dunn, Culliver, and Jones, in the face of the spike of violence at Ventress and widespread violence at facilities throughout the ADOC system were particularly felt at Ventress.  During April 2018, the month Mr. Beaty was assaulted, Ventress reported 27 assaults on prisoners, more than any other facility in the ADOC system. By the end of fiscal year 2018, Ventress reported 4 inmate deaths and 291 total assaults on prisoners, far more than any other facility in the ADOC system, and almost 60% more than reported in fiscal year 2017.

**C. Dunn, Culliver, Mercado, Sides, Gallew, Jones, Drake, and Harris Were on Notice That Use of Excessive Force by Correctional Officers Against Prisoners Was Widespread Throughout ADOC and at Ventress**

151.    Under Defendant Dunn's tenure as ADOC Commissioner, correctional officer assaults on prisoners were widespread.  During the period prior to the assault of Mr. Beaty, ADOC leadership condoned systemic violence by allowing a relatively dwindling number of correctional officers to manage a growing prison population with whatever disciplinary methods they deemed effective.  In numerous instances, correctional officers used excessive force on the incarcerated

42

population, including use of force against restrained and defenseless prisoners, as a means of discipline. This practice or custom was widespread and persistent, and was conducted with the knowledge of senior leadership of ADOC.

152.   Well before the assault of Mr. Beaty at Ventress, Defendants Dunn, Culliver, Jones, Drake, Harris, Mercado, Sides, and Gallew were all on notice of widespread constitutional violations at Ventress.  In particular, these Defendants were aware that prison staff at Ventress routinely resorted to the use of excessive force at the prison.  These Defendants were aware that officer violence and misconduct significantly contributed to the danger and high risk faced by inmates.  These Defendants were also aware that officer use of force against inmates at Ventress was often not adequately investigated or disciplined.  As discussed below, ADOC employed inadequate standards at Ventress for monitoring officer and prisoner interactions and investigating officer assaults of prisoners, permitting officers to engage in excessive force against prisoners without consequences.

153.   ADOC senior leaders, including Dunn and Culliver, were aware that correctional officers at Ventress used excessive force against inmates as early as August 4, 2010, when 24-year-old Rocrast Mack Jr. was beaten unconscious by a group of six Ventress officers, using batons and their fists, while Mr. Mack was lying on the ground of his dorm.  The officers then took Mr. Mack, unresponsive and in handcuffs, to the shift office and continued to beat him, at one point slamming his head into a wall.  Mr. Mack sustained fractures to his ribs, arms, legs, and skull, and had to be taken to multiple hospitals.  He was ultimately declared brain dead as a result of blunt force trauma.  The coroner ruled that his death was a homicide.

154.   ADOC senior leaders, including Dunn, Culliver, and Mercado were aware that correctional officer violence against inmates was not adequately investigated or disciplined.

43

ADOC unduly delayed its investigation of the Mack homicide.  Neither the Warden nor senior corrections officers took prompt action to suspend the officers involved in the attack, and several officers reported to work the following day.

155.    The death of Rodrick Mack was subsequently investigated by the FBI.  ADOC senior leaders, including Dunn and Culiver, were aware that the FBI found, as reported in the *Washington Post* in 2014, that there "was a culture of corruption" at Ventress where correctional officers thought they could "do whatever they wanted."  The FBI investigators found that the Mack case was an example of "severe problems in Alabama prisons, one of the most overcrowded, understaffed, and underfunded systems in the country, and shed further light on a pattern of brutality by Alabama corrections officers."  The FBI also noted the "lack of cooperation from prison officials," and the "coach[ing]" of witnesses to try to protect the responsible guards.

156.    As noted above, violence at Ventress increased significantly after 2010, and had spiked in the first three months of 2018.

157.    In addition to having access to these statistical reports and being aware of the FBI investigation into Rocrast Mack's death at Ventress, prior to Mr. Beaty's assault, senior ADOC leadership, including Defendants Dunn and Culliver, were on notice that there were significant and pervasive constitutional violations across ADOC prisons.  Among other things:

> a.   In August 2011, EJI called for the criminal prosecution of the Ventress officers who fatally beat Mr. Mack.  In November 2011, the Huffington Post published an investigative report documenting a history of violence by of the officers involved in Mr. Mack's killing and the inadequate responses by state officials to officers' excessive violence against prisoners.

44

b.  In July 2013, the Equal Justice Initiative filed complaints documenting violence perpetrated by correctional officers at multiple ADOC facilities, including nearly a dozen instances where prisoners were beaten by officers while handcuffed.

c.  In January 2014, after conducting a federal investigation, the Justice Department concluded that ADOC violated the Eighth Amendment by failing to protect female prisoners at the Julia Tutwiler Prison for Women ("Tutwiler") due to the long "[h]istory of unabated staff-on-prisoner sexual abuse and harassment." The Justice Department's report describes numerous incidents where ADOC staff raped, sodomized, fondled, and exposed themselves to prisoners. Defendant Jones was Deputy Warden of Tutwiler during the period of the Justice Department's investigation. For decades, Tutwiler staff engaged in a pattern and practice of sexually harassing and sexually abusing the female prisoners.

d.  In June 2014, Naglich and Dunn's predecessor as ADOC Commissioner (Kim Thomas) was named as a defendant in a class action suit brought on behalf of prisoners across the ADOC system alleging that ADOC was deliberately indifferent to the serious medical needs of prisoners in their custody. *Dunn v. Thomas*, M.D. Ala. 2:14-cv-601 n/k/a *Braggs v. Hamm*. Commissioner Dunn became a defendant in the suit upon becoming Commissioner. Discovery and expert analysis in that case (performed in August 2016) revealed a pattern of severe overcrowding that prevents ADOC from ensuring prisoners are able to access necessary medical care, inadequate staffing of infirmary units, and failing to provide for timely hospitalization, leading to preventable deaths. ECF 555-2, 555-3. The portions of

US 172228547v4

this case that have gone to trial have resulted in liability findings against senior ADOC officials.

e.  In October 2014, Dunn and Culliver were named as defendants in a class action brought on behalf of prisoners at St. Clair describing widespread constitutional violations stemming from inadequate supervision and monitoring and the creation of a dangerous culture of violence.  *Duke v. Dunn*, N.D. Ala. 4:14-cv-1952.

f.  In November 2014, the Equal Justice Initiative issued a report on Alabama prisons, noting that the homicide rate in Alabama prisons was more than three times the national average and the number of assaults on Alabama inmates had increased 598 percent since 2008.  The report finds that ADOC did not conduct effective or reliable investigations of staff misconduct and notes multiple instances where ADOC officials had done little to hold wardens and prison leaders accountable.

158.   On October 6, 2016, the Justice Department put senior ADOC leadership, including Defendants Dunn and Culliver, on notice that it opened a Civil Rights of Institutionalized Person Act ("CRIPA") investigation into Alabama's male prisons, including Ventress.  According to the Department of Justice press release, the Defendants were specifically on notice that the investigation would assess *inter alia* whether "prisoners are adequately protected from use of excessive force."

159.   The Department of Justice Investigation, released in two reports on April 2, 2019 and July 23, 2020, concluded, based on its investigation spanning 2016 through 2019, that the conditions in Alabama's male prisons violate the Eighth Amendment's prohibition on cruel and unusual punishment due to ADOC's failure to "protect prisoners from serious harm and substantial risk of serious harm."    The Justice Department found that "correctional officers within the

46

Alabama Department of Corrections frequently use excessive force on prisoners housed in Alabama's prisons for men."   The Justice Department review found "frequent uses of excessive force in 12 of the 13 Alabama prisons" reviewed, including Ventress, and that this conduct was "pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment."   The Department of Justice also found that in light of the "pervasiveness of the uses of excessive force and the statewide application of ADOC's use of force policies and procedures," there was cause to believe that "issues of excessive force occurring within Alabama's prisons give rise to systemic unconstitutional conditions" and that there was a "lack of accountability in reviewing and tracking uses of force."

160.    In 2017, ADOC tracked 1,800 uses of force; the Department of Justice found from its review of a statistically significant set that a "large number of reported uses of force were unjustified."

161.    As detailed above, senior ADOC leadership, including Defendants Dunn, Culliver, Naglich, Mercado, and Sides, as well as Defendant Jones, Harris, and Drake, were aware that Ventress was egregiously understaffed.  Egregious understaffing and poor training contributes to an increased use of excessive force by correctional officers, creating an environment where the risk of physical harm is high.

162.    Despite widespread knowledge of violent officer behavior, ADOC officials have done little to address this behavior or to hold wardens and other supervisory officers accountable for their actions and the actions of their direct reports. As a result, the prevalent use of excessive force in interactions with prisoners has increased and appears to be an accepted—or even preferred—method of discipline and control within ADOC facilities.

US 172228547v4

163.    As discussed in more detail below, there was a systemic failure at Ventress and across ADOC to hold perpetrators of violence at all personnel levels accountable for the abuse of prisoners, which has contributed to the continued proliferation of violence under the watch of ADOC leadership. Correctional officers rarely face discipline for prisoner abuse and in many instances, reports of violence are investigated in a perfunctory manner, if at all.

164.    Incidents of severe violence perpetrated by correctional officers at Ventress have been well documented.  These incidents have been persistent and widespread, involving officers of all ranks, and reinforce the custom of correctional officer violence against prisoners at ADOC facilities.  In some cases, these incidents of excessive force by correctional officers have resulted in the death of prisoners in ADOC custody, including at Ventress, where prisoners assaulted by officers have suffered serious injuries and died.  Upon information and belief, these incidents at Ventress include, but are not limited to, the following assaults, all of which resulted in serious injury to the incarcerated person:

a.  In October 2020 at Ventress, Joshua Alexander was assaulted twice by Officer Siler—punched in the head on the evening of October 12 and sprayed with mace, then kicked and punched on October 13.  Although he was temporarily blinded by the mace, Mr. Alexander was taken to restricted housing following the incident.

b.  In March 2020 at Ventress, Carroll Driskell and several other prisoners were assaulted by members of a visiting CERT team in the E-dorm.  Mr. Driskell was punched in the head and back, and other prisoners were punched and struck with batons.  The incident was reported to, among others, Defendant Laseter.

c.  On or about January 29, 2020 at Ventress, Anthony Poe was assaulted by a group of officers, including Lieutenant Whitt, after Mr. Poe got up to use the bathroom in

48

the B-1 Dorm.  Mr. Poe was knocked unconscious by Lieutenant Whitt, woke up, and was then beaten unconscious a second time by a group of officers.

d.  On or about March 27, 2020 at Ventress, a prisoner was assaulted by several officers with batons.

e.  On or about March 30, 2020 at Ventress, the ADOC CERT team conducted a raid on Ventress.  During the raid, a number of prisoners were assaulted and injured.

f.  In December 2019 at Ventress, according to a press release issued by ADOC, inmate Michael Smith died in the hospital following an "alleged use of force" by officers on November 30, 2019.  Two correctional officers were placed on mandatory leave following the incident, and the circumstances of Mr. Smith's death are still being investigated.  The Department of Justice report notes that the autopsy report revealed that Mr. Smith "died from blunt force trauma to the head," "sustained multiple areas of intercranial bleeding, fractures of his nose and left eye socket, and had at least six teeth knocked out."

g.  In 2019 at Ventress, Defendant Officer Dennis assaulted a prisoner in handcuffs while in the process of transporting the man from Ventress to Holman Correctional Facility in Atmore, Alabama ("Holman").  Defendant Dennis was fired after video emerged of him handcuffing the man to a fence and beating him.

h.  In 2019 at Ventress, Eddie Crout was assaulted by Sergeant Knight in the infirmary. Knight grabbed Mr. Crout by the neck and choked him, saying that he would drag him out of the infirmary if he did not leave on his own.

i.  In April 2019 at Ventress, Brandon Lee Jackson was assaulted by four officers, including Officers Barber, Lafogg, and Smith.  These officers put a handcuff on

Mr. Jackson's arm and used the other end of the cuff to twist Mr. Jackson's arm behind his back.  The officers then kicked and stomped Mr. Jackson multiple times.

j.  In September 2019, a lieutenant at Ventress lifted a handcuffed prisoner up off the ground and slammed him on a concrete floor several times, knocking him unconscious.

k.  On or about July 20, 2019 at Ventress, James Long was assaulted by Officer Blair while walking to the dining hall.  Officer Blair, who was stationed outside the dining hall, called Mr. Long over, and slapped Mr. Long repeatedly in the face.

l.  In July 2019 at Ventress, Jason Decker was assaulted by the Ventress Institutional PREA Compliance Manager (IPCM) and Officer Patton while he was confined to a single-man cell in the E-Dorm.  Mr. Decker had previously reported being sexually assaulted in the E-Dorm.  When he asked the officers to take him to the infirmary because he had continuing pain from his injuries, the IPCM—an officer specifically charged with protecting inmates from sexual assault—beat him with a baton while Officer Patton sprayed Mr. Decker with mace.

m.  On March 25, 2019 at Ventress, Officer Patterson allowed inmates to approach Javaris Barnes's cell and verbally harass and threaten him.  Because Mr. Barnes felt unsafe in his cell, he reported to Officer Patterson that he was suicidal and needed to seek mental health services, but Officer Patterson refused to take him. Mr. Barnes then set a fire in his cell, and Officer Patterson said, "I hope you can clean that up yourself," before leaving Mr. Barnes in the burning cell.  Mr. Barnes required significant medical care as a result of smoke inhalation.

50

n.  On May 9, 2019 at Ventress, Officer Patterson assaulted Rashad Donner outside the dining hall, grabbing him by the throat, slamming him to the ground, striking him in the face with a baton, and stomping and kicking him.  A number of other officers, including Officers Rogers and Dennis, joined in.  Mr. Donner was beaten unconscious and had to be sent to a hospital for treatment.

o.  On or about May 9, 2019 at Ventress, James Flair was assaulted by a Sergeant. After his cell flooded, the sergeant entered the cell and held Mr. Flair's face in the two to three inches of water that had accumulated.

p.  In December 2018, a correctional officer brutally hit, kicked, and struck a handcuffed prisoner with an expandable baton in the Ventress medical unit.  Two nurses saw the officer beat the prisoner, and two other nurses could hear the beating from adjacent rooms.  The prisoner did not antagonize the officer before the beating and his hands were handcuffed behind his back.  According to the Department of Justice, while I&I concluded that the use of force was excessive and unjustified, on information and belief, the matter was not referred for criminal prosecution and ADOC did not impose discipline.

q.  In November 2018 at Ventress, John Ray was assaulted by a group of officers in the medical ward.  Mr. Ray then had a seizure.  Over the protests of other inmates in the ward, officers dragged Mr. Ray by his feet into a smaller treatment room. Mr. Ray was kept in the room for several hours, shackled and belly-chained to the bed.  Officers continued to assault Mr. Ray for several hours.

r.  On or about September 24, 2018 at Ventress, after Matthew Jones was stabbed, he was placed in a segregation cell and left handcuffed for several hours.  When Mr.

51

Jones was released from the handcuffs, he dropped a tray of food because his hands were shaky from being handcuffed for such a long period of time. The officer who brought the food slapped Mr. Jones so hard that Mr. Jones lost hearing in one ear for an extended period of time.

s.   On or about September 2, 2018 at Ventress, Melissa Morgan, a transgender prisoner, was pushed to the ground by an officer. This officer then dragged Ms. Morgan outside, shoved her into a pole, kicked her in the ribs, and stomped on her head.

t.   In July 2018, an officer sexually assaulted Antonio Cunningham at Ventress. When Mr. Cunningham reported the assault, he was sent to the "Hot Bay." Another officer attempted to take Mr. Cunningham to a closet to perform sexual acts. When Mr. Cunningham resisted, the officer sprayed Mr. Cunningham's genitals and buttocks with mace.

u.   On or about June 11, 2018 at Ventress, Mardarrius Johnson was grabbed by his neck and choked by Sergeant Terry while Officer Edwards slammed Mr. Johnson against the wall.

v.   According to the Department of Justice, in January 2018, a prisoner at Ventress was extorted and beaten when he failed to pay. The prisoner's mother subsequently received texts threatening to chop the prisoner into pieces and rape him if she did not pay money.

w.   According to the Department of Justice, in September 2017 at Ventress, an officer sprayed a prisoner with a chemical agent. After the prisoner was taken to the

52

medical unit, a second officer kicked the prisoner several times in the stomach and chest, and a third officer hit the prisoner several times in the genitals with a shoe.

x.  The Department of Justice report notes that in September 2017, in the span of four days, (i) three separate prisoners in three separate incidents were punched so hard that it required outside hospitalization, (ii) another prisoner was stabbed by two other prisoners with handmade knives, (iii) a fifth prisoner was stabbed by a prisoner and had to receive outside hospitalization, and (iv) a sixth prisoner reported being sexually assaulted.

y.  In May 2017 at Ventress, after Michael Myers was assaulted by another prisoner in the Hot Bay, Officer Steele attempted to prevent Myers from going to the infirmary. After Mr. Myers was treated, he was returned to the Hot Bay where he was assaulted again.  The injuries from the second assault required outside hospitalization.

z.  On or about May 7, 2017, at Ventress, Defendant Person sprayed Dedrick Dean with mace and left him without treatment for 24 hours, and allowed another inmate to access Mr. Dean's cell and choke him.

aa. In January 2017, Jamie Lee Walker was attacked by guards and a Warden at Ventress.  As a result, Mr. Walker sustained cuts and bruises, was forced to wear a helmet to camouflage the injuries on his head, and was kept hidden when others came to tour the prison.

bb. On or about January 24, 2017, Eugene Moore was jumped by a Warden and four to five other officers at Ventress.  As a result of the attack, Mr. Moore had to be rushed to the emergency room.

      cc. On July 23, 2013, Kareem Young was assaulted in two separate incidents by correctional officers at Ventress.  Mr. Young was grabbed and pushed against the wall, and one officer threatened to kill him.

165.    Defendants Dunn, Culliver, Mercado, Sides, Gallew, Jones, Drake and Harris had knowledge of the substantial risk of serious harm facing prisoners such as Mr. Beaty at Ventress based on incident reports for the above-identified assaults, as well reports by the ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, direct observation, internal communications, and/or prisoner lawsuits.

      a.   The security crisis at Ventress was obvious and common knowledge to all ADOC employees who physically worked at Ventress, including Jones, Drake, and Harris.

      b.   Notably, many of these incidents occurred while Defendant Jones was Warden at Ventress.

      c.   The Ventress Warden, as well as the Ventress Captains (including Defendants Drake and Harris), knew or should have known about all of the foregoing incidents because under ADOC policies, the Captain or Warden is required to conduct an initial investigation of all uses of force in the facility.  As the Department of Justice noted in its July 23, 2020 Report, "Whenever a use of force occurs within an Alabama prison, a warden or captain is required to conduct an initial investigation."

      d.   As the I&I officer who conducted most of the investigations at Ventress, Defendant Gallew similarly knew or should have known about the foregoing incidents.

      e.   Senior ADOC officials, including Defendants Dunn, Culliver, Mercado, and Sides, knew or should have known about the foregoing incidents because ADOC

administrative regulations require that the I&I Director supervise the review and investigation of all serious incidents, and investigative reports are to be distributed to, among others, the Commissioner and Associate Commissioners and Wardens as appropriate. As the Department of Justice noted in its report, "ADOC's regulation requires that a prison's head warden notify I&I and request further investigation if there is reason to believe that a use of force was not justified."

### D. Dunn, Culliver, Naglich, and Jones Were on Notice That Failure To Attend To Serious Medical Needs of Prisoners Was Widespread Through ADOC and at Ventress

166.   Defendants Dunn, Culliver, Naglich, and Jones were also on notice concerning the failure of ADOC correctional officers generally, and those at Ventress specifically, to attend to prisoners' serious medical needs.

167.   As noted above, in June 2014, Naglich and Dunn's predecessor as ADOC Commissioner (Kim Thomas) was named a defendant in the class action suit *Dunn v. Thomas*, brought on behalf of prisoners across the ADOC system alleging that ADOC was deliberately indifferent to the serious medical needs of prisoners in their custody.  Dunn became a Defendant in this suit when he became Commissioner.  As noted above, expert analysis in that case on the administration of medical care to prisoners revealed (as of April 2016) that ADOC "is quite simply a system in a state of perpetual crisis—a fact known and yet unaddressed by Alabama officials for a considerable period of time." ECF 555-2 at 5.  One expert testified that "conditions within ADOC, as well as operational practices, interplay to cause a direct harmful impact and risk of harm on the provision of medical and mental healthcare for prisoners currently housed in the ADOC." ECF 555-2 at 4.  "The increased need for care caused by violence and other health related issues stemming from overcrowding, combined with the inability of ADOC, because of a dramatic lack of custody staff, to ensure prisoners are able to access care, results in a current, ongoing and

significant risk of serious harm to ADOC inmates living in Alabama prisons."  ECF 555-2 at 5. The adjudication of claims has resulted, to date, in extensive liability findings against the Defendants.

168.   As noted above, in 2014, the Department of Justice on Tutwiler found, among other issues, that patients had reported "inadequate medical care."  As noted earlier, Defendant Jones was Deputy Warden of Tutwiler during the time period covered by this report.  Defendant Naglich was the Associate Commissioner of Health Services, and both Defendants Dunn and Culliver were senior ADOC officials at the time of this report.

169.   Upon information and belief, ADOC operates the most overcrowded prisons in the nation and spends among the lowest on medical care per prisoner of any state in the nation. As alleged in the *Dunn v. Thomas* suit, ADOC had 25,591 prisoners cared for by 15 medical doctors, or 1,684 patients per doctor.  This was known to Defendants Dunn and Naglich.

170.   Upon information and belief, ADOC prisons have had among the highest prisoner mortality rates in the country. According to its own statistical reports, ADOC reported 120 prisoner deaths in fiscal year 2017.  And by March 2018, just before Mr. Beaty's assault, ADOC had reported 69 prisoner deaths for the year to date.  This was known to Defendants Dunn, Culliver, Naglich, and Jones.

171.   The sheer number of correctional officers—eleven separate officers—and medical personnel who delayed getting Mr. Beaty immediate medical attention demonstrates significant deficiencies in the training of Ventress correctional officers and medical personnel at the time of the incident.

172.   Many of the incidents of excessive force at Ventress described above were followed by the failure to attend to significant medical needs of the prisoner.  This pattern of instances where

US 172228547v4

correctional officers failed to provide timely medical care has been persistent and widespread, involving officers of all ranks, and further promulgates the custom of correctional officer violence against prisoners at ADOC facilities.  In some cases, the failure to attend to the serious medical needs of inmates contributed to the death of prisoners in ADOC custody.  Upon information and belief, these incidents include, but are not limited to, the following incidents, all of which resulted in serious injury to the incarcerated person:

    a.  Following the September 2019 assault described above where a Ventress lieutenant lifted a handcuffed prisoner up off the ground and slammed him on a concrete floor, correctional staff did not respond promptly.  The prisoner ultimately had to be taken to an outside hospital, where medical personnel had to administer CPR several times to keep the prisoner alive.

    b.  Following the assault on Brandon Lee Jackson in April 2019 at Ventress described above, after an initial emergency room visit where he was told to come back for a two-week checkup, Mr. Jackson was prevented from seeing an external doctor for several months.

    c.  During the assault on Jason Decker in July 2019 at Ventress described above, correctional officers refused Mr. Decker's request to take him to the infirmary and instead beat him with a baton.  Officers further delayed taking Mr. Decker to an outside hospital for treatment.

    d.  Following the injuries to Jarvais Barnes in March 2019 at Ventress described above, the officer refused to take him for medical care and left him in a burning cell, delaying getting him medical care for his injuries.

57

e. As discussed above, in 2019 at Ventress, Eddie Crout was assaulted by Sergeant Knight in the infirmary.

f. As discussed above, in December 2018, a correctional officer brutally hit, kicked, and struck a handcuffed prisoner with an expandable baton in the Ventress medical unit. At the time of the assault, the prisoner's hands were handcuffed behind his back.

g. As discussed above, in November 2018 at Ventress, John Ray was assaulted by a group of officers in the medical ward over the course of several hours.

h. In September 2018, LaCorrey Russell was stabbed by another inmate multiple times in the chest. Correctional officers did not promptly bring him to the infirmary and he had to get medical attention from other inmates.

i. As discussed above, following the stabbing of Matthew Jones in September 2018 at Ventress, correctional officers handcuffed him and placed him in a segregation cell.

j. In September 2018, Travis Tillman broke his arm during a fight with other inmates at Ventress. When he asked an officer to request medical attention, the officer refused to contact the infirmary. Mr. Tillman lost all functionality in his arm for several days until officers finally attended to his medical needs.

k. In September 2017, after a prisoner fell off the examination table in the infirmary, a sergeant kicked the prisoner several times in the stomach and chest. Another sergeant then took a shoe and hit the prisoner multiple times in the genitals.

l. As discussed above, following Defendant Person's assault on Dedrick Dean in May 2017 at Ventress during which Person sprayed Mr. Dean with Mace, Person and

other officers left Mr. Dean and he was not able to obtain medical treatment for 24 hours.

m.  Upon information and belief, in May 2017, after a prisoner was stabbed by inmates in the Hot Bay who blamed him for stealing contraband that belonged to an officer, that officer blocked the prisoner from going to the infirmary for medical attention. After the prisoner obtained medical attention, the officer directed other officers to return the prisoner to the Hot Bay,  where he was assaulted by other prisoners again.

173.    Defendants Dunn, Culliver, Naglich, and Jones had knowledge of the substantial risk of serious harm facing prisoners such as Mr. Beaty at Ventress based on incident reports for the above-identified assaults, as well reports by the ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, direct observation, internal communications, and/or prisoner lawsuits.

E.  **Defendants Dunn, Culliver, Naglich, Mercado, Sides, Jones, Harris and Drake Failed to Respond Appropriately Despite Being on Notice That Conditions at Ventress Posed Unreasonable Risks to Prisoners Housed There**

174.    Defendants Jones, Culliver, Naglich, Mercado, Sides, Jones, Harris and Drake are responsible for the care, custody, and control of prisoners in their facilities, and, through their acts and omissions, Defendants have subjected prisoners at Ventress and at other ADOC facilities to an environment of violence and danger that poses an ongoing threat to the physical safety, mental health, and lives, as demonstrated by the numerous events narrated above, the assault on Mr. Beaty, and many other incidents.

175.    Defendants Dunn, Culliver, Naglich, Jones, Drake, and Harris knew about the understaffing and overcrowded conditions at Ventress and at other ADOC facilities, unchecked

59

extortion at Ventress and other ADOC facilities, and the frequent incidents of correctional officer violence through internal reports, including incident reports, reports by the Investigation & Intelligence division, duty officer reports, disciplinary reports, medical reports, annual and monthly ADOC data reports, and internal communications, as well as through external sources including the Justice Department reports and/or prisoner lawsuits.

176.    Upon information and belief, and as evidenced by the unabated and widespread violence and neglect within Ventress and throughout the ADOC system, ADOC leadership has not made meaningful efforts to address the dangerous conditions at Ventress that allow violence, including violence perpetrated by ADOC staff, to proliferate.

177.    Neither ADOC nor Ventress leadership adopted changes at Ventress in response to either the internal or external reports of violence at Ventress due to understaffing and overcrowding and instead allowed the violence to continue unabated.

178.    ADOC and Ventress leadership also failed to promulgate, implement, and enforce adequate policies, procedures, or practices essential to adequately supervise correctional staff and monitor the common areas and to ensure the safety of inmates.

179.    As the Justice Department's July 23, 2020 report found, ADOC has failed to ensure that use of force procedures are uniform throughout the Alabama prison system.  For example, it is standard procedure that officers engage in efforts to deescalate the situation before using force at most Alabama prisons.  But the standard procedures at Ventress and a few other institutions contain no such requirement.

1. **Defendants Dunn and Culliver Assigned Karla Jones to Ventress, Knowing That She Had a History of Presiding Over, Ignoring and/or Condoning Violence and Abuse**

180.    The most consistent response to widespread violence by correctional officers against prisoners seems to be the retention of and continued promotion of the very supervisory

60

US 172228547v4

personnel that have consistently failed to establish and enforce effective procedures to protect inmates from officer violence. As a result, the culture of excessive force thrives among staff and a message is sent that such action is condoned and indeed, preferred.

181.    Notwithstanding being on notice that conditions in Ventress posed unreasonable risks to prisoners there, Defendants Dunn and Culliver assigned Defendant Jones to be the Ventress warden.

182.    Defendants Dunn and Culliver made this assignment with the knowledge that Defendant Jones has a long history of presiding over institutions marred by widespread correctional officer violence against prisoners:

   a.   When Defendant Jones was the Deputy Warden responsible for security and staff at Tutwiler, the Justice Department conducted and completed its investigation of Tutwiler, discussed above. Its findings letter and Notice of Expanded Investigation (the "Tutwiler Report") was submitted to Alabama Governor Robert Bentley with a copy to the then-Commissioner of the ADOC, Kim Thomas.   The Justice Department found Tutwiler staff subjected its female prisoners to a pattern of sexual abuse in violation of the Eighth Amendment.   Defendant Jones was directly responsible for overseeing security and staff who engaged in this misconduct.   A contemporaneous evaluation conducted by the National Institute of Corrections noted that Tutwiler operated under "fear driven leadership" and operated in a culture of "intimidation and undue harshness."   The Tutwiler Report highlighted ineffective reporting, lack of investigations and the absence of a grievance policy among several systemic failures fueling the abuse against prisoners. The Justice Department also confirmed allegations of rape, assault, and sexual abuse by

61

correctional officers.  Defendant Jones took no action to address sexual abuse and misconduct at Tutwiler.

b.  Rather than being penalized by ADOC leadership for her failure to address the growing horrors at Tutwiler, Defendant Jones was rewarded with a promotion to the Warden position at Easterling, which experienced an increase in violence following her transfer.[13] The Equal Justice Initiative specifically put the Defendants on notice of Defendant Jones' misconduct at Easterling in March and April 2014, noting that since her arrival, there had been "a continuing wave of complaints from Easterling about arbitrary new policies and procedures that have increased violence and tension at that facility."

c.  Following this notice, no attempts were made by ADOC to alter Defendant Jones' fear-based leadership style, which set the tone for treatment of prisoners by her subordinates.  Rather, Jones' leadership style also led to numerous complaints and even the loss of personnel in an already understaffed prison.

d.  Defendant Jones was subsequently named Warden at Ventress, which was similarly plagued with widespread violence by correctional officers against prisoners.  Defendant Jones was in that position at the time of Mr. Beaty's assaults.

e.  This record followed Defendant Jones to St. Clair, where Jones served as warden from 2018 to 2019.  During her tenure, there were pervasive issues with correctional officer violence against prisoners.  Defendant Jones has been named in other suits concerning her failures at St. Clair.

---

[13] Equal Justice Initiative Report: Tutwiler Prison for Women, November 2014, EJI.com

US 172228547v4

183.    Defendant Jones is not an exception.  Defendants Dunn and Culliver have a history of retaining and promoting other wardens who have similar records of presiding over facilities plagued by violence.  For example:

a.    Warden Frank Albright failed to address systemic abuse at Tutwiler. The Equal Justice Initiative filed a complaint based on the Tutwiler Report calling for Albright's removal.   Rather than terminating his employment, Commissioner Thomas noted she would not "remove a very passionate warden…who's dedicated a lot of their life to the department and the state, merely on the whim of one request."  Commissioner Thomas did ultimately transfer Albright to Kilby, and moved Kilby's warden, Bobby Barret, to Tutwiler. This method of staff reallocation to address concerns rather than holding leadership accountable through disciplinary action leads to the continuation of poor practices and further danger to prisoner safety throughout the system.   Ultimately, Albright retired with full benefits, despite being at the helm of Tutwiler during periods of some of the worst prisoner abuse ADOC has ever seen.

b.    Warden Davenport of St. Clair was promoted into his position after punching a handcuffed prisoner in the face as a form of discipline. When asked about an investigation of this horrific act, Defendant Culliver testified on record that he did not see a need to investigate Davenport's actions because he self-reported the incident. Davenport was given a two-day suspension, and no effort was made to determine if his behavior was part of a regular pattern of behavior. Davenport's promotion to Warden of St. Clair sent a clear message to prisoners that violent behavior on the part of leadership and correctional staff is permissible and the

people put in place at the highest levels to protect them have no interest in doing so. Davenport was subsequently reassigned and became the Warden at Easterling Correctional Facility in Clio, Alabama ("Easterling") and later, Holman.  While Davenport was at Holman, conditions in the prison culminated in a riot, televised on social media, which ended with an officer being killed and Warden Davenport himself being stabbed. He retired soon thereafter with full benefits and no record of discipline for the degradation of prisoner rights at his facility.

c.   Defendant Culliver was demoted from Associate Commissioner to Regional Coordinator based on allegations of sexual misconduct. Just six months later, he was promoted back into his position as Associate Commissioner by Defendant Dunn.

184.   In other words, ADOC has incentivized violence by continuing to retain and promote senior staff who engage in and condone violence in their prisons, including Defendant Jones.

### 2.   Defendants Dunn, Culliver, Mercado, Sides, Gallew, Jones, Drake, and Harris Oversaw a System that Failed to Adequately Investigate or Discipline Excessive Force Incidents

185.   ADOC and Ventress leadership, including Defendants Dunn, Culliver, Mercado, Sides, and Jones were put on notice of the inadequate security provided to inmates at Ventress and throughout the ADOC system, through their own observations, their supervisory roles at the prison and ADOC, internal ADOC reports, communications with staff and inmates, inmate lawsuits naming them as defendants, and the Justice Department reports.

186.   Despite their knowledge that overcrowding, understaffing, and inadequate policies resulted in unchecked extortion and prevalent violence, including violence by correctional staff, at

64

Ventress and throughout the ADOC system, Defendants Dunn, Culliver, Naglich, Mercado, Sides, and Jones acted with deliberate indifference to the substantial risk of harm to Mr. Beaty and other such inmates by failing to address Ventress's dangerous conditions. Their persistent failure to take action in the face of these obvious and systemic incidents of violence ratified the practice of correctional officers using excessive force against prisoners and directly contributed to and enabled Mr. Beaty's injuries.

187. Defendants Dunn, Culliver, Naglich, Jones, Mercado, and Sides also knew that the efforts of the I&I Division to investigate violence against prisoners, including violence by correctional staff, at Ventress and throughout the ADOC system were wholly inadequate. As the Department of Justice noted in its July 2020 report, which covered the period from 2015 to 2019:

a. In 2017, ADOC tracked 1,800 uses of force; the Department of Justice found from its review of a statistically significant set that a "large number of reported uses of force were unjustified."

b. "ADOC's use of force regulation . . . is not effectively implemented or consistently enforced by correctional officers . . . [and is] often ignored by correctional officers."

c. "Whenever a use of force occurs within an Alabama prison, a warden or captain is required to conduct an initial investigation," and wardens have "discretion to refer the matter to I&I for further review."

d. The "overwhelming majority of uses of force do not receive scrutiny beyond an institution-level use of force investigation" and "referrals to I&I or for corrective action are only made in a small percentage of use of force incidents."

e. "In 2017, half of Alabama's prisons referred either one or no uses of force for corrective action or I&I review," and the majority of referrals came from a single facility (Bullock).

f. "Referrals to I&I do not always result in a use of force investigation. In many instances I&I did not open an investigation even though a correctional supervisor . . . recommended a referral to I&I."

g. "ADOC does not routinely review uses of force to identify officers who may have a history or pattern of excessive force allegations . . . nor does ADOC have a centralized system to track officers who are repeatedly investigated for using force."

h. Of the 1,800 uses of force in 2017, only 35 cases were referred to I&I. Of those, I&I opened investigations into only 14.

i. "[I]nvestigations into uses of force are often inadequate."

j. "I&I also closes a significant number of administrative investigations prematurely."

k. "ADOC rarely suspends or dismisses correctional officers for uses of excessive force where such action would be warranted."

l. Based on documentation ADOC provided to the Department of Justice concerning disciplinary actions in 2016 and 2017, "during those two years, ADOC considered suspending or dismissing only one employee for excessive force."

188.   As the Department of Justice noted, "the failure to rigorously and properly investigate uses of force fosters an environment where the use of excessive force is not addressed."

189.   If a correctional agency does not adequately investigate allegations, it will be unable to determine the factors that enable incidents to occur and the corrective actions necessary

to address the problem.  As the Justice Department found in the Notice Letter ADOC's "investigations are incomplete and inadequate," and noted that ADOC "dismisses many incidents as unsubstantiated without a thorough investigation."

190.    This inaction by senior ADOC and Ventress leaders, including Defendants Dunn, Culliver, Naglich, Mercado, Sides, and Jones, to take adequate steps to investigate or discipline excessive force signaled to correctional officers and inmates that anything except the most egregiously violent behavior would be tolerated, and that correctional officers could engage in such behaviors without any fear of consequences.  Indeed, by repeatedly failing to investigate or otherwise take action in response to reports of correctional officers using excessive force against defenseless inmates, Defendants Dunn, Culliver, Naglich, Mercado, Sides, and Jones tacitly encouraged officers like Defendant Person to engage in excessive force and deliberate indifference to serious medical needs, thereby ratifying the systemic violations of prisoners' constitutional rights.

191.    For example, with regard to Mr. Beaty's assault on April 24, 2018, it took over a year—until May 1, 2019—for the ADOC to dismiss Defendant Person, in whole or in part for his assault on Mr. Beaty.

192.    And the investigation conducted by Defendant Gallew, as supervised by Defendants Mercado and Sides, was patently inadequate.  Defendant Gallew did not adequately investigate the numerous officers who refused to help him get medical assistance or second assault in the infirmary.  Following the inadequate investigation, the ADOC did not terminate or take any action against any other correctional employee who (i) assisted Defendant Person in trying to cover up his assault, (ii) who denied Mr. Beaty much-needed medical treatment, (iii) Defendant Lindsey

67

who committed a second assault on Mr. Beaty in the infirmary, or (iv) the officers who assisted Defendant Lindsay in trying to cover up his assault.

193.    And there was no discipline for Defendant Jones. Rather, she transferred to become the Warden at St. Clair, a larger and higher security prison.  While Defendant Jones was at St. Clair, there were pervasive issues with correctional officer violence against prisoners.

### 3. Instead of Addressing Unconstitutional Conditions and Threats of Violence in ADOC Facilities, ADOC Developed "Hot Bays" as a Means of Instilling Fear in Prisoners

194.    In addition to the culture of violence promulgated by the chronic overcrowding, understaffing, use of excessive force and condonation of officer violence, ADOC facilities further fail to protect prisons from risk of serious harm through the creation of "Hot Bays" across the ADOC system.

195.    The "Hot Bay" is a term given to housing designated to inmates considered violent resulting in higher management needs.  As described in the Justice Department findings, the Hot Bay—an internal nickname for the "Behavior Modification" dormitory or "Restricted Housing Unit"—involves housing men with higher management needs together in a single, open bay unit. Despite the higher needs of this population, and the open layout, ADOC fails to provide adequate correctional officer presence necessary to manage these units.  Prisoners are commingled and generally unsupervised.  In most facilities, the Hot Bay serves as an unsupervised dumping ground for troublesome or violent inmates.

196.    This is the opposite of how administrative segregation is supposed to work. Inmates that are violent should be supervised to a greater degree and with more staff, and should have less unsupervised freedom of movement than the general prison population.

197.    The Hot Bay is a mechanism used by ADOC to further instill fear among prisoners and exacerbate the culture of violence at its facilities.  Upon information and belief, the Hot Bay

68

is routinely used to house prisoners who have been disciplined, as well as to discipline prisoners because they have reported violence by other prisoners or complained about prison conditions.

198.    Hot Bays are considered notoriously violent and dangerous dormitories.  As part of its investigation into ADOC facilities, the Justice Department inspected the Hot Bay at Bibb and found that it was "critically dangerous."  During another facility visit, when a Justice Department representative entered the Hot Bay, a captain remarked, "enter at your own risk."

199.    Prisoners in the Hot Bays are housed in double bunkbeds multiple rows deep, creating "blind spots" where correctional officers cannot observe prisoner-on-prisoner violence.

200.    ADOC's Hot Bays suffer from even more severe understaffing and lack of supervision than other portions of the prison facility.  As the Justice Department noted, "unlike disciplinary units in other correctional systems, which require increased correctional staffing and supervision, prisoners and staff reported that there is little supervision in ADOC's Hot Bays, greatly contributing to the high level of violence in these units."

201.    On information and belief, Defendants Dunn, Culliver, and Naglich, have been put on notice of the violent culture in ADOC Hot Bays, and Defendants Jones, Harris, and Drake were on notice of the particularly violent culture of the Ventress Hot Bay, and the need for enhanced supervision of these housing units, through incident reports, reports by the Investigations and Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, internal communications and/or prison lawsuits.  They have failed to take remedial measures to enhance the safety of these dorms and add additional staffing to ensure that the prisoners in Hot Bays are adequately supervised.

202.    Hot Bays are used as a disciplinary tool by ADOC to both instill fear in prisoners and subject them to heightened violence in order to dissuade them from committing further

infractions.  Men are often placed in the Hot Bay even while their disciplinary infractions are pending investigation.  They report being kept in the Hot Bay indefinitely, with no timeline for their release back to the general population.  Through the use of Hot Bays, ADOC cultivates an environment where prisoners are at serious risk of physical harm as a disciplinary tactic—in clear violation of the Eighth Amendment.

203.    Like at other ADOC prisons, Ventress uses a Hot Bay system wherein prisoners considered particularly dangerous are collected in a single, woefully insecure dormitory.  At Ventress, the B-1 housing unit is the "Hot Bay."  Rather than alleviating the dangerous conditions at Ventress, the Hot Bay only heightens the risk of violence.  There is little staff presence in the Ventress "Hot Bay."  In addition to using the Hot Bay to house violent inmates, officers at Ventress threaten to or put inmates in the Hot Bay to punish them for complaining about the prison conditions or violence at the facility.

204.    The layout of the B-1 Hot Bay dorm at Ventress heightens the risk of danger for inmates there because it limits the ability of any correctional officer who is present to maintain security.  Within the Hot Bay, inmates live on double bunks around the perimeter of the dorm. Sheets hang from the bunks and create blind spots.  The lack of a regularly functioning wall phone in the Hot Bay deprives inmates of any means to reach out for help when staff is not present.  From their roles, Defendants Jones, Drake, and Harris all had or should have had personal knowledge of the conditions in the Hot Bay at Ventress.

205.    Because Ventress is overcrowded with inmates far beyond its capacity, when the limited number of holding cells are full, men who are pending investigation or serving disciplinary time are placed in the "Hot Bay."  They are often left there indefinitely with no timeline for their release back to the general population dorms.

70

206.    The environment within the Hot Bay leads to higher levels of prisoner-on-prisoner violence.  Ventress officers use placement in the Hot Bay as a means to retaliate against prisoners who complain about misconduct.   For example, as discussed in Paragraph 172(m), upon information and belief, in May 2017, after a prisoner was stabbed by inmates in the Hot Bay who blamed him for stealing contraband that belonged to an officer, the officer blocked the prisoner from going to the infirmary for medical attention. After the prisoner obtained medical attention, the officer directed other officers to return the prisoner to the "Hot Bay."  When the prisoner was retuned, he was assaulted by other prisoners again and had to be transported to a hospital

## PLAINTIFF'S DAMAGES

207.    As a result of Defendants' wrongful actions, Plaintiff has suffered severe physical and emotional trauma.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

208.    There are no administrative remedies within the Alabama Department of Corrections for Plaintiff to exhaust.

## CLAIMS

### Count I – 42 U.S.C. § 1983
### Eighth and Fourteenth Amendment Excessive Force
### Against Defendants Person and Lindsey

209.    As described in paragraphs [45-73 and 99-101], Defendant Person used force against Mr. Beaty, causing him severe injury.  At the time Defendant Person used force against Mr. Beaty, Mr. Beaty was restrained with his hands physically restrained in handcuffs behind his back.  That use of force was unreasonable in light of the facts and circumstances present at the time that the force was used.

210.    As described in paragraphs [83-91], Defendant Lindsey used force against Mr. Beaty, causing him severe injury.  At the time Defendant Lindsey used force against Mr. Beaty,

US 172228547v4

Mr. Beaty was in the infirmary seeking medical attention.  That use of force was unreasonable in light of the facts and circumstances at the time that the force was used.

211.    In using force against Mr. Beaty, these Defendants intentionally used extreme and/or excessive cruelty toward Mr. Beaty for the purpose of causing him harm, and not in a good faith effort to maintain or restore security or discipline.

212.    Additionally, these Defendants knew that using force presented a risk of harm to Mr. Beaty, but they recklessly disregarded that risk and Mr. Beaty's safety by failing to take reasonable measures to minimize that risk of harm.

213.    The use of force used by these Defendants was unreasonable in light of all of the circumstances present during the encounter.

214.    As a result of this unjustified and unconstitutional conduct of these Defendants, Mr. Beaty experienced pain, suffering, emotional distress and severe injury.

215.    Defendants Person and Lindsey each negligently, wantonly, willfully, or otherwise wrongfully assaulted Mr. Beaty.

216.    The assaults by Defendants Person and Lindsey were so brutal that they caused severe injuries to Mr. Beaty.

**Count II – 42 U.S.C. § 1983**
**Eighth and Fourteenth Amendment Failure to Intervene**
**Against Individual Defendants Laseter, Pittman, Pittman, Grey, and Baldwin**

217.    As described in paragraphs [59-66] (Grey and Baldwin) and paragraphs [83-91] (Laseter, Pittman, and Pittman) Grey, Baldwin, Laseter, Pittman, and Pittman each had a reasonable opportunity to prevent the violation of Mr. Beaty's constitutional rights as set forth above had they been so inclined, but failed to do so.

218.    These Defendants knew of a substantial risk to Mr. Beaty's safety, but consciously disregarded that risk by failing to take reasonable steps to prevent the harm from occurring.

72

219.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and/or deliberate indifference to Mr. Beaty's rights.

220.    As a result of these Defendants' failure to intervene, Mr. Beaty experienced pain, suffering, emotional distress and severe injury.

221.    Prior to the assault of Mr. Beaty by Defendant Person, Defendants Baldwin and Grey had a reasonable opportunity to prevent the assault on Mr. Beaty and violation of Mr. Beaty's constitutional rights.

222.    Prior to the assault of Mr. Beaty by Defendant Lindsey, Defendants Laseter, Pittman, and Pittman had a reasonable opportunity to prevent the assault on Mr. Beaty and violation of Mr. Beaty's constitutional rights.

223.    Mr. Beaty's injuries were caused by employees of ADOC, including Defendants Person and Lindsey, who acted pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system described above.

224.    Defendants' misconduct directly and proximately caused Mr. Beaty to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, emotional distress and severe injury.

### Count III – 42 U.S.C. § 1983
### Eighth and Fourteenth Amendment Deliberate Indifference to Serious Medical Needs and Individual Defendants Person, Grey, Baldwin, Steele, Dennis, Cannon, Merritt, Laseter, Lindsey, Pittman, and Pittman

225.    As described in paragraphs [63, 65-80 and 82-97], after his assaults, Mr. Beaty had an objectively serious medical need.

226.    As described in paragraphs 63-73 (Person, Grey, Baldwin), 74-80 (Steele, Dennis, Cannon, and Merritt),  and 82-97 (Laseter, Lindsey, Pittman and Pittman), Defendants Person,

73

Grey, Baldwin, Steele, Dennis, Cannon, Merritt, Laster, Lindsey, Pittman, Pittman, and Ventress medical personnel had notice of Mr. Beaty's medical needs and the seriousness of his medical needs, and they knew the risk of harm to Mr. Beaty's health if he did not receive adequate and immediate medical care.  Despite that knowledge, Defendants refused and unreasonably delayed medical treatment care.

227.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Beaty's rights. Alternatively, Defendants were deliberately indifferent to Mr. Beaty's objectively serious medical needs.

228.    Defendants Person, Grey, Baldwin, Steele, Dennis, Merritt, and Cannon knew that Mr. Beaty had been assaulted and had severe medical needs.  As a proximate result of their malice, deliberate or reckless indifference to his serious medical needs, Mr. Beaty's treatment was refused and delayed for hours after his assault exacerbating his injuries and suffering.

229.    Defendants Laseter, Lindsey, Pittman, and Pittman, and Ventress medical personnel, knowing that Mr. Beaty had been assaulted and had severe medical needs, intentionally, with malice, and/or with reckless indifference, exacerbated Mr. Beaty's injury and caused Mr. Beaty's medical care to be further delayed.  As a proximate result of their malice, deliberate, or reckless indifference to his serious medical needs, Mr. Beaty's injuries and suffering were exacerbated.

230.    Mr. Beaty's injuries were exacerbated by the conduct of employees of ADOC, who acted pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified by Defendants Dunn, Naglich, and Jones.

231.     Defendants' misconduct directly and proximately caused Mr. Beaty to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, emotional distress and severe injury.

**Count IV – 42 U.S.C. § 1983**
**Eighth and Fourteenth Amendment Deliberate Indifference to Serious Medical Needs**
**Supervisory Claims Against Defendants Dunn, Culliver, Naglich, and Jones**

232.     Mr. Beaty's injuries were proximately caused by the policies, practices, and customs of ADOC and Ventress leadership, including Defendants Dunn, Culliver, Naglich, and Jones.

233.     As described in paragraphs 112-150, 157.c, 157.d, and 166-173, Defendants Dunn, Culliver, Jones, and Naglich were aware of or deliberately indifferent to the conditions at Ventress -- chronically overcrowded prison population, egregious understaffing of prison personnel, and excessive violence -- that resulted in ADOC failing to deliver constitutionally adequate medical care to Mr. Beaty.

234.     As described in paragraphs 63, 65-80, and 82-97, after the first assault, Mr. Beaty had an objectively serious medical need that eleven separate correctional officers at Ventress (Person, Grey, Baldwin, Steele, Dennis, Cannon, Merritt, Laseter, Lindsey, Pittman and Pittman), as well as medical personnel whom Defendant Naglich supervised, were indifferent to.

235.     Defendant Jones supervised all of these officers as Warden of Ventress at the time of this incident, was responsible for their training, as well as the widespread failure of officers under her command failing to respond appropriately to a prisoner with serious medical needs.

236.     As the Commissioner of ADOC, Defendant Dunn was responsible for the direction, control, supervision, and training of these employees, as well as the widespread failure of these officers to respond appropriately to a prisoner with serious medical needs.

75

237.    As the Associate Commissioner of Health Services, Defendant Naglich was responsible for their training, supervised the Ventress medical personnel, and is responsible for their failure to provide medical care and to respond appropriately to a prisoner with serious medical needs.

238.    As the Associate Commissioner for Operations, Defendant Culliver was responsible for ensuring the effective and safe daily operations of Ventress, including among other things overseeing institutional security, departmental employees trainings, and audits to assess the adequacy of institutional policies and procedures.  Because he is responsible for all training, he is responsible for the failure of the eleven Ventress employees to provide medical care and to respond appropriately to a prisoner with serious medical needs.

239.    Prior to the April 24, 2018 assaults, Defendants Jones, Dunn, Culliver, and Naglich were aware of or deliberately indifferent to the fact that correctional officers routinely were refusing to provide or delaying the medical care for prisoners assaulted by correctional officers at Ventress and other ADOC facilities.  As discussed in paragraphs 14-17, 120(iii), 120(iv), and 130-138, Jones, Dunn, Culliver, and Naglich had notice and/or knowledge of these episodes through incident reports, as well as reports by the ADOC Investigations & Intelligence division, duty officer reports, medical records, annual and monthly ADOC data reports, internal communications and/or prisoner lawsuits.  The failure to provide timely medical care for prisoners assaulted by correctional officers was widespread and pervasive.  Despite this knowledge of unconstitutional deprivation of medical care, Defendants Jones, Dunn, Culliver, and Naglich failed to adequately supervise, discipline, or train Ventress correctional officers and medical personnel, or take any other reasonable measures to prevent nurses and officers like Defendants Person, Lindsey,

Baldwin, Grey, Steele, Dennis, Merritt, Cannon, Laseter, Pittman, or Pittman from failing to provide timely medical care to prisoners like Mr. Beaty.

240.    At all times relevant to their involvement in this case, Defendants Jones, Dunn, Culliver, and Naglich were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners, the training of correctional staff on the provision of medical care, and the supervision and discipline of correctional staff at Ventress and throughout the ADOC system.

241.    By failing to take any minimally adequate action to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress and other ADOC facilities, Defendants Jones, Dunn, Culliver, and Nagich were deliberately indifferent to the problem thereby effectively ratifying it.   Their persistent failure to take action caused the correctional officers at Ventress and other facilities to believe that they could deliberately deny medical care to prisoners in violation of their Eighth Amendment rights with impunity.

242.    Mr. Beaty's injuries were exacerbated by the conduct of employees of ADOC, who acted pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified by Defendants Jones, Dunn, Culliver, and Naglich.

243.    Defendants Jones, Dunn, Culliver, and Naglich's misconduct directly and proximately caused Mr. Beaty to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, emotional distress and severe injury.

**Count V – 42 U.S.C. § 1983**
**Eighth and Fourteenth Amendment Failure to Protect**
**Against Defendants Dunn, Culliver, Jones, Harris, Drake, Mercado, Sides, and Gallew**

244.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

245.    As described more fully in paragraphs 14-15, 17-19, 31-33, 110-165, and 174-206, Defendants Dunn, Culliver, Jones, Harris, and Drake, acting individually and in conspiracy with other Defendants, failed to protect Mr. Beaty.

246.    Defendants Dunn, Culliver, Jones, Harris, Drake, Gallew, Sides, and Mercado knew of and consciously disregarded the substantial risk that Mr. Beaty would be injured while in custody at Ventress, failing to protect him from harm.

247.    Additionally, Defendants Dunn, Culliver, Jones, Harris, Drake, Gallew, Sides, and Mercado knew of and consciously disregarded the substantial risk that Defendant Person and Defendant Lindsey would harm prisoners like Mr. Beaty while in custody at Ventress, and Defendants Dunn, Culliver, Jones, Harris, Drake, Gallew, Sides, and Mercado failed to take any action in response.

248.    The misconduct described in this Count was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of Mr. Beaty and other prisoners at Ventress and other ADOC facilities, and this misconduct was objectively unreasonable.

249.    The misconduct of Dunn, Culliver, Jones, Harris, Drake, Gallew, Sides, and Mercado directly and proximately caused Mr. Beaty to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including pain, suffering, emotional distress and severe injury.

78

**Count VI – 42 U.S.C. § 1983**
**Civil Conspiracy**
**[Against Defendants Dunn, Culliver, Naglich, Jones, Drake, Harris, Person, Grey, Baldwin, Steele, Dennis, Cannon, Merritt, Laseter, Lindsey, Pittman, Pittman, Gallew, Sides, and Mercado**

250.    As described more fully in paragraphs 14-33, 58-107, and 110-206, the Defendants Dunn, Culliver, Naglich, Jones, Drake, Harris, Person, Grey, Baldwin, Steele, Dennis, Cannon, Merritt, Laster, Lindsey, Pittman, Pittman, Gallew, Sides, and Mercado and other co-conspirators not yet known to Plaintiff, acted in concert with one another to accomplish an unlawful purpose by unlawful means.

251.    The Defendants and other co-conspirators not yet known to Mr. Beaty reached an agreement among themselves to deprive Plaintiff of his right to be free from unreasonable harm, to fail to protect him from unreasonable risk of harm, to fail to attend to his serious medical needs, and to cover up the widespread misconduct that led to Plaintiffs harm, in violation of Plaintiff's constitutional rights.

252.    In furtherance of this conspiracy, and as set forth in the complaint above, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity. Among other things:

   a.    As described in paragraphs 14-17 and 110-206, Defendants Dunn, Culliver, Naglich and Jones were responsible for establishing policies and supervising the training of Ventress officers, were on notice of widespread correctional officer violence against prisoners, were aware of the spike of assaults of inmates in the few months preceding Mr. Beaty's assault, were aware that Ventress officers failed to respond appropriately to the serious medical needs of prisoners, were aware that Ventress was severely overcrowded and understaffed, and (with Defendants Gallew, Sides, and Mercado) were aware that correctional officer assaults on

79

prisoners were not adequately investigated or disciplined.   As discussed in paragraphs 110(e), 110(g), 164(z), his includes a prior assault on a prisoner by Defendant Person in May 2017 that was not adequately investigated or disciplined, and in paragraph 164, numerous other uses of excessive force at Ventress that were not adequately investigated or disciplined.

b.   As described in paragraphs 110-111, 144-165, and 185-193,  Defendants Dunn, Culliver, Jones, Drake, Harris, Gallew, Sides and Mercado failed to act in light of their awareness of widespread correctional officer violence against prisoners at Ventress, as well as (for Dunn, Culliver, Sides and Mercado) throughout the ADOC system, and were aware that such incidents were not adequately investigated or disciplined;

c.   As described in paragraphs 63 and 86, two separate correctional officers (Person and Lindsey) assaulted Mr. Beaty in two separate attacks;

d.   As described in paragraphs 59-66 and 83-88, five separate correctional officers (Grey, Baldwin, Laseter, Pittman, and Pittman) failed to intervene to prevent the assaults on Mr. Beaty;

e.   As described in paragraphs 67-73, 79. 83-85, 99-107, following the assaults, six separate officers (Person, Lindsey, Laseter, Pittman, Pittman, and Gallew) attempted to cover up the misconduct, either by directing Plaintiff not to discuss his assault, to blame someone other than Person for the assault, or in Gallew's case, to dissuade Plaintiff from pressing charges and "let it go";

f.   As described in paragraphs 63-92, following the assault on Mr. Beaty, eleven separate correctional officer defendants furthered the effort to cover up the

misconduct by failing to attend to or delaying treatment to his serious medical needs for hours, endangering his life. The concerted nature of this action is evident in (i) the failure to obtain immediate medical assistance for Plaintiff, (ii) numerous shifts of correctional officers leaving Plaintiff to bleed out in the "Hot Bay," (iii) the actions of correctional officers to dismiss the nurse and cancel the ambulance, (iv) the actions of Lindsey to assault Plaintiff in the infirmary, and (v) the delays in transporting Plaintiff to outside medical attention. Had Plaintiff died, none of the Defendants would have been held accountable.

g.   As described in paragraphs 102-109, Defendants Gallew, Sides, and Mercado conducted an inadequate investigation, which failed to hold the officers responsible for failing to intervene and failing to attend to Plaintiff's serious medical needs accountable. After Plaintiff refused Defendant Gallew's entreaties to "let it go," only a single officer involved (Person) was terminated.

h.   As described in paragraphs 107, 110 and 185-193, Defendants Dunn, Culliver, Jones, Harris and Drake, failed to take appropriate action upon learning of the incident, including after receiving the I&I report. After receiving the report, only a single officer involved (Person) was terminated.

253.   These allegations demonstrate that there was a core conspiracy of officers at Ventress to cover up Defendant Person and Lindsey's assaults, as well as the failure of eleven officers to attend to Mr. Beaty's medical needs, and a related conspiracy of senior Ventress and ADOC officials to cover up the breadth of misconduct and deficiencies in ADOC policies and training, by confining the investigation and disciplinary consequences to Defendant Person.

254.     Defendants were involved in the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the use of force and medical treatment at Ventress and throughout the ADOC system.

255.     As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered damages.

**Count VII – State Law**
**Civil Conspiracy**
**[Against Defendants Person, Lindsey, Grey, Baldwin, Laseter, Dennis, Pittman and**
**Pittman, Cannon, Merritt, and Steele]**

256.     As described more fully in paragraphs 45-92 and 99-101, Defendants Person, Lindsey, Grey, Baldwin, Laseter, Dennis, Pittman, Pittman, Cannon, Merritt and Steele  and other co-conspirators not yet known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

257.     In furtherance of a conspiracy to deprive Plaintiff of his right to be free from unreasonable harm and retaliation while in State custody, Defendants Person, Lindsey, Grey, Baldwin, Laseter, Dennis, Pittman and Pittman, Cannon, Merritt and Steele and other unknown co-conspirators committed overt acts and were otherwise willful participants in joint activity. Among other things, each of the Defendants was involved in the assault, failure to protect Plaintiff from unreasonable risk of harm, failure to attend to Plaintiff's serious medical needs, and covering up that misconduct.

258.     The misconduct described above was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

259.     As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered damages.

US 172228547v4

**Count VIII – State Law**
**Intentional Infliction of Emotional Distress**
**Against Defendants Person, Lindsey, Baldwin, Grey, Laseter, Pittman, and Pittman**

260.    The acts of Defendants Person, Lindsey, Baldwin, Grey, Laseter, Pittman, and Pittman as set forth in paragraphs 45-73, 83-92, and 99-101 were both extreme and outrageous.

261.    Defendants intended to cause, or acted in reckless regard of the probability that they would cause, severe emotional distress to Plaintiff.

262.    The misconduct described above was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

263.    As a direct and proximate result of the misconduct described above, Plaintiff's rights were violated and he suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. declare that the acts and omissions of the Defendants violated the Eighth and Fourteenth Amendments of the United States Constitution;

b. order Defendants to comply with the Constitution and enter an injunction prohibiting Defendants from engaging in further violations of the Eighth Amendment;

c. enter an injunction prohibiting Defendants from retaliating against Plaintiff;

d. enter a judgment in his favor and against all Defendants;

e. award Plaintiff compensatory damages against Defendants, jointly and severally, in an amount to be determined;

f. award Plaintiff punitive damages against Defendants, jointly and severally,

g. award reasonable attorneys' fees and costs; and

h. order such additional relief as the Court may deem just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Shannon Holliday
COPELAND FRANCO SCREWS & GILL, P.A.
444 South Perry Street
Montgomery, AL 36104
Tel: (334) 384-1180
Holliday@copelandfranco.com

*/s/ John A. Freedman*
John A. Freedman (D.C. Bar No. 453075)
Maureen R. Jeffreys (D.C. Bar No. 476621)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 942-5000
John.Freedman@arnoldporter.com
Maureen.Jeffreys@arnoldporter.com

*/s/ Jeffrey A. Fuisz*
Jeffrey A. Fuisz (N.Y. Bar No. 2472868)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Jeffrey.Fuisz@arnoldporter.com


*Attorneys for Plaintiff Daniel Beaty*

US 172228547v4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed this 25th day of July, 2022, via the Court's CM/ECF system, which will provide service to all counsel of record. *Pro se* defendants **Markeon Person** and **David Dennis** are not required to be served because they have thus far failed to appear to defend this case. *See* FRCP 5(a)(2).

/s/ *John A. Freedman*
