IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DANIEL ADAM BEATY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  2:20CV279-ECM |
| | ) | (wo) |
| JEFFERSON S. DUNN, in his | ) | |
| Individual capacity, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Now pending before the Court are a motion to dismiss filed by Jefferson S. Dunn ("Dunn"), Ruth Naglich ("Naglich"), Kenneth Drake ("Drake"), Pamela Harris ("Harris"), Karla Jones ("Jones"), David Gallew ("Gallew"), Scott Sides ("Sides"), and Arnaldo Mercado ("Mercado") (doc. 151); a motion to dismiss filed by Grant Culliver ("Culliver") (doc. 153); and a partial motion to dismiss filed by Tameka Grey ("Grey"), Lancie Cannon ("Cannon"), Joshua Merritt ("Merritt"), and Deon Steele ("Steele") (doc. 155).

The Plaintiff, Daniel Adam Beaty ("Beaty"), has filed three complaints, the third of which was filed with leave of Court after the Court ruled on motions to dismiss the second amended complaint. The latest motions to dismiss are directed to the third amended complaint. (doc. 140).

Beaty has brought claims of excessive force under the Eighth and Fourteenth Amendments against Markeon Person ("Person") and Robert Lindsey ("Lindsey") (count I); failure to intervene under the Eighth and Fourteenth Amendment against Elizabeth

Laseter ("Laseter"), Joshua Pittman, Jonathan Pittman ("Pittman"), Grey, and Ladarion Baldwin ("Baldwin")(count II); a claim of deliberate indifference to serious medical needs against Person, Grey, Baldwin, Steele, David Dennis ("Dennis"), Cannon, Merritt, Laseter, Lindsey, Joshua Pittman, and Pittman (count III); a supervisory claim of deliberate indifference to serious medical needs against Dunn, Culliver, Naglich, and Jones (count IV); a claim of failure to protect against Dunn, Culliver, Jones, Harris, Drake, Mercado, Sides, and Gallew (count V); a federal civil conspiracy claim against Dunn, Culliver, Naglich, Jones, Drake, Harris, Person, Grey, Baldwin, Steele, Dennis, Cannon, Merritt, Lasester, Lindsey, Pittman, Joshua Pittman, Gallew, Sides, and Mercado (count VI); state law claim for civil conspiracy against Person, Lindsey, Grey, Baldwin, Laseter, Dennis, Pittman, Joshua Pittman, Cannon, Merritt, and Steele (Count VII); and state law intentional infliction of emotional distress against Person, Lindsey, Baldwin, Grey, Laseter, Joshua Pittman, and Pittman (count VIII).

The motions to dismiss which have been filed do not apply to all of Beaty's claims. No motion to dismiss has been filed as to counts I, II, or VIII. As to count II, the Defendants only move to dismiss the claim against Grey. Dunn, Naglich, Jones, Drake, Harris, Mercado, Sides, Gallew, and Culliver move to dismiss counts IV, V, and VI. Grey, Cannon, Merritt, and Steele move to dismiss count VII. Although given the opportunity to do so, only Grey, Cannon, Merritt, and Steele have filed a reply brief in support of their motion.

Upon consideration of the motions, the briefs, the record, and applicable law, and for reasons to be discussed, the motions are due to be DENIED.

## I.    FACTS

The facts as pleaded in the third amended complaint are as follows:

Beaty has been incarcerated with the Alabama Department of Corrections ("ADOC") since April of 2017 and was moved to Ventress Correctional Institution ("Ventress") in late 2017.

During the events in question, Dunn was the Commissioner of the ADOC; Culliver was the Associate Commissioner for Operations; and Naglich was the Associate Commissioner of Health Services, responsible for the administration of medical and mental health services at Ventress.

Jones was the Warden at Ventress during the events in question. Other employees of Ventress have also been named as Defendants, including Drake, Harris, and Laseter. Another group of Ventress sergeants and officers—Person, Lindsey, Baldwin, Grey, Pittman, Joshua Pittman, Cannon, Merritt, Dennis, and Steele—are alleged to have been on duty during the events which are the subject of Beaty's claims. Sides, Mercado, and Gallew work for the Investigation & Intelligence Division ("I&I").

Beaty alleges in the third amended complaint that on April 24, 2018, he was cornered by three inmates who attempted to extort from him. The inmates assaulted him and Beaty fled from the dorm to the lobby. Beaty sought help from Person, the on-duty officer in the dorm. The third amended complaint alleges, however, that Person expressed

3

disbelief in Beaty's story, and Beaty was led away from the direction of the infirmary by Person.  The two then encountered Lieutenant Calhoun, and when Beaty informed him that other prisoners had attacked him, Calhoun escorted Beaty to the infirmary, but left Beaty under Person's supervision.  Beaty was examined by a nurse.

Person then escorted Beaty to the "Hot Bay" which refers to housing for inmates considered to be violent.  The third amended complaint alleges that the Hot Bay is chronically understaffed and under-supervised.  The third amended complaint further alleges that Beaty had no disciplinary issues that warranted placement in the Hot Bay. Beaty pleaded with Person that he not place Beaty there, but when it appeared that he would be housed in the Hot Bay, Beaty tried to get away from Person.  Person pulled out his baton to trip Beaty and Beaty ran from Person and banged on a dorm door, yelling for help.

Person put on gloves, which the third amended complaint alleges were riot gloves, handcuffed Beaty behind his back, and led him to the lobby of the Hot Bay. At that time, Person instructed Baldwin to close the lobby door and move a screen to obstruct the view outside of the lobby.  Person also instructed Grey to lock the front door to the B-Dorm and to the observation booth, which Grey did.  Person pulled Beaty by the collar and led him to a side hallway or closet.  The third amended complaint alleges that Baldwin and Grey could still observe Person and Beaty.  Person struck Beaty in the jaw with his riot glove. The third amended complaint alleges that the assault was unnecessary to accomplish any reasonable purpose, dislocated Beaty's jaw, fractured the jaw in two places, and caused a bone fragment to protrude from his gum.  It further alleges that Grey and Baldwin were

4

able to witness this blow but made no attempt to render aid.  Beaty was bleeding profusely.

Person ordered the lobby cleaned and sent another prisoner to get a clean uniform for Beaty.

Beaty had to change uniforms a second time due to blood stains and filled multiple cups

with his blood. Person did not take Beaty to the infirmary, but left him on a bench in the

dorm and departed.  Beaty begged Steele and Dennis and other unknown officers to take

him to the infirmary, but they did not.

Cannon, Merritt, and other unknown officers came to the Hot Bay at shift change,

witnessed Beaty still bleeding profusely, but ignored Beaty's pleas to get him medical help.

It was not until 10:00 p.m., approximately four hours after the assault, that a nurse

who came to the dorm to dispense medication took Beaty to the infirmary.  The nurse called

an ambulance.  Laseter, Lindsey, Joshua Pittman, and Pittman entered the infirmary asked

Beaty what had happened.  Beaty said that he had been assaulted by Person.  The nurse

left.  Lindsey pried Beaty's mouth open, causing his skin to tear, a piece of bone to stick

through his gum, and more blood to flow from his mouth.  Laseter observed Lindsey do

this, made a gagging sound, and ran from the room.  The ambulance which had been called

was cancelled by one of the officers.  The second amended complaint alleges that Lindsey,

Laseter, Pittman, and Joshua Pittman did nothing to stop Beaty's bleeding or otherwise

treat him.  After an hour, Beaty was handcuffed and taken to the hospital in a prison van.

Beaty was first taken to a hospital in Troy, but due to the seriousness of his injuries, was

taken to Baptist Medical Center South in Montgomery, Alabama for surgery.

After he returned to Ventress, first having been transferred to another facility, Beaty was threatened by Person. Gallew investigated Beaty's assaults. According to the third amended complaint, when Gallew interviewed Beaty, Gallew attempted to convince Beaty not to press charges. Person ultimately was dismissed from his employment due to his assault of Beaty. Beaty inquired as to why none of other officers who attacked him or failed to get him medical care were disciplined and Gallew responded that Beaty had already won.

The third amended complaint alleges that an inadequate investigation was conducted of Lindsay's assault on Beaty, the failure of officers to prevent the assaults on Beaty, or the failure of the officers to promptly seek medical care for Beaty.

Beaty was transferred away from Ventress in January 2019.

In addition to the facts specific to Beaty, the third amended complaint alleges that the ADOC condones the use of excessive force because of chronic understaffing and overcrowding. The third amended complaint lists incidents of assault of ADOC prisoners by correctional officers at Ventress and other ADOC facilities from 2010 until Beaty's incident, as well as incidents which occurred after Beaty's incident. The third amended complaint alleges that the United States Department of Justice issued a Notice Letter after an investigation and identified the combination of ADOC's overcrowding and understaffing as key factors leading to inadequate supervision, unsafe housing, and violence. The pleading further alleges that although Dunn, Culliver, and other Defendants were aware of the history of widespread violence through the ADOC's prisons and the

6

connection between violence and overcrowding and understaffing, they failed to take meaningful steps to alter the environment before Beaty's assault.

The third amended complaint points to *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1198 (M.D. Ala. 2017), for the proposition that understaffing has been a persistent, systemic problem that leaves many ADOC facilities dangerous and that overcrowding and understaffing leads to dangerous and violent conditions. Finally, the third amended complaint alleges that there was a conspiracy among the officers to cover up Person's and Lindsey's assaults of Beaty and failure to obtain medical care for Beaty.

## II.   STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663 (alteration in original) (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard.

*Twombly*, 550 U.S. at 555, 570.  This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678.  Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

## III.   DISCUSSION

### A. Federal Claims

#### 1. *Qualified Immunity*

The claims in this case are asserted against the Defendants in their individual capacities and the motions to dismiss raise qualified immunity to those claims.  Qualified immunity protects government officials from suit if they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 525–26 (1985).  It balances the need to hold the government accountable with the need to protect officers from the distractions of litigation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (quotations omitted).

In resolving questions of qualified immunity, courts engage in a two-pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party

asserting the injury, . . . show the officer's conduct violated a [federal] right [.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Governmental actors are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.* at 741.

In *Vinyard v. Wilson*, 311 F.3d 1340, 1350B53 (11th Cir. 2002), the Eleventh Circuit articulated three ways in which individual state defendants can receive fair notice that their conduct violates clearly established law. First, the words of a federal statute or constitutional provision may be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law. *Id.* at 1350 (emphasis in original). The Eleventh Circuit considers a case falling into this category an obvious clarity case. *Id.* at 1350. Second, if the conduct at issue is not so egregious as to violate the Constitution or a federal statute on its face, the court must turn its attention to case law that espouses broad statements of principle not tied to particularized facts. *Id.* at 1351. In these types of cases, courts will declare conduct unconstitutional regardless of the specific factual situation. *Id.* Third, courts must look to cases that tie a particular type of conduct to the specific facts of the case. *Id.* With these

cases, if the circumstances facing the official are materially similar to those of a fact-specific case, this precedent can clearly establish the applicable law and qualified immunity will not be warranted. *Id.* at 1352.

    2. *Count II Failure to Intervene*

In count II, Beaty claims that prior to the assault of Beaty by Person, Baldwin and Grey had a reasonable opportunity to prevent the assault, and prior to the assault of Beaty by Lindsey, Laseter, Pittman, and Joshua Pittman had a reasonable opportunity to prevent the assault. Although Beaty asserts this claim against multiple Defendants, only Grey has advanced arguments to support a dismissal of the claim against her.

In the motion to dismiss the third amended complaint, Grey argues that she was not in a position to intervene in Person's actions because there was a single punch by Person and the events occurred quickly. Grey also argues that there are no facts alleged to show that Grey could communicate with Person from the lobby observation booth where Grey was located at the time of the assault. Grey alternatively argues that even if the complaint sufficiently alleges a constitutional violation, that violation was not of clearly established law.

In response, Beaty argues that the facts of the third amended complaint are that Grey cooperated with Person to isolate Beaty by locking two doors to prevent interruption of the assault. (Doc. 140 para 61). Beaty argues that the failure to intervene came before the blow, when Grey was told to lock the door. Beaty's position is that the facts alleged allow for the conclusion that Person recruited Grey to help him hide the assault of Beaty from

the public's view and that the Court cannot assume the facts Grey seeks to rely on as to distance and ability to communicate, as those are assumptions drawn in Grey's favor.

"[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998). "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007).

Case law provides guidance on when an officer can be held liable for failing to intervene. When events occur so quickly that the officer cannot intervene in the use of excessive force, the officer is not liable for another's constitutional violation. *Fils v. City of Aventura*, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011). "Instances of force that occur within seconds do not place officers in a realistic position to intervene." *Johnson v. White*, 725 F. App'x 868, 878 (11th Cir. 2018). The Eleventh Circuit also has held that in the absence of evidence from which a reasonable jury could find that an officer "could have anticipated and then stopped" another officer from punching a plaintiff once, there is no constitutional violation. *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008). Additionally, "where the allegations of excessive force are limited to a single blow, the plaintiff must show that the defendant officer 'could have anticipated and then stopped' the other officer from striking the plaintiff." *Schultz v. City of Brundidge*, 2012 WL 705358, at *7 (M.D. Ala. 2012).

The third amended complaint alleges that Grey witnessed Person prepare to and commit assault on Beaty (doc. 140 para. 1), and that Grey witnessed the assault (*id.* para. 24). According to the pleading, Person handcuffed Beaty behind his back, led him to the lobby of the Hot Bay, and once there, Person instructed Baldwin to close the lobby door and move a screen to obstruct the view outside of the lobby. (*Id.* para. 60). Person also instructed Grey to lock the front door to the B-Dorm and to the observation booth, which Grey did. (*Id.* para 61). Person pulled Beaty by the collar and led him to a side hallway or closet. (*Id.* para. 62). The third amended complaint alleges that Baldwin and Grey could still observe Person and Beaty when Person struck Beaty in the jaw with his riot glove. (*Id.*)

The third amended complaint, therefore, does not merely allege that a single blow occurred, or that there was an incident which occurred in a matter of seconds, but instead alleges that Person took multiple actions, including bringing a handcuffed Beaty into the lobby, ordering two officers to block access which screened his actions from view, then taking Beaty to a more secluded area which was still within sight of Grey before striking Beaty. Applying the legal principles set out above, under the facts alleged, a reasonable officer "could have anticipated and then stopped" Person from striking Beaty. *See Hadley*, 526 F.3d at 1330–31.

In view of the invocation of qualified immunity, to determine whether the violation alleged was of clearly established law, this Court must frame the question so as not to define the clearly established law at a high level of generality. Therefore, the Court asks

whether it was clearly established that the Constitution requires an officer to act when, based on a fellow officer's conduct in shielding from view a handcuffed prisoner, the officer could have anticipated an unreasonable use of force and stopped it. *Cf. Reynolds v. Calhoun*, 2022 WL 4349312, at *4 (M.D. Ala. Sept. 19, 2022)(denying qualified immunity and noting that question of violation of law must be parsed "more finely to avoid defining clearly established law at a high level of generality."). The *Hadley,* 526 F.3d at 1331, anticipation standard dictates that the law governing Beaty's claim was clearly established. The Court concludes, therefore, that the motion to dismiss is due to be DENIED as to the claim in count II against Grey.

### 3. *Count IV Deliberate Indifference to Medical Needs*

A prisoner states a valid claim under 42 U.S.C. section 1983 for deliberate indifference to medical needs when there is indifference "by prison guards in intentionally denying or delaying access to medical care . . . or intentionally interfering with treatment once proscribed." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)(quotation and citation omitted). Claims against prison officials in supervisory roles require proof of a causal connection, which can be established when there is a history of widespread abuse which puts the supervisor on notice of a need to correct the deprivation or when the supervisor's improper custom or policy resulted in deliberate indifference. *Doe v. School Bd. of Broward Cty. Fla.,* 604 F.3d 1248, 1266 (11th Cir. 2010).

In count IV, Beaty alleges that Dunn, Jones, Culliver, and Naglich are liable for deliberate indifference to his medical needs because their policies and customs proximately

caused Beaty's injuries.  Beaty has pointed to both policies and customs of the DOC and to allegations of prior incidents of abuse.  He pleads that prior to the assaults on him, Jones, Dunn, Culliver, and Naglich were aware of or deliberately indifferent to the fact that correctional officers routinely refused to provide or delayed medical care.  Beaty does not merely plead that they were deliberately indifferent, however.  He also provides factual content, including an allegation that expert analysis in 2016 revealed a pattern of cases of overcrowding that prevented ADOC from ensuring that prisoners are able to access necessary medical care and failing to provide for timely hospitalization, leading to preventable deaths  (doc. 140 para. 157 d), and that Jones, Dunn, Culliver, and Naglich had notice or knowledge of incidents of correctional officers refusing to provide or delaying medical care through incident reports, internal communications, and prisoner lawsuits (*id.* para. 239).

The Defendants challenge Beaty's ability to adequately plead a widespread pattern of abuse. Culliver and Naglich also specifically move to dismiss this claim arguing that Beaty has failed to adequately allege a basis for their liability.  Culliver argues that there is no allegation that Culliver had any control or authority over staffing issues or that Culliver had knowledge of any facts that overcrowding or overstaffing would lead to incidents like the one alleged in this case. Naglich argues that she has no authority to create customs concerning delays in transporting inmates to medical units.

Turning first to the argument that there is insufficient evidence to establish a widespread pattern of abuse, the Court finds that the Defendants have taken an unjustifiably

limited view of the allegations of the third amended complaint. Culliver contends that Beaty has only pointed to two incidents before April 2018, which are insufficient to support an allegation of widespread abuse. Dunn, Naglich, and Jones similarly argue that two prior incidents of delay in medical care identified in the third amended complaint are too limited to establish liability.

Although the Court does not agree with Beaty's characterization of his having identified thirteen relevant instances of excessive force that were followed by the failure to attend to the medical needs of the prisoner, because many of the thirteen instances of denial of care pointed to by Beaty occurred after the assault on him, the third amended complaint also sets out other facts. For example, Beaty pleads that four years prior to the assault on him, Naglich, Dunn, and other Defendants were named in a class action lawsuit which revealed numerous systemwide deficiencies in how the ADOC attended to the medical needs of prisoners, citing *Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017). The third amended complaint also pleads that expert analysis in 2016 revealed a pattern of cases of overcrowding that prevented ADOC from ensuring that prisoners are able to access necessary medical care and failing to provide for timely hospitalization, leading to preventable deaths. (Doc. 140 para. 157 d). At this point in the proceedings, therefore, the Court cannot conclude that Beaty has only pointed to the facts of two prior incidents of delay or denial of medical care to establish a widespread pattern. In addition, Beaty has alleged that the failure of Jones, Dunn, Culliver, and Naglich to take action caused the correctional officers at Ventress to believe they could deliberately deny medical care with

15

impunity, and that they failed to act, which effectively ratified that action.  (Doc. 140 para. 241).

In *Harper v. Lawrence County, Ala.*, 592 F.3d 1227, 1236–37 (11th Cir. 2010), a plaintiff alleged that defendants who were responsible for the management and administration or oversight of a jail had customs or policies including delaying medical treatment. The plaintiff did not merely rely on the allegation that the policy existed, however, but also pointed to an incident of denial of care in situations similar and close in time to his own. The court concluded that given the complaint's factual detail about the similar incident, and specific allegations regarding the customs or policies put in place, the plaintiff sufficiently alleged that both that the supervisory defendants violated constitutional rights based on customs or policies and the existence of widespread abuse. *Id.* at 1237 & n.14.

Although the prior incidents in the instant case were not as close in time to Beaty's as the incident was in *Harper*, as in *Harper*, Beaty has pleaded facts to show that the Defendants were aware of incidents of denial of medical care through incident reports and analysis, and has alleged that they adopted a policy through ratification, which he has supported with factual detail.  These allegations go beyond conclusory allegations and are specific enough to support a claim under *Harper*.

As to the argument that certain Defendants lacked authority over staffing, Beaty contends that the third amended complaint adequately alleges a basis of authority for Naglich and Culliver's authority by alleging that they were responsible for the creation,

16

implementation, oversight, and supervision of policies, practices, and procedures. (Doc. 140 para. 240). The third amended complaint, therefore, alleges a policy as a basis for liability for these defendants.

Dunn, Jones, Culliver, and Naglich also have argued that qualified immunity applies because there is no constitutional violation (doc. 152 at 21); however, as discussed, Beaty has sufficiently pleaded a violation of constitutional law. Culliver further contends that if there is a violation, the unlawfulness is not so apparent so as to constitute an obvious clarity case. *Harper*'s guidance, however, demonstrates that the violation of adopting a policy of delay of medical care was clearly established under the principles applied in that case. 592 F.3d at 1237 (denying qualified immunity to supervisors even in the absence of a factually similar case). The motion to dismiss is, therefore, due to be DENIED.

### 4. *Count V Failure to Protect*

Under the Eighth Amendment, prison officials have a duty to "take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). "A prison official violates the Eighth Amendment 'when a substantial risk of serious harm, of which the official is subjectively aware, exists[,] the official does not respond reasonably to the risk,'" and the official's actions or inaction causes the injury. *Id.*

"A failure to stop claim under a theory of supervisory liability only requires that the supervisor (1) have the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the

constitutional violation, and (2) subsequently fails to exercise that authority to stop it."
*Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010). "The difference between a
direct failure to intervene claim and a failure to stop claim under a theory of supervisory
liability lies in the position and authority of the defendant with respect to the person who
commits the constitutional violation." *Id.*

   a.   Claim Against Culliver, Naglich, Jones, and Dunn

Culliver moves to dismiss this claim against him on the ground that the third
amended complaint fails to allege adequate facts as a basis for supervisory liability under
either a theory of overcrowding of the prison and understaffing or widespread instances of
abuse. Culliver contends that the overcrowding and understaffing theory is not plausible
because overcrowding of inmates could not have caused assaults by officers. As to the
theory that there was a widespread pattern of abuse, Culliver argues that the Department
of Justice letters cited in the third amended complaint were issued in 2019 and 2020, after
Culliver's retirement. Naglich, Jones, and Dunn also argue that the third amended
complaint identifies just five prior incidents of violence at Ventress, only one of which
involved either Person or Lindsey.

Beaty's argument in response is that he need not show deliberate indifference to a
particular attacker and has adequately pleaded instances of violence among staff at ADOC
facilities, as well as the means by which the Defendants became aware of the risk of
violence. Beaty disputes that he has only identified five specific instances of abuse,

contending instead that the third amended complaint pleads 29 attacks on prisoners by correctional officers close-in-time to Beaty.

Again, as with the medical needs claim, some of the specific incidents pleaded by Beaty occurred after his assault and, therefore, would not serve to put the supervisors on notice of a widespread pattern.  There are, however, several events pleaded which occurred in September, May, and January of 2017, involving violence by Ventress correctional officers, including an incident involving Person spraying mace; an August 2010 event involving an inmate being beaten to death by Ventress officers; and Beaty's allegation that as a facility Ventress reported the highest number of assaults on prisoners of any ADOC facility during fiscal year 2017 (doc. 140 para. 147).

Responding specifically to Culliver's argument that officer violence is unrelated to overcrowded conditions, Beaty points out that he has alleged that prior to the assault on Beaty, ADOC leadership condoned systemic violence by officers by allowing a dwindling number of correctional officers to manage a growing number of prisoners using whatever discipline they chose, including excessive force. (*Id.* para. 151).  Although the Department of Justice reports cited in the third amended complaint were issued after Culliver left, according to the third amended complaint, in 2017 ADOC itself tracked 1,800 uses of force. (*Id.* para. 160).  Additionally, Beaty has alleged that Culliver received or had access to incident reports of correctional officers using excessive force against inmates, as well as data reports, and prisoner lawsuits.  (*Id.* para. 15).

The Court concludes that Beaty has provided sufficient factual content at the motion to dismiss stage to state a plausible claim of a constitutional violation by Culliver, Naglich, Dunn, and Jones. To address whether that violation was of clearly established law, the Court looks to other supervisory liability cases for excessive force against prisoners.

In *Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006), the court rejected an argument by a defendant that it was not clearly established that a warden could face liability for excessive force by guards.  The court held that a warden who is charged with directing the policy of the prison and enforcing its rules would bear liability if a prisoner were beaten and the warden had failed to take reasonable steps in the face of a history of widespread abuse or his adoption of a policies which resulted in deliberate indifference. *Id.* Applying that reasoning in this case, the Court concludes that the law was clearly established at the time of Beaty's assault that a reasonable supervisor with notice of widespread unreasonable force against prisoners or who adopts a policy of condoning such force violates the Constitution.  Therefore, the motion to dismiss is due to be DENIED as to this claim.

b.  Claim Against Sides, Mercado, and Gallew

Sides, Mercado, and Gallew also argue that they have no responsibilities, authority, or power to protect inmates, so the motion to dismiss should be granted as to them. As noted above, Sides, Mercado, and Gallew work for the I&I Division of the DOC.  Beaty alleges that these Defendants had knowledge of correctional officers' use of violence and failed to investigate and take action against violence by correctional staff, and that the "overwhelming majority of uses of force d[id] not receive scrutiny beyond an institution-

level use of force investigation" and "referrals to I&I or for corrective action [we]re only made in a small percentage of use of force incidents." (Doc. 140 paras. 186-188). Beaty cites to a November 2014 report which found that the ADOC did not conduct effective or reliable investigations of staff misconduct and cited multiple instances where ADOC officials had not held prison leaders accountable. (*Id.* para. 157 f). Beaty also alleges that ADOC administrative regulations require that the I&I Director supervise the review and investigation of all serious incidents. (*Id.* para. 165 e).

In *Ingram v. Kubik*, 30 F.4th 1241, 1255 (11th Cir. 2022), the Eleventh Circuit reversed a grant of qualified immunity to a defendant against whom a plaintiff claimed supervisory liability for excessive force. The complaint alleged that there were multiple incidents of misconduct by officers that were not investigated by the defendant. *Id.* The complaint identified specific incidents and pleaded that the defendant was copied on all use of force reports and approved of them without having them investigated and that no officer was disciplined. *Id.* The plaintiff also identified a policy requiring investigation. *Id.* The Eleventh Circuit explained that the case was to be distinguished from others in which only officials' names and titles were pleaded, and held that the allegations of multiple reports of prior misconduct with no investigation allowed the court to draw the inference that there was a causal connection between the failure to investigate misconduct and the officer's belief that he could act with impunity. *Id.* at 1256. The court went on to hold that qualified immunity was due to be denied because the law had been clearly established that "a custom of allowing excessive force provides the requisite fault[,] . . . as

a persistent failure to take disciplinary action against officers can give rise to an inference that a [supervisor] has ratified conduct." *Id.* (quoting *Fundiller v. City of Cooper City*, 777 F.3d 1436, 1443 (11th Cir. 1985)). Although *Ingram* is a 2022 decision, it applies *Fundiller*, a case which had clearly established the law as of 1985.

Beaty's theory is that the investigators contributed to the policy of use of excessive force by allowing officers to use excessive force to discipline the prisoners in overcrowded conditions. He has alleged facts of documentation of prior incidents and failure to follow policy in investigating those. Whether or not Beaty ultimately can prevail on this theory, he has provided sufficient factual detail to state a plausible claim of a violation of clearly established law. The motion to dismiss is due to be DENIED as to this claim.

    c.  Count VI Federal Civil Conspiracy

Beaty brings a federal civil conspiracy claim which alleges that the Defendants reached an agreement among themselves to deprive Beaty of his right to be free from unreasonable harm and to fail to intervene to prevent harm. Beaty alleges that each of the Defendants was involved in the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the use of force and medical treatment through the ADOC system.

The Defendants raise several grounds for dismissal as to this claim; namely, that there is no underlying constitutional violation, that there is no allegation of fact to show agreement, and that the intracorporate conspiracy doctrine bars this claim. They argue that the exception to the intracorporate conspiracy doctrine relied on by Beaty; namely, that the

conspiracy is to commit a crime, only applies if there is a violation of the federal criminal code, citing *Grider v. City of Auburn*, 618 F.3d 1240, 1263 (11th Cir. 2010).

Having concluded that Beaty has alleged a plausible constitutional violation, the Court turns to the argument that the third amended complaint insufficiently pleads agreement. The Defendants maintain that the third amended complaint only uses conclusory allegations of agreement and identifies only parallel conduct, which is insufficient. Culliver also contends that Beaty has failed to allege facts to show the time, date, and circumstance of any alleged agreement.

Beaty argues that the third amended complaint identifies specific overt actions taken in furtherance of the conspiracy, rather than just parallel conduct, because the third amended complaint alleges that the initial inquiry and subsequent investigation were a cover up of the violence against Beaty.

The Eleventh Circuit has found adequate allegations of conspiracy in the context of an orchestrated coverup. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015). In *Weiland*, the complaint alleged that after the plaintiff was shot by the defendant officer, the defendants conspired to cover up the violation of his rights by fabricating a crime that the plaintiff had not committed. The court held that the allegations of agreement to frame the plaintiff after the shooting were sufficient to state a claim. *Id.* at 1327.

In this case, Beaty's conspiracy theory parallels his theory that officer violence occurred pursuant to a policy of the DOC. That is, for the policy theory, Beaty has alleged

that officers engaged in violence because Ventress was understaffed and overcrowded, and that a policy was adopted to condone that violence, and for the conspiracy theory, he has alleged that the Defendants agreed to allow the violence in disciplining prisoners and not to investigate uses of violence, and specifically did so with regard to the assault on him. The Court cannot conclude, therefore, that he has failed to adequately allege facts reflecting agreement. Instead, he has alleged facts of actions taken to hide wrongdoing, as in *Weiland* and, therefore, has alleged a violation of clearly established law.

The intracorporate conspiracy doctrine applies when a conspiracy is engaged in by members of a single entity. *Grider*, 618 F.3d at 1263. In *Grider*, the Eleventh Circuit noted that it had previously adopted an exception to the intracorporate conspiracy doctrine when the conduct violated the federal criminal code. *Id.* It is this language to which the Defendants in this case point in arguing that Beaty has failed to state a claim because he has not pleaded that the conspiracy violated the federal criminal code. However, the *Grider* court cited *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031 (11th Cir. 2000), in which the court had reasoned that there was no basis for drawing a distinction between "cases in which the underlying criminal conspiracy arises under 18 U.S.C. § 371 rather than under 42 U.S.C. § 1985(2)." *Id.* The *McAndrew* court explained that "both the rationale for the intracorporate conspiracy doctrine and the legislative history of § 1985(2) counsel in favor of a consistent application of the criminal conspiracy exception to the intracorporate conspiracy doctrine regardless of whether the criminal conspiracy arises under the federal criminal or civil code." *Id.* at 1040.

24

A judge of this court has examined this issue and determined that violations of state criminal law also suffice to support an exception to the intracorporate conspiracy doctrine. *Newsome v. Lee Cty., Ala.*, 431 F. Supp. 2d 1189, 1204 (M.D. Ala. 2006). There, the court reasoned that the rationale supporting the application of the criminal conspiracy exception counsels in favor of its extension to a case alleging violation of state criminal law and that the Eleventh Circuit has suggested that the court does not intend to constrict its application. *Id.*

This Court is persuaded that the exception to the intracorporate conspiracy doctrine is broad enough to include violation of both federal and state criminal law and so applies to the facts as alleged by Beaty. Although Culliver has argued that there is no clearly established law that the intracorporate conspiracy doctrine does not apply so as to remove qualified immunity, *McAndrew* established the contours of the criminal conspiracy exception which applies here. The Court concludes, therefore, that the motion to dismiss is due to be DENIED as to the federal conspiracy claim.

### B.  State Law Claim in Count VII for civil conspiracy

Conspiracy with the underlying tort of intentional infliction of emotional distress is asserted against Person, Lindsey, Grey, Baldwin, Laseter, Dennis, Pittman, Joshua Pittman, Cannon, Merritt, and Steele. Grey, Cannon, Merritt, and Steele move to dismiss it. This Court is persuaded that the same analysis would apply to the state-law claim as that applied to the federal claim. Therefore, for the reasons discussed with regard to the federal civil

conspiracy claim, the motion to dismiss is also due to be DENIED as to the state-law civil

conspiracy claim.

## IV.  CONCLUSION

For the reasons discussed, it is hereby ORDERED that the motions to dismiss (docs.

151,153 & 155) are DENIED.

DONE this 30th day of November, 2022.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE